**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**



JOSEPH MARTINGANO, on behalf of himself and
all others similarly situated,

              Plaintiff,

    vs.

AMERICAN INTERNATIONAL GROUP, INC.,
AIG FINANCIAL ADVISORS, INC., ROYAL
ALLIANCE ASSOCIATES, INC., FSC
SECURITIES CORPORATION, and
ADVANTAGE CAPITAL CORPORATION,

              Defendants.

CV Action No. **06  1625**

GLEESON, J.

MANN, M.J.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 0 7 2006 ★

BROOKLYN OFFICE

Plaintiff, by and through counsel, alleges the following based upon the investigation of

counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, and

media reports about American International Group, Inc. ("AIG Inc.") and its related entities also

named herein as defendants (collectively "Defendants" or "AIG").  Plaintiff believes that

substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal class action arising out of Defendants' failure to disclose an

unlawful and deceitful course of conduct in which they engaged in conduct that was designed to

improperly financially advantage Defendants to the detriment of Plaintiff and the other members

of the class.  This claim is brought by Plaintiff against Defendants on behalf of a Class (defined

*supra*) consisting of all persons or entities who purchased and/or held one or more of the AIG proprietary funds, the SunAmerica Funds (the "AIG Funds"), and/or one or more non-proprietary funds participating in AIG revenue sharing and directed brokerage arrangements (collectively, the "Shelf-Space Funds" or "Preferred Partner Funds") through AIG or its affiliates, from June 30, 2000 through June 8, 2005, inclusive (the "Class Period").

2.     AIG has represented that its wholly owned subsidiary broker/dealers (the "AIG Brokers"), "offer[] one of the most personalized" services in the industry and are "committed to an independent, entrepreneurial spirit." AIG Financial Advisors, a*vailable at* http://www.aigfinancialadvisors.com/. AIG's Brokers have stated that they "offer[] unbiased financial information based solely on your financial agenda and no one else's." Advantage Capital Corporation Overview, *available at* http://www.advcap.net/overview/default.asp; FSC Securities Corporation Overview, *available at* http://www.fscorp.net/overview/default.asp. In truth, to the detriment of Plaintiff and the other members of the Class, AIG participated in a self-serving kickback scheme referred to as selling "Shelf-Space," whereby AIG used the AIG Brokers to direct AIG clients into the Shelf-Space Funds in exchange for illegal kickback payments from those funds.

3.     Defendants, in clear contravention of their disclosure obligations failed to properly disclose that they had been aggressively pushing the AIG Brokers to sell the Shelf-Space Funds that provided undisclosed payments, financial incentives and rewards to AIG or its affiliates and its personnel based on sales and assets held. Instead of offering fair, honest and unbiased recommendations to Plaintiff and the other members of the Class, the AIG Brokers gave pre-determined recommendations and canned advice, directing clients into a pre-selected, limited number of Shelf-Space Funds so that Defendants could reap millions of dollars in

kickbacks from Shelf-Space Funds, with whom they had struck secret, highly-lucrative deals to profit at the shareholders' expense.

4. Defendants cultivated a clandestine, incentive-driven culture to sell Shelf-Space Funds to the exclusion of other funds, regardless of their clients' best interests. Defendants' sales practices created an insurmountable conflict of interest between AIG, AIG Brokers and Plaintiff and the other members of the Class by providing substantial monetary incentives for AIG Brokers to sell the Shelf-Space Funds, sales of which increased Defendants' overall profits. As detailed below, while AIG claimed to provide unbiased, objective financial planning advice and objective fund recommendations in their clients' best interests, they instead made a standard business practice of giving their customers self-serving and biased investment advice for the purpose of pushing customers into the Shelf-Space Funds as part of a secret plan and scheme to improperly generate fees.

5. To add insult to injury, the money paid to AIG as part of the kickback scheme originated from mutual fund fees paid in part by AIG investors who had already been steered into purchasing the Shelf-Space Funds.

6. Pursuant to the secret deal between Defendants and the Shelf-Space Funds, the Shelf-Space Funds received a number of marketing benefits. First, Defendants' brokers had an institutional directive to steer their clients into investing in the Shelf-Space Funds, including their own AIG Funds, instead of any other funds. This manipulation was achieved by brokers under the guise of providing unbiased "investment advice." Second, AIG ensured that these Shelf-Space Funds had a higher priority in AIG's sales system than non-participating funds by increasing the interaction of representatives of the Shelf-Space Funds with AIG brokers; offering Shelf-Space Funds increased visibility on Defendants' websites, which included Shelf-Space

3

sections incorporating content provided by the participating fund complexes (such as sales ideas, product-specific data, and hyperlinks to the fund complexes' own web sites); increased access to the sales force, which included participation in Defendants' educational and sales conferences and meetings to reward top producing brokers, receipt of lists of registered representatives, and meetings between fund complex personnel and Defendants' branch offices; the inclusion of materials relating to the Shelf-Space Funds in Defendants' internal marketing publications and newsletters; ticket charge waivers; and participation in joint marketing programs between Defendants and Shelf-Space Fund complexes.

7.     Defendants' sales practices created a material insurmountable conflict of interest between themselves and Plaintiff and the other Class members by providing monetary incentives to AIG Brokers to sell Shelf-Space Funds, sales of which increased Defendants' overall profits, but accordingly, diminished their client's returns.  Defendants also failed to disclose any of these financial incentives for selling Shelf-Space Funds, knowing that, if the truth was revealed, investors would not invest in the Shelf-Space Funds based upon the advice of Defendants.  The Defendants' failure to disclose the conflict of interest created by these incentives is a clear violation of federal securities laws.

8.     Defendants' Investment Advisers created further undisclosed material conflicts of interest by entering into revenue-sharing agreements with AIG Brokers to push investors into AIG Funds, regardless of whether such investments were in the investors' best interests. Revenue sharing occurs when the investment adviser or its affiliate makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that fund.  Revenue sharing arrangements are problematic, *inter alia*, because brokerages cannot uphold their fiduciary responsibilities when they choose to include or exclude funds based solely on the fund's

participation in a revenue sharing arrangement rather than based on the benefit to the participant.

69 Fed. Reg. 6438, 6411 n. 21 (February 10, 2004).

9.     The truth about AIG was revealed on June 8, 2005 when the NASD charged 15

broker/dealers with Directed Brokerage violations. As detailed in the press release:

> NASD found that the 14 retail firms, most of which sold funds offered by hundreds of different mutual fund complexes, operated "preferred partner" or "shelf space" programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage. The benefits to mutual fund complexes of these quid pro quo arrangement included, in various cases, higher visibility on the firms' internal web sites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a broader basis than was available for other funds...The retail firms generally monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations. The use of directed brokerage allowed the fund complexes to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations.

Press Release, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines

Totalling More Than $34 Million, (June 8, 2005), *available at* http://www.nasd.com/web/

idcplg?IdcService=SS_GET_ PAGE&ssDocName=NASDW_014340 ("NASD Press Release")

10.     Six AIG Brokers, Royal Alliance, Inc. ("Royal Alliance"), SunAmerica Securities,

Inc. ("SunAmerica"), FSC Securities Corp. ("FSC"), Sentra Securities Corporation ("Sentra"),

Spelman & Co., Inc. ("Spelman"), and Advantage Capital Corp. ("Advantage"), were among the

14 broker/dealers exposed in the NASD Press Release.  These six AIG Brokers were also found

to have violated Section 17(a) of the Securities and Exchange Act, Rule 17a-4 thereunder, and

NASD Conduct Rules 3110 and 2110 for failing to retain emails for the required time period.

11.     Plaintiff seeks to recover damages caused by Defendants' violations of the

Securities Act of 1933 ("Securities Act"), and the Securities Exchange Act of 1934 (the

"Exchange Act").

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities

Act, 15 U.S.C. § 77v.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1391.  A substantial part of the events giving rise to the claims

set forth herein occurred within this District.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including but not limited to the mails,

interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiff

15.     Plaintiff Joseph Martingano purchased shares of the Shelf-Space Funds during the

Class Period and was thereby damaged.

### The Parent Company

16.     Defendant AIG Inc. is the ultimate parent of all Defendants named in the

Complaint and is incorporated in Delaware.  AIG Inc. is a U.S.-based international insurance and

financial services organization and the largest underwriter of commercial and industrial insurance

in the United States.  Through its subsidiaries, AIG Inc. offers a wide range of general and life

insurance products for commercial, institutional and individual customers in approximately 130

countries and jurisdictions throughout the world.  AIG Inc.'s global businesses also include

financial services, retirement savings and asset management. The Company's financial services

businesses include aircraft leasing, financial products, trading and market making and consumer finance. AIG Inc. has one of the largest retirement savings businesses in the United States and is a leader in asset management for the individual and institutional markets, with specialized investment management capabilities in equities, fixed income, alternative investments and real estate. The Company is headquartered at 70 Pine Street, New York, New York 10270. AIG Inc. is the ultimate beneficiary of the undisclosed plan and scheme to push Shelf-Space Funds as alleged herein.

**The AIG Brokers**

17.     Defendant AIG Financial Advisors, Inc. ("AIGFA") is incorporated in Arizona and its offices are located at 2800 N. Central Ave, Suite 2100, Phoenix, AZ 85004. SunAmerica, Sentra and Spelman were combined to form AIGFA on October 31, 2005. SunAmerican, Sentra and Spelman entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain. The last trade date for SunAmerica, Sentra and Spelman was October 28, 2005.

18.     Defendant Advantage is incorporated in New York and is a wholly owned subsidiary of AIG Inc. Advantage entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain. Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

19.     Defendant FSC is incorporated in Delaware and is a wholly owned subsidiary of AIG Inc. FSC entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain. Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

20.     Defendant Royal Alliance is incorporated in Delaware and is a wholly owned

subsidiary of AIG Inc. Royal Alliance entered into "shelf-space" arrangements during the Class

Period, steering clients into the Shelf-Space Funds, in exchange for financial gain. Its offices are

located at 733 Third Avenue, New York, New York 10017.

21.     Defendants Advantage, FSC, Royal Alliance, SunAmerica, Sentra, and Spelman

operated throughout the Class Period under the marketing designation "AIG Advisor Group."

The AIG Advisor Group now consists of AIGFA, Advantage, FSC, and Royal Alliance.

22.     Herein, Defendants AIGFA, Advantage, FSC, and Royal Alliance will be referred

to as the AIG Brokers.

## SUBSTANTIVE ALLEGATIONS

23.     AIG Inc. provides insurance, aircraft leasing, financial products, trading and

market making, consumer finance, retirement savings and asset management in approximately

130 countries throughout the world. AIG Brokers have represented that they "offer[] unbiased

financial information based solely on your financial agenda and no one else's." Advantage

Capital Corporation Overview, *available at* http://www.advcap.net/overview/default.asp; FSC

Securities Corporation Overview, *available at* http://www.fscorp.net/overview/default.asp.

Advantage represents its service as follows:

> Most people want a financial advisor who will offer completely
> unbiased financial advice-and with Advantage Capital Corporation,
> that's exactly what you get. As an independent financial services firm,
> Advantage Capital has no proprietary products. So instead of pushing
> that week's stock selection or having to meet a quota, your financial
> advisor has complete flexibility to choose only those investment
> products that best match your financial needs.

Advantage Capital Quality Products With Personal Service, *available at* http://www.advcap.net

/qualityp.html.

24.     The AIG Brokers, in fact, carefully participated in an institutional revenue-sharing

8

scheme wherein the AIG Brokers received secret payments from the Shelf-Space Funds in exchange for recommending such funds regardless of their suitability to clients of AIG. The AIG Brokers put themselves into conflicts of interest that were even more egregious in light of the fact that the kickback payments received were the result of illegal fees charged on the funds into which AIG pushed its clients.

25.    One method by which AIG Brokers received kickbacks under their revenue-sharing scheme was to receive directed brokerage commissions. As discussed above, directed brokerage refers to the excess commissions resulting from mutual funds directing trades in their underlying portfolio of the securities to a broker/dealer in exchange for the broker/dealer's commitment to feature or promote the sale of the fund's shares.

26.    These illegal practices by the AIG Brokers are particularly serious given the nature of the clients they defrauded. The typical mutual fund investor is a married, middle-class individual in his or her forties with a median household income of $55,000. Nearly all mutual fund investors consider their investments to be long-term savings. Approximately 98% of mutual fund shareholders say their investments constitute long-term savings and about 77% cite retirement savings as their primary financial goal. David J. Carter, "Mutual Fund Board and Shareholder Action," 3 *Vill. J. & Investment Management* at 8.

**AIG Brokers Received Incentives to Push the AIG Funds**

27.    The AIG Brokers pushed the AIG Funds on unsuspecting clients. As a result, investors in the AIG Funds footed the bill for the financial incentives given to the AIG Brokers as kickbacks.

28.    The AIG Brokers received revenue for pushing AIG Funds based on customer assets held by the AIG Funds. The AIG Brokers also received revenue for pushing AIG Funds.

29.     These arrangements were never adequately disclosed to investors in the AIG Funds by the AIG Brokers.

**Specific Programs Were Designed By AIG To Create Shelf-Space Arrangements**

30.     The AIG Brokers implemented and managed a revenue-sharing program with the Shelf-Space Funds.  The program required the Shelf-Space Funds to pay the AIG Brokers in order for brokers to promote the Shelf Space-Funds to investors.

31.     While promoting the Shelf-Space Funds to its clients, the AIG Brokers represented the Shelf-Space Funds as being better for its clients than other funds available.  AIG clients were led to believe that AIG brokers were recommending the Shelf-Space Funds based on objective analysis which indicated that such funds would perform better than offerings from other fund companies.  Only 18 mutual fund families out of over 100 fund families with which AIG Brokers had distribution agreements were ranked by AIG as Preferred Partner Funds.  See SunAmerica Securities, Inc.'s Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors; Advantage Capital Corporation's Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors; Sentra Securities Corporation's Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors; Spelman & Company, Inc.'s Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors; FSC Securities Corporation's Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors; and Royal Alliance Disclosure Document for Mutual Fund and Variable Annuity Investors.

32.     The AIG Brokers received the following revenue sharing payments from its Shelf-Space Funds:

- A payment of up to a 0.25% (i.e., 25 basis points) charge on the sales of shares; and

- Quarterly fees, of up to 0.11% (i.e., 11 basis points) per year, of the amount held.

33.     On top of the sales load and the commissions or concessions charged in connection with the mutual fund's offering, Defendants also received revenue through reimbursement for expenses incurred by the AIG Brokers during "top producer" meetings and educational and training conference seminars.  The AIG Brokers also were able to share certain administrative costs such as record keeping with the fund families.

34.     To ensure the dominance of Shelf-Space Funds, Defendants instituted a sales system wherein the individual employee AIG Brokers also received benefits based on their sale of Shelf-Space Funds.

35.     The List of Shelf-Space Funds for the AIG Brokers included the following mutual fund families:

> AIG SunAmerica Asset Management
> AIM Investments
> AllianceBernstein
> American Funds
> American Skandia
> Columbia Management
> Fidelity Investments
> Franklin Templeton Investments
> Hartford Mutual Funds
> John Hancock Funds
> MFS
> NationsFunds
> Pacific Life
> Pioneer Investments
> Putnam Investments

Oppenheimer Funds
Scudder Investments
Van Kampen Investments
WM Funds Distributor, Inc.

## AIG Promoted A Culture That Increased The Sales Of Shelf-Space Funds

36.     Defendants cultivated a clandestine, incentive-driven culture among AIG's brokerage arm to sell Shelf-Space Funds, regardless of the comparative value of the funds.

37.     Defendants' evaluation of the Shelf-Space Funds was neither objective nor performance-based. Instead, unbeknownst to Plaintiff and other members of the Class, Defendants blatantly solicited the sponsorship of the Shelf-Space Funds' distributors and investment advisers for company events, office parties, training and educational meetings and conferences in exchange for the inclusion of their funds in the Shelf Space Fund list. Shelf-Space Funds were favorably perceived as having achieved a higher, "preferred" status based on their performance, while representatives from these funds were given greater access to branch offices and were invited to corporate training and marketing events. Consequently, representatives from the Shelf-Space Funds were given increased opportunities to interact with AIG's brokers to promote the sale of their mutual funds.

38.     Investment Advisers and Distributors from other mutual fund companies were forced to engage in this "pay to play" arrangement with AIG because Defendants condoned and even promoted this practice as a required course of conduct with AIG. In other words, if funds and their advisers did not pay AIG's Brokers illegal kickbacks, then AIG would not sell their funds.

## The Shelf-Space Funds Paid Excessive Commissions through Directed Brokerage

39.     In connection with running the funds, the Shelf-Space Funds regularly traded securities of issuers held in the Fund's portfolio and paid commissions on such trades to the AIG

12

Brokers. In return for the efforts of the AIG Brokers to steer its clients into the Shelf-Space Funds, the funds paid Defendants directed brokerage commissions that were in excess of what they would have paid under an agreement reached with AIG Brokers through arms-length bargaining. The investment advisers would use these excessive commissions to meet their revenue sharing commitments.

## Defendants Have Been Subject to NASD Charges and Fines For the Alleged Conduct

40.     The AIG Brokers have been charged and had fines placed on them for the exact conduct alleged in this complaint.

41.     The NASD found that the AIG Brokers operated "shelf-space" programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage. According to the NASD, the AIG Brokers monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations. June 8, 2005 NASD Press Release.

42.     The NASD alleged that the Shelf-Space Fund companies directed trades to the AIG Brokers to be in their "preferred partner" or "shelf-space" program. The shelf-space fund companies received "enhanced exposure," such as access to AIG salespeople and the right to send prospecting letters to AIG's customers. Walter Hamilton, *Brokerages Settle Fund-Sale Cases; Fifteen Firms Will Pay $34 Million to Resolve Charges of Promoting Mutual Funds Based on the Fees They Paid*, The Los Angeles Times, June 9, 2005, at C4.

43.     As a result, SunAmerica, FSC, Sentra, Spelman, Royal Alliance and Advantage Capital Corp. ("Advantage"), were collectively fined $12,730,000 by the NASD for engaging in revenue sharing and directed brokerage arrangements with different fund families. June 8, 2005 NASD Press Release.

## Defendants Failed To Disclose Their Fraudulent Practices

44.     The revenue-sharing and kickback activities engaged in by the Defendants described above created conflicts of interest with respect to the AIG Brokers' management of client accounts.  These conflicts of interest were not disclosed to Plaintiff and the other members of the Class, and were actively concealed from clients.  Disclosure of these sales incentives and compensation structures were necessary for AIG's clients to make informed investment decisions.  Through a constant barrage of financial incentives and programs, pressure was exerted on the AIG Brokers to sell Shelf-Space Funds in order to receive additional compensation.

45.     AIG disclosed information to its customers concerning mutual fund purchases primarily through supplying customers with the prospectuses and if requested, the statements of additional information ("SAIs") issued by the mutual funds.

46.     Prior to investing in any of the Shelf-Space Funds, Plaintiff and each member of the Class were entitled to receive the appropriate prospectuses.  The prospectuses and registration statements were materially deceptive and materially misleading as they failed to disclose Defendants' practice of steering investors to Shelf-Space Funds.

## Defendants' Fraudulent Course Of Conduct

47.     The practice of aggressively selling Shelf-Space Funds to investors, without disclosing Defendants' strong financial interest in recommending such funds over other investment choices, coupled with Defendants' undisclosed practice of paying excessive commissions to AIG for steering investors their way, is a clear violation of Defendants' fiduciary obligations of loyalty and care to their clients and operated as a fraud and deceit against them.  As a result of the undisclosed scheme, Plaintiff and the other members of the Class sustained

damages.

48.      Defendants are liable for (i) making materially false statements, and/or for failing to disclose material adverse facts while selling shares of the Shelf-Space Funds, and/or (ii) participating in a scheme to defraud and/or a course of conduct that operated as a fraud or deceit on purchasers of the Shelf-Space Funds shares during the Class Period. The wrongful conduct alleged herein enabled Defendants to profit at the expense of Plaintiff and the other Class members.

49.      As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Shelf-Space Funds were materially false and misleading, knew that such statements and documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Shelf-Space Funds, their control over, and/or receipt and/or modification of Shelf-Space Funds' allegedly materially misleading misstatements and/or their associations with the Shelf-Space Funds which made them privy to confidential information concerning the Shelf-Space Funds, culpably participated in the fraudulent course of conduct alleged herein.

50.      Defendants were highly motivated to allow and facilitate the conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, the Investment Advisers, inter alia, received increased management fees which inured to their benefit and the benefit of AIG. In addition, the AIG Brokers were highly motivated to engage in the wrongdoing alleged herein

15

because it incurred lower costs when selling the Shelf-Space Funds, thereby increasing their profitability.

## THE PROSPECTUSES, THEIR SAIs AND PUBLIC STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

51.     Plaintiff and the other members of the Class were entitled to receive one or more Prospectuses pursuant to which the Shelf-Space Funds shares were offered.  The SAIs are not distributed to investors, but available to them on request.

52.     Prospectuses and their SAIs are required and used to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

53.     Each of the Shelf-Space Funds Prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them.  As seen below, each of the Prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding directed brokerage, 12b-1 fees and soft dollars.

54.     Each of the Prospectuses and their SAIs issued during the Class Period contained substantially the same materially false and misleading omissions of key information regarding the Funds' directed brokerage and 12b-1 fees that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to invest in the Funds.

## Examples of Material Omissions Regarding Directed Brokerage

55.     The Hartford mutual fund family - one of the Shelf-Space Funds identified in

Exhibit B attached hereto - is just one example of a fund complex engaged in making Shelf-Space payments to the AIG Brokers. However, the Hartford Funds' Prospectuses and their SAIs are substantially similar to the Prospectuses and SAIs for all Shelf-Space Funds during the Class Period with respect to brokerage transactions. For example, the March 1, 2003 SAI for the Hartford Mutual Funds, Inc. is essentially identical in substance to all other Shelf-Space Fund SAI issued during the Class Period in that it states under the heading PORTFOLIO TRANSACTIONS AND BROKERAGE the following:

> The Companies have no obligation to deal with any dealer or group of dealers in the execution of transactions in portfolio securities. Subject to any policy established by each Company's board of directors and HIFSCO, HIMCO and Wellington Management, as applicable, are primarily responsible for the investment decisions of each Fund and the placing of its portfolio transactions. In placing orders, it is the policy of each Fund to obtain the most favorable net results, taking into account various factors, including price, dealer spread or commission, if any, size of the transaction and difficulty of execution. While HIMCO and Wellington Management generally seek reasonably competitive spreads or commissions, the Funds do not necessarily pay the lowest possible spread or commission. Upon instructions from HIFSCO, Wellington Management may direct certain brokerage transactions to broker/dealers who also sell shares of funds in the fund complex. Upon instructions from HIFSCO, Wellington Management may also direct certain brokerage transactions to broker/dealers that pay for certain other services used by the Funds.

56.     This statement is materially false and misleading, as are all of the Shelf-Space Fund Prospectuses and their SAIs, in that it fails to disclose that the Hartford Funds directed brokerage commissions to AIG brokerages to satisfy pre-determined, negotiated arrangements for specific amounts of brokerage commissions with the AIG Brokers. Additionally, the above statement is materially false and misleading for the following reasons:

> (a)     that investor assets were used to pay AIG's brokerage to satisfy bilateral arrangements between the Shelf-Space Funds and AIG Brokers whereby

the broker steered clients into the Shelf-Space Funds;

(b)    that brokerage commissions over and above those allowed by Rule 12b-1 were used to pay for the Shelf-Space programs;

(c)    that brokerage payments were directed to AIG brokerages to satisfy the Shelf-Space arrangements and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Shelf-Space Funds Rule 12b-1 Plan; and

(d)    that such revenue sharing payment created undisclosed conflicts of interest.

## Additional Scienter Allegations

57.    As alleged herein, Defendants acted with scienter in that Defendants knew, or in the absence of recklessness, should have known, that the public statements issued or disseminated in the name of Shelf-Space Funds were materially false and misleading, knew that such statements would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their knowledge of the true facts regarding the kickback scheme and improper influence exerted to push the Shelf-Space Funds on AIG clients, and their control over, and/or receipt and/or modification of Shelf-Space Funds' materially misleading omissions and misstatements and/or their associations with AIG which made them privy to confidential proprietary information concerning the Defendants' incentive scheme, culpably participated in the fraudulent scheme alleged herein. Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class (the "Class") of all persons or entities who purchased and/or held shares or like interests in any of the Shelf-Space Funds between June 30, 2000 and June 8, 2005, inclusive, and who were damaged thereby.  Excluded from the class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed class.  Record owners and the other members of the Class may be identified from records maintained by the Shelf-Space Funds and AIG may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.      Whether the federal securities laws were violated by Defendants' acts as alleged herein; and

    b.      To what extent the members of the Class have sustained damages and the proper measure of such damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it virtually impossible for members of the Class to

individually redress the wrongs done to them.  There will be no difficulty in the management of

this action as a class action.

**COUNT I**

**AGAINST DEFENDANTS FOR VIOLATION OF SECTION 12(a)(2) OF THE
SECURITIES ACT**

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if

fully set forth herein, except that, for purposes of this claim, Plaintiff expressly excludes and

disclaim any allegation that could be construed as alleging fraud or intentional or reckless

misconduct.

63.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C.

§ 771(a)(2), against AIG for its failure to disclose sales practices that created an insurmountable

conflicts of interest.

64.    AIG was the seller, or the successor-in-interest to the seller, within the meaning of

the Securities Act, for one or more of the respective fund shares sold to Class members because it

either: (a) transferred title of shares of the Shelf Space Funds to members of the Class; (b)

transferred title to shares of the Shelf Space Funds to the Shelf Space Funds distributors that in

turn sold shares of the Shelf Space Funds as agents for the Shelf Space Funds; and/or (c) solicited

the purchase of shares of the Shelf Space Funds by members of the Class, motivated in part by a

desire to serve its own financial interests or those of the Shelf Space Funds.

65.    During its sale of the Shelf Space Funds to members of the Class, AIG failed to

disclose the incentives alleged herein that its investment representatives received in exchange for

pushing AIG clients into the Shelf Space Funds. These incentives created an insurmountable

20

conflict of interest which was never disclosed to investors.

66.     AIG also caused to be issued to members of the Class the Shelf Space

Prospectuses that failed to disclose that fees and commissions from the Shelf Space Funds would

be used to pay brokers for directing investors into the Shelf Space Funds and the existence of the

AIG Brokers' conflicts of interests described herein.

67.     As set forth herein, when they became effective, all Shelf Space Funds'

Prospectuses were misleading as they omitted the following material facts:

(a)     that the Shelf Space Funds' investment advisers directed brokerage

payments to AIG in exchange for AIG pushing its clients into the Shelf Space Funds;

(b)     that the Shelf Space Funds and/or the Shelf Space Funds' investment

advisers authorized the payment from fund assets of excessive revenue sharing payments to AIG

and AIG Brokers in exchange for AIG pushing its clients into the Shelf Space Funds; and

(c)     that by AIG Brokers to aggressively steer their clients to the Shelf Space

Funds, the Shelf Space Funds' investment advisers were creating for the brokers a conflict of

interest and profiting from the brokers' improper conduct.

(d)     Class members have sustained damages due to AIG's violations.

(e)     At the time they purchased and/or held the Shelf Space Funds shares

pursuant to or traceable to the defective Prospectuses, Class members were without knowledge of

the facts concerning the material omissions alleged herein and could not reasonably have

possessed such knowledge.

68.     By virtue of the material deception alleged above, Plaintiff is entitled to a

declaration that they may, at the option of each Class Member, rescind his or her purchase of the

securities at issue, and upon the tender of the securities at issue, obtain reimbursement of the

amounts paid. If any Plaintiff no longer owns the securities at issue, he or she is entitled to damages.

69.    This claim was brought within the applicable statute of limitations.

## COUNT II

## AGAINST AIG INC. FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT

70.    Plaintiff repeats and re-alleges each and every allegation contained above, except that for purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

71.    This claim is brought pursuant to Section 15 of the Securities Act against AIG Inc. as control person of AIG.

72.    AIG Inc. is liable under Section 12(a)(2) of the Securities Act as set forth herein.

73.    AIG Inc. was a "control person" of AIG within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or ownership. At the time that Defendant AIG sold one or more shares of the Shelf Space Funds to Plaintiff and the other members of the Class, by virtue of its position of control and authority over AIG, AIG Inc. directly and indirectly, had the power and authority, and exercised the same, to cause AIG to engage in the wrongful conduct complained of herein.

74.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, AIG Inc. is liable to Plaintiff and the other members of the Class to the same extent as is AIG for its primary violations of Section 12(a)(2) of the Securities Act.

75.    By virtue of the wrongful conduct alleged above, Plaintiff and the other members of the Class are entitled to a declaration that they may, at the option of each Class Member, rescind his or her purchase of the securities at issue, and upon the tender of the securities at issue,

obtain reimbursement of the amounts paid. If any Plaintiff no longer owns the securities at issue, he or she is entitled to damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(B) PROMULGATED THEREUNDER

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

77.     During the Class Period, Defendants employed manipulative and deceptive devices and contrivances in that they omitted to state material facts, i.e., the agreements with the Shelf Space Funds whereby Defendants received improper incentives in exchange for pushing AIG clients into the Shelf Space Funds and the inherent, insurmountable conflicts of interest such incentives created.

78.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the improper incentives and conflicts of interest alleged herein. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

79.     Defendants omitted to state material facts in order to profit from millions of dollars of incentive payments described above made to them by the Shelf Space Funds from the assets of unwitting investors. Defendants thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class.

80.     The Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose

23

such facts, because they knew that the misconduct described herein was, *inter alia*, against SEC and NASD rules. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

81.     As a result of the Defendants' failure to disclose material facts, as set forth above, the Defendants manipulated the sales process by causing Plaintiff and other Class members to purchase shares of the Shelf Space Funds during the Class Period and pay commissions and mutual fund fees that Plaintiff and the other members of the Class would have refused to have paid had they known about the practices alleged herein.  In relying on the purported honesty of AIG's business practices, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired the shares or interests in the Shelf Space Funds during the Class Period without receiving the impartial advice from their brokers required under the federal securities laws, and were damaged thereby.

82.     At the time of said omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth concerning the Directed Brokerage, Revenue Sharing and other improper practices complained of herein which were not disclosed by Defendants, Plaintiff and other members of the Class would not have held, purchased or otherwise acquired their shares of the Shelf Space Funds, would not have paid any commissions or fees paid as a result of their acquisition of the Shelf Space Funds, and would not have paid the fees and costs associated with ownership of the Shelf Space Funds, or if they had acquired such shares or other interests during the Class Period, they would not have done so due to the purportedly fair and impartial advice for which they had paid.

83.     By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5(b) promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

the other members of the Class suffered damages in connection with their respective purchases

and sales of the Shelf Space Funds shares during the Class Period.

85.     This claim was brought within the applicable statute of limitations.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE
## EXCHANGE ACT AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER

86.     Plaintiff repeats and re-alleges each and every allegation contained above as if

fully set forth herein except for claims brought pursuant to the Securities Act.

87.     During the Class Period, each of the Defendants carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did deceive members

of the Class, as alleged herein and caused members of the Class to purchase shares of the Shelf

Space Funds and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and

course of conduct, Defendants took the actions set forth herein.

88.     Defendants (i) employed devices, schemes, and artifices to defraud; and (ii)

engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the

purchasers of the Shelf Space Funds, including members of the Class, in an effort to enrich

themselves through undisclosed manipulative tactics by which they wrongfully distorted the

pricing and market trends of the Shelf Space Funds in violation of Section 10(b) of the Exchange

Act and Rule 10b-5(a) and (c).  All Defendants are sued as primary participants in the wrongful

and illegal conduct and scheme charged herein.

89.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG and the Shelf Space Funds' operations, as specified herein.

90.     Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Shelf Space Funds alleged above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

91.     Class members were ignorant of Defendants' fraudulent scheme. Class members were injured because had Class members known of Defendants' unlawful scheme, they would not have held, purchased or otherwise acquired shares of the Shelf Space Funds, would not have paid any commissions or fees as a result of their acquisitions of the Shelf Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities. Absent Defendants' wrongful conduct, Class members would not have been injured.

92.     By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

93.     As a direct and proximate result of Defendants' wrongful conduct, Class members suffered damages in connection with their purchases and acquisitions of Shelf Space Funds during the Class Period.

94.     This claim was brought within the applicable statute of limitations.

## COUNT V

## AGAINST AIG FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-10 PROMULGATED THEREUNDER

95.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

96.     During the Class Period, AIG effected transactions in the Shelf Space Funds for or with the accounts of Class members, and/or induced Class members to purchase the Shelf Space Funds.

97.     At or before completion of Class members' purchases of the Shelf Space Funds, AIG failed to disclose the source and amount of remuneration AIG received from the Shelf Space Funds in connection with Class members' purchases of the Shelf Space Funds, as required by Rule 10b-10, promulgated under Exchange Act Section 10(b).

98.     The Shelf Space Funds' payment of such remuneration created insurmountable and undisclosed conflicts of interest. Class members were thus ignorant of the source and amount of remuneration AIG received from the Shelf Space Funds and of the resulting conflicts of interest. Had Class members known of the source and amount of such remuneration and the resulting conflicts of interest, they would not have held, purchased or otherwise acquired shares of the Shelf Space Funds, would not have paid any commissions or fees paid as a result of their acquisitions of the Shelf Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities.

99.     Class members have sustained damages due to AIG's violations of Rule 10b-10.

100.    At the time they purchased or held the Shelf Space Funds shares traceable to the defective disclosures, Class members were without knowledge of the facts concerning the

27

material omissions alleged herein and could not reasonably have possessed such knowledge.

101.    This claim was brought within the applicable statute of limitations.

## COUNT VI

## AGAINST AIG INC. FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

102.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

103.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against AIG Inc.

104.    As the parent company, AIG Inc. directly and indirectly was responsible for the content and causing the dissemination of the various statements which Plaintiff contends are false and misleading. AIG Inc. had the ability to prevent the issuance of statements alleged to have failed to disclose the material information described herein.

105.    AIG Inc. had direct and supervisory involvement in the operations of AIG.

106.    As set forth above, the Defendants violated Section 10(b) and Rules 10b-5 and 10b-10 promulgated thereunder by AIG's acts and omissions as alleged in this Complaint. AIG Inc. is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Shelf Space Funds' securities during the Class Period.

107.    This claim was brought within the applicable statute of limitations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action and appointing Plaintiff as Lead Plaintiff and their counsel as Lead Counsel for the Class and certifying them as

Class representative under Rule 23 of the Federal Rules of Civil Procedure;

      (b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)    Awarding Plaintiff and the other members of the Class rescission of their contracts with the Defendants, including recovery of all fees which would otherwise apply and recovery of all fees paid to the Defendants pursuant to such agreements;

      (d)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (e)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 7, 2006

Respectfully submitted,

**STULL, STULL & BRODY**

Jules Brody (JB-9151)
Mark Levine (ML-0180)
James E. Lahm (JL-0242)
James Henry Glavin IV (JG-2188)
6 East 45th Street
New York, New York 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

*Attorneys for Plaintiff*

30

## PLAINTIFF CERTIFICATION

_Joseph Martingano_____ ("Plaintiff") hereby states that:

1.	Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.	Plaintiff did not purchase any of the securities which are the subject of this action at the direction of his/her counsel or in order to participate in this private action.

3.	Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.	Plaintiff was a client of an AIG Advisor Group broker-dealer (as described in Exhibit A)

5.	The following includes all of Plaintiff's purchases and holdings of **AIG SunAmerica Mutual Funds** and/or **Shelf-Space Funds** (as described in Exhibit B) through an AIG Advisor Group broker-dealer during the class period specified in the complaint:

| SECURITY (Name of Fund) | TRANSACTION (Purchase or Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| SunAmerica Growth Opportunity Fund Class A | 10,257.45 | 5/24/04 | $14.22 | 721.3400 |
| SunAmerica New Century Fund Class A | $11,105.37 | 5/24/04 | $14.10 | 787.6150 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

6.	Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

7.	Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this __06__ day of _April_____, 2006.

_Joseph Martingano_
Signature