**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE AIG FINANCIAL ADVISORS, INC.
SECURITIES LITIGATION

Master File No.
06-CV-01625(JG)(JMA)

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      Introduction.................................................................................................. 1

II.     Jurisdiction and Venue................................................................................. 5

III.    Parties......................................................................................................... 6

   A.   Plaintiffs................................................................................................. 6

   B.   The Parent Company............................................................................... 7

   C.   The AIG Brokers..................................................................................... 7

IV.    Substantive Allegations .............................................................................. 8

   A.   Background ............................................................................................. 8

   B.   Defendants Received Undisclosed Kickbacks to Push Investors into the Shelf-Space
        Funds....................................................................................................... 9

   C.   Specific Programs Were Designed By AIG To Create Shelf-Space Arrangements......... 11

   D.   AIG Promoted a Culture That Increased the Sales of Shelf-Space Funds................ 13

   E.   The Sales Loads Paid to the AIG Brokers Were Not Justified ......................... 14

   F.   The Truth is Disclosed by the NASD ................................................... 16

   G.   The Performance of Many Shelf-Space Funds Was Below the Industry Average........... 17

   H.   The Shelf-Space Arrangements Resulted in Investors Paying Higher Fees to the AIG
        Brokers................................................................................................... 21

   I.   The Shelf-Space Funds' Prospectuses, Their Statements of Additional Information and
        Defendants' Public Statements Were Materially False and Misleading Regarding the Shelf-
        Space Arrangements ............................................................................... 23

   J.   Defendants Were Materially Misleading in Their Public Statements Regarding Brokers'
        Compensation ......................................................................................... 30

   K.   Additional Scienter Allegations............................................................. 30

   L.   Plaintiffs and the Other Members of the Class Have Suffered Damages as a Result of
        Defendants' Illegal And Improper Actions ........................................... 31

V.     Class Action Allegations ........................................................................... 33

VI.    Causes of Action........................................................................................ 34

   Count I, Against the AIG Brokers for Violation of Section 12(a)(2) of the Securities Act ..... 34

   Count II, Against AIG Inc. for Violation of Section 15 of the Securities Act ...................... 36

Count III, Against All Defendants for Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder ................................................................. 37

Count IV, Against All Defendants for Violation of Section 10(b) of The Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder .................................................... 39

Count V, Against the AIG Brokers for Violation of Section 10(b) of The Exchange Act and Rule 10b-10 Promulgated Thereunder ................................................................ 41

Count VI, Against AIG Inc. for Violations of Section 20(a) of the Exchange Act ................. 42

VII.    Prayer for Relief ................................................................................................... 43

VIII.   Jury Trial Demanded ............................................................................................ 44

Lead Plaintiffs Joseph Martingano, Frances Martingano, Alan Bogage, Ethel J. Karabin, as beneficiary of the IRA FBO Ethel J. Karabin and trustee of the FBO The Residual Trust of The Karabin Trust U/A DTD 05/10/1985 and Survivor Trust of The Karabin Trust U/A DTD 05/10/1985, Sidney Perris, and Steven R. Wiskow (the "Martigano Group" or "Plaintiffs"), by and through counsel, allege the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, and media reports about American International Group, Inc. ("AIG Inc.") and its related entities also named herein as defendants (collectively "Defendants" or "AIG").  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     <u>INTRODUCTION</u>

1.     This is a federal class action arising out of Defendants' failure to disclose an unlawful and deceitful course of conduct in which they engaged that was designed to improperly enrich Defendants to the detriment of Plaintiffs and the other members of the class.  This claim is brought by Plaintiffs against Defendants on behalf of a Class (defined *infra*) consisting of all persons or entities who purchased one or more of the funds participating in the AIG revenue sharing program (collectively, the "Shelf-Space Funds") through AIG or its affiliates, from April 8, 2001 through June 8, 2005, inclusive (the "Class Period").[1]

2.     AIG has represented that its wholly owned subsidiary broker/dealers (the "AIG Brokers"), "offer[] one of the most personalized" services in the industry and are "committed to an independent, entrepreneurial spirit."  AIG Financial Advisors, *at* http://www.

aigfinancialadvisors.com/.  The AIG Brokers market their brokers as "financial advisors" and have stated that they "offer[] unbiased financial information based solely on your financial agenda and no one else's."  Advantage Capital Corporation Overview, *at* http://www.advcap.net/ overview/default.asp (last visited April 6, 2006); FSC Securities Corporation Overview, *at* http://www.fscorp.net/overview/default.asp (last visited April 6, 2006).  In truth, to the detriment of Plaintiffs and the other members of the Class, AIG participated in a self-serving kickback scheme referred to as selling "Shelf-Space," whereby AIG used the AIG Brokers to direct AIG clients into the Shelf-Space Funds  in exchange for illegal kickback payments through revenue sharing and other improper incentives that AIG received from the Shelf-Space Funds.

3.      Defendants, in clear contravention of their disclosure obligations and fiduciary responsibilities to investors, pursued abusive and unlawful undisclosed sales practices of mutual funds to benefit themselves.  Defendants failed to properly disclose that they had been aggressively pushing the AIG financial advisors to sell the Shelf-Space Funds that provided undisclosed payments, financial incentives and rewards to AIG or its affiliates in exchange for kickbacks.  Instead of offering fair, honest and unbiased recommendations to Plaintiffs and the other members of the Class, the AIG financial advisors gave pre-determined recommendations and canned advice, directing clients into a pre-selected, limited number of Shelf-Space Funds so that Defendants could reap millions of dollars in kickbacks from Shelf-Space Funds, with whom they had struck secret, highly-lucrative deals to profit at the shareholders' expense.  The NASD has already fined and censured the AIG Brokers for their roles in this scheme.

4.      Defendants cultivated a clandestine, incentive-driven culture to sell Shelf-Space Funds to the exclusion of other mutual funds, regardless of their clients' best interests.

---

[1]      A list of the Shelf-Space Funds is attached hereto as Exhibit A.

Defendants' sales practices created an insurmountable conflict of interest between AIG, its financial advisors, and Plaintiffs and the other members of the Class due to the substantial monetary incentive, provided by revenue sharing, for the AIG Brokers to sell the Shelf-Space Funds, sales of which increased Defendants' overall profits.  During the Class Period, AIG used its nationwide network of financial advisors to improperly steer Plaintiffs and the other members of the Class into the Shelf-Space Funds, which generally carry higher expenses.  As detailed below, while AIG claimed to provide unbiased, objective financial planning advice and objective fund investment recommendations in their clients' best interests, they instead made a standard business practice of giving their customers self-serving and biased investment advice for the purpose of pushing customers into the Shelf-Space Funds as part of a secret plan and scheme to enjoy the profits improperly generated by the collection of kickbacks from the Shelf-Space Funds.

5.      Realizing that disclosure of this scheme and the inherent conflicts of interest it created would undermine any investment recommendation made by their financial advisors, Defendants failed to disclose any of their improper conduct to Plaintiffs and the other members of the Class, thereby concealing information significant to any reasonable person deciding how to invest his or her money.

6.      To add insult to injury, the money paid to AIG as part of the kickback scheme originated from mutual fund fees paid, in part, by AIG investors who had already been steered into purchasing the Shelf-Space Funds.

7.      Pursuant to the secret deal between Defendants and the Shelf-Space Funds, the Shelf-Space Funds received a number of marketing benefits.  First, Defendants' financial advisors had an institutional directive to steer their clients into investing in the Shelf-Space

3

Funds instead of any other funds.  This manipulation was achieved by the AIG Brokers under the guise of providing unbiased "investment advice."  Second, AIG ensured that these Shelf-Space Funds had a higher priority in AIG's sales system than non-participating funds by increasing the interaction of representatives of the Shelf-Space Funds with AIG financial advisors and otherwise increasing the visibility of the Shelf-Space Funds.

8.     Defendants' sales practices created a material insurmountable conflict of interest between themselves and Plaintiffs and the other Class members by providing monetary incentives to AIG financial advisors to sell Shelf-Space Funds, sales of which increased Defendants' overall profits, but, accordingly, diminished their client's returns.  Defendants also failed to disclose any of these financial incentives for selling Shelf-Space Funds, knowing that, if the truth was revealed, investors would not invest in the Shelf-Space Funds based upon the advice of Defendants.  The Defendants' failure to disclose these practices and the conflict of interest created by these incentives is a clear violation of federal securities laws.

9.     In other words, Defendants' undisclosed incentive arrangements operated as a fraudulent scheme that exploited the misplaced trust of AIG's clients.  Moreover, the advice that investors received was not only biased by AIG's undisclosed interest in pushing the Shelf-Space Funds onto investors, it was also financially damaging to AIG's clients because the return on the Shelf-Space Funds were diminished due to the improper payments paid from the assets of Shelf-Space Funds investors that were used as kickbacks to reward AIG for pushing the Shelf-Space Funds.  Furthermore, Plaintiffs and the other members of the Class paid fees and commissions that they would not have paid otherwise had the kickback scheme been disclosed and, as a result, received lower returns from their investments.

10.     The truth about AIG was revealed on June 8, 2005 when the NASD fined and

censured the AIG Brokers for the exact conduct alleged in this complaint. Press Release, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines Totalling More Than $34 Million, (June 8, 2005), *at* http://www.nasd.com/PressRoom/NewsReleases/ 2005NewsReleases/NASDW_014340 ("NASD Press Release")

11.     Six AIG Brokers, Royal Alliance, Inc. ("Royal Alliance"), SunAmerica Securities, Inc. ("SunAmerica"), FSC Securities Corp. ("FSC"), Sentra Securities Corporation ("Sentra"), Spelman & Co., Inc. ("Spelman"), and Advantage Capital Corp. ("Advantage"), were among the 14 broker/dealers exposed in the NASD Press Release.  These six AIG Brokers were also found to have violated Section 17(a) of the Securities and Exchange Act, Rule 17a-4 thereunder, and NASD Conduct Rules 3110 and 2110 for failing to retain emails for the required time period.

12.     Plaintiffs seek to recover damages caused by Defendants' violations of the Securities Act of 1933 ("Securities Act"), and the Securities Exchange Act of 1934 (the "Exchange Act").

## II.    JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391.  A substantial part of the events giving rise to the claims set forth herein occurred within this District.

15.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails,

interstate telephone communications, and the facilities of the national securities markets.

III.    **PARTIES**

    A.    **Plaintiffs**

    16.    Plaintiff Joseph Martingano purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mr. Martingano are listed in Exhibit B.

    17.    Plaintiff Frances Martingano purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mrs. Martingano are listed in Exhibit B.

    18.    Plaintiff Alan Bogage purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mr. Bogage are listed in Exhibit B.

    19.    Plaintiff Ethel J. Karabin, as beneficiary of the IRA FBO Ethel J. Karabin and trustee of the FBO The Residual Trust of The Karabin Trust U/A DTD 05/10/1985 and Survivor Trust of The Karabin Trust U/A DTD 05/10/1985, purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Ms. Karabin are listed in Exhibit B.

    20.    Plaintiff Sidney Perris purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Fund acquired by Mr. Perris are listed in Exhibit B.

    21.    Plaintiff Steven R. Wiskow purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Fund acquired by Mr. Wiskow are listed in Exhibit B.

**B.**     **The Parent Company**

22.     Defendant AIG Inc. is the ultimate parent of all Defendants named in the
Complaint and is incorporated in Delaware.  AIG Inc. is a U.S.-based international insurance and
financial services organization and the largest underwriter of commercial and industrial
insurance in the United States.  Through its subsidiaries, AIG Inc. offers a wide range of general
and life insurance products for commercial, institutional and individual customers in
approximately 130 countries and jurisdictions throughout the world.  AIG Inc.'s global
businesses also include financial services, retirement savings and asset management. The
Company's financial services businesses include aircraft leasing, financial products, trading and
market making and consumer finance.  AIG Inc. has one of the largest retirement savings
businesses in the United States and is a leader in asset management for the individual and
institutional markets, with specialized investment management capabilities in equities, fixed
income, alternative investments and real estate.  The Company is headquartered at 70 Pine
Street, New York, New York 10270.  AIG Inc. is the ultimate beneficiary of the undisclosed plan
and scheme to push Shelf-Space Funds as alleged herein.  AIG Inc. was the ultimate beneficiary
of the scheme alleged herein.

**C.**     **The AIG Brokers**

23.     Defendant AIG Financial Advisors, Inc. ("AIGFA") is incorporated in Arizona
and its offices are located at 2800 N. Central Ave, Suite 2100, Phoenix, AZ 85004.  SunAmerica,
Sentra and Spelman were combined to form AIGFA on October 31, 2005.  SunAmerican, Sentra
and Spelman entered into "shelf-space" arrangements during the Class Period, steering clients
into the Shelf-Space Funds, in exchange for financial gain.  The last trade date for SunAmerica,
Sentra and Spelman was October 28, 2005.

24.     Defendant Advantage is incorporated in New York and is a wholly owned subsidiary of AIG Inc.  Advantage entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

25.     Defendant FSC is incorporated in Delaware and is a wholly owned subsidiary of AIG Inc.  FSC entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

26.     Defendant Royal Alliance is incorporated in Delaware and is a wholly owned subsidiary of AIG Inc.  Royal Alliance entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 733 Third Avenue, New York, New York 10017.

27.     Defendants Advantage, FSC, Royal Alliance, SunAmerica, Sentra, and Spelman operated throughout the Class Period under the marketing designation "AIG Advisor Group." The AIG Advisor Group now consists of AIGFA, Advantage, FSC, and Royal Alliance.

28.     Herein, Defendants AIGFA, Advantage, FSC, and Royal Alliance will be referred to as the AIG Brokers.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background**

29.     AIG Inc. provides insurance, aircraft leasing, financial products, trading and market making, consumer finance, retirement savings and asset management in approximately 130 countries throughout the world.  AIG Brokers have represented that they "offer[] unbiased financial information based solely on your financial agenda and no one else's."  Advantage

Capital Corporation Overview, *at* http://www.advcap.net/overview/default.asp (last visited April

6, 2006); FSC Securities Corporation Overview, *at* http://www.fscorp.net/overview/default.asp

(last visited April 6, 2006).  Advantage represented its service as follows:

> Most people want a financial advisor who will offer completely
> unbiased financial advice-and with Advantage Capital Corporation,
> that's exactly what you get. As an independent financial services firm,
> Advantage Capital has no proprietary products. So instead of pushing
> that week's stock selection or having to meet a quota, your financial
> advisor has complete flexibility to choose only those investment
> products that best match your financial needs.

Advantage Capital Quality Products With Personal Service, *at* http://www.advcap.net

/qualityp.html.

30.      The AIG Brokers, in fact, carefully participated in an institutional revenue sharing

scheme wherein the AIG Brokers received secret payments from the Shelf-Space Funds in

exchange for recommending such funds regardless of their suitability to clients of AIG.  The

AIG Brokers put themselves into conflicts of interest that were even more egregious in light of

the fact that the kickback payments received were the result of illegal fees charged on the funds

into which AIG pushed its clients.

**B.      Defendants Received Undisclosed Kickbacks to Push Investors into the Shelf-
Space Funds**

31.      Throughout the Class Period, the AIG Brokers received undisclosed kickbacks

from the Shelf-Space Funds in exchange for steering investors into the Shelf-Space Funds. The

AIG Brokers received these kickback payments in several forms.

32.      Revenue sharing occurs when a mutual fund's investment adviser or its affiliate

makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that

fund over other funds. Revenue sharing arrangements are problematic, *inter alia,* because

financial advisors cannot uphold their fiduciary responsibilities when they choose to include or exclude a fund based solely on the fund's participation in a revenue sharing arrangement rather than based on the benefit to the investor. Additionally, the SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds." 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004)

33.    The use of "directed brokerage" was the primary method used by the Shelf-Space Funds to pay the AIG Brokers the fees necessary for participation in the revenue sharing program. Directed brokerage involves allotting trades — and the lucrative commissions that are a result of the trades — in the securities that make up a mutual fund investment portfolio to a particular brokerage (such as an AIG Broker or an intermediary) in exchange for that brokerage pushing the sale of those mutual funds onto investors.  As stated by the NASD in its sanction and fine of the AIG Brokers, such conduct violates NASD Rule 2830(k):

> The rule provides, in pertinent part:
>
> (1)  No member shall, directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account.
>
> *      *      *
>
> (6)  No member shall, … (B)  recommend specific investment companies to sales personnel, or establish "recommended," "selected," or "preferred" lists of investment companies…, if such companies are recommended or selected on the basis of brokerage commissions received or expected from any source ….
>
> *      *      *
>
> By receiving brokerage commissions to pay for the fund complexes' participation in the shelf space programs, Respondents violated

NASD Conduct Rules 2830(k) and 2110.

NASD Letter of Acceptance, Waiver and Consent, No. CE2050011.

34.     As stated by the NASD in its censure and multi-million dollar fine of the AIG

Brokers, Defendants violated NASD rule 2830(k) by arranging and accepting more than $41

million dollars of directed brokerage during the Class Period.  *Id.*

35.     The "directed brokerage," "revenue sharing," and other payments received by

AIG during the Class Period are jointly referred to as "kickback payments" below.

**C.     Specific Programs Were Designed By AIG To Create Shelf-Space Arrangements**

36.     The AIG Brokers implemented and managed a revenue-sharing program called

the "Elite Partners" program for Shelf-Space Funds.  The program required the Shelf-Space

Funds to pay the AIG Brokers in order for their financial advisors to promote the Shelf-Space-

Funds to investors.  According to the NASD:

> The Elite Partners funds were offered increased visibility on the firms' websites, which included Elite Partners sections incorporating content provided by the participating fund complexes (such as sales ideas, product-specific data, and hyperlinks to the fund complexes' own web sites); increased access to the sales force, which included participation in [the AIG Brokers'] educational and sales conferences and meetings to reward top producing brokers, receipt of lists of registered representatives, and meetings between fund complex personnel and [the AIG Brokers'] branch offices; the inclusion of materials relating to the Elite Partner funds in [the AIG Brokers'] internal marketing publications and newsletters; ticket charge waivers; and participation in joint marketing programs between [the AIG Brokers] and Elite Partner fund complexes.

NASD Letter Of Acceptance, Waiver And Consent (No. CE2050011).

37.     While promoting the Shelf-Space Funds to its clients, the AIG Brokers

represented the Shelf-Space Funds as being better for its clients than other funds available.  AIG

clients were led to believe that AIG financial advisors were recommending the Shelf-Space

Funds based on objective analysis which indicated that such funds would perform better than

offerings from other fund companies.  Only 19 mutual fund families out of over 100 fund

families with which AIG Brokers had distribution agreements participated as Shelf-Space Funds.

*See* Royal Alliance Associates, Inc.'s Disclosure Document for Mutual Fund, Variable Product,

Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager

Investors *at*  http://www.royalalliance.com/language/

RARevSharingLanguage6_06.pdf; FSC Corporation's Disclosure Document for Mutual Fund,

Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party

Money Manager Investors *at* http://www.fscorp.com/EPProgramDisclosure.pdf.

 38. The AIG Brokers received the following revenue sharing payments from its

Shelf-Space Funds:

-  A payment of up to a 0.25% (i.e., 25 basis points) charge on the sales of shares; and

-  Quarterly fees, of up to 0.11% (i.e., 11 basis points) per year, of the amount of assets under management.

*See* NASD Letter Of Acceptance, Waiver And Consent (No. CE2050011); Royal Alliance

Associates, Inc.'s Disclosure Document for Mutual Fund, Variable Product, Real Estate

Investment Trust, Direct Participation Program and Third Party Money Manager Investors *at*

http://www.royalalliance.com/language/RARevSharingLanguage6_06.pdf

 39. On top of the sales load and the commissions or concessions charged in

connection with the mutual fund's offering, Defendants also received revenue through

reimbursement for expenses incurred by the AIG Brokers during "top producer" meetings and

educational and training conference seminars.  The AIG Brokers also were able to share certain

administrative costs such as record keeping with the fund families.

40.     To ensure the dominance of Shelf-Space Funds, Defendants instituted a sales system wherein the individual financial advisors of the AIG Brokers also received benefits from the kickbacks based on their sale of Shelf-Space Funds.  For instance, the AIG financial advisors did not have to pay the usual "ticket charge" of up to $12 per transaction when selling Shelf-Space Funds, raising the commission they received with each Shelf-Space Fund sale.

### D.     AIG Promoted a Culture That Increased the Sales of Shelf-Space Funds

41.     Defendants cultivated a clandestine, incentive-driven culture among AIG's brokerage arm to sell Shelf-Space Funds, regardless of the comparative value of the funds.

42.     Defendants' evaluation of the Shelf-Space Funds was neither objective nor performance-based.  Instead, unbeknownst to Plaintiffs and other members of the Class, Defendants blatantly solicited the sponsorship of the Shelf-Space Funds' distributors and investment advisers for company events, office parties, training and educational meetings and conferences in exchange for the inclusion of their funds in the Shelf-Space Fund list.  Shelf-Space Funds were favorably perceived as having achieved a higher, preferred status based on their performance, while representatives from these funds were given greater access to branch offices and were invited to corporate training and marketing events.  Consequently, representatives from the Shelf-Space Funds were given increased opportunities to interact with AIG's financial advisors to promote the sale of their mutual funds.

43.     Investment advisers and distributors from other mutual fund companies were forced to engage in this "pay to play" arrangement with AIG because Defendants condoned and even promoted this practice as a required course of conduct with AIG.  In other words, if funds and their advisers did not pay the AIG Brokers unlawful kickbacks, then the AIG Brokers would

not sell their funds.

        **E.**        **The Sales Loads Paid to the AIG Brokers Were Not Justified**

44.      Approximately 98% of mutual fund shareholders say their investments constitute

long-term savings and about 77% cite retirement savings as their primary financial goal. David J.

Carter, *Mutual Fund Board and Shareholder Action,* 3 Vill. J. of Law & Inv. Mgmt. 1, 8 (2001).

Many investors purchase mutual funds through brokers such as the AIG Brokers, ostensibly

paying their broker to guide their fund selection. According to a recent survey by the SEC,

investors believed that anyone with a title other than a broker, for example a "financial adviser,"

provided something more than a broker. In addition, many assumed that investment advisers,

financial consultants and financial advisers all provided financial planning. Cynthia A.

Glassman, Speech by SEC Commissioner, SEC in Transition: What We've Done and What's

Ahead, June 15, 2005, *at* http://ftp.sec.gov/news/speech/spch061505cag.htm.

45.      When investors speak to financial advisors regarding the purchase of mutual

funds, financial advisors can help the investor by providing (a) assistance selecting funds that are

harder to find and evaluate; (b) access to funds with lower costs (excluding distribution costs);

and (c) access to funds with better performance. Daniel Bergstresser et al., *Assessing the Costs

and Benefits of Brokers in the Mutual Fund Industry* (Jan. 16, 2006) (Working Paper Series, Am.

Fin. Assoc. 2006 Boston Meetings), *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id

=616981.

46.      Investors can avoid the huge fees associated with the services of distribution

professionals, such as financial advisors, by determining all the above-mentioned issues for

themselves and purchasing mutual funds directly from a fund company. Many investors choose,

however, to pay the substantial fees and commissions to obtain financial guidance from financial

14

advisors. These commissions are often known as a "sales load" or "sales charge." There are two general types of sales loads—a front-end sales load investors pay when they purchase fund shares and a back-end or deferred sales load investors pay when they redeem their shares. 12b-1 fees can also be used to compensate brokers in place of part of their sales load. Securities and Exchange Commission, Mutual Fund Fees and Expenses, *at* http://www.sec.gov/answers/ mffees.htm.

47.     According to a recent study, in 2002, mutual fund investors paid as much as $3.6 billion in front-end loads, $2.8 billion in back-end loads and another $8.8 billion in 12b-1 fees, all in addition to the $23.8 billion investors paid during that same year for investment management fees and other operational expenses. Bergstresser et al., Assessing the Costs, *supra*. Thus, the effort to sell a mutual fund consumes material resources from the investors, often deducting around 5% from their total investments in a fund. In 2002, the fees associated with funds sold through a broker were twice as large as the fees charged to investors who purchased funds directly from the mutual fund family. *Id*.

48.     The AIG Brokers gave the impression of providing the benefits of objective investment advice to investors. In order to attract mutual fund investors that would result in a heavy sales loads, the AIG Brokers' websites stated that they "offer[] unbiased financial information based solely on your financial agenda and no one else's."  Advantage Capital Corporation Overview, *at* http://www.advcap.net/overview/default.asp (last visited April 6, 2006); FSC Securities Corporation Overview, *at* http://www.fscorp.net/overview/default.asp (last visited April 6, 2006).

49.     However, the AIG Brokers failed to provide any benefits to the investors who used their services to purchase the Shelf-Space Funds. Defendants' unlawful mutual funds sales

practices focused on maximizing Defendants' profit to the detriment of investors, placing

investors in mutual funds that did not perform as well as their peers and were more expensive

with respect to fees. Defendants did this for undisclosed kickbacks received from Shelf-Space

Funds. Defendants took advantage of investors' reliance on their financial expertise and steered

those investors into unsuitable mutual funds, inappropriate class shares and brokerage programs

that incurred higher costs to the investor.

      **F.**    **The Truth is Disclosed by the NASD**

      50.    The truth about AIG's kickback scheme was revealed on June 8, 2005 when the

NASD censured and fined the AIG Brokers for the same conduct as alleged in this complaint:

> NASD found that the 14 retail firms, most of which sold funds
> offered by hundreds of different mutual fund complexes, operated
> "preferred partner" or "shelf space" programs that provided certain
> benefits to a relatively small number of mutual fund complexes in
> return for directed brokerage. The benefits to mutual fund complexes
> of these quid pro quo arrangements included, in various cases, higher
> visibility on the firms' internal web sites, increased access to the
> firms' sales forces, participation in "top producer" or training
> meetings, and promotion of their funds on a broader basis than was
> available for other funds...The retail firms generally monitored the
> amount of directed brokerage received to ensure that the fund
> complexes were satisfying their revenue sharing obligations. The use
> of directed brokerage allowed the fund complexes to use assets of the
> mutual funds instead of their own money to meet their revenue
> sharing obligations.

NASD Press Release

      51.    The NASD found that the AIG Brokers operated "shelf-space" programs that

provided certain benefits to a relatively small number of mutual fund complexes in return for

directed brokerage. According to the NASD, the AIG Brokers monitored the amount of directed

brokerage received to ensure that the fund complexes were satisfying their revenue sharing

obligations. NASD Press Release.

52.     The NASD alleged that the Shelf-Space Fund companies directed trades to the AIG Brokers to be in their "preferred partner" or "shelf-space" program.  The shelf-space fund companies received "enhanced exposure," such as access to AIG salespeople and the right to send prospecting letters to AIG's customers.  Walter Hamilton, Brokerages Settle Fund-Sale Cases; Fifteen Firms Will Pay $34 Million to Resolve Charges of Promoting Mutual Funds Based on the Fees They Paid, *The Los Angeles Times*, June 9, 2005, at C4.

53.     As a result, SunAmerica, FSC, Sentra, Spelman, Royal Alliance and Advantage Capital Corp. were collectively fined $12,730,000 by the NASD for engaging in revenue sharing and directed brokerage arrangements with different fund families.  NASD Press Release.

**G.     The Performance of Many Shelf-Space Funds Was Below the Industry Average**

54.     Defendants' decision to steer investors into Shelf-Space Funds over other funds was detrimental to investors, as is illustrated by the Shelf-Space Funds' poor performance. For example, during the Class Period, AIM Mutual Funds, a Shelf-Space Fund, posted returns that were below the industry's category average returns:

|  | **2002** | **2003** | **2004** |
|---|---|---|---|
| **AIM's Total Return** | -20.8 | 29.6 | 11.1 |
| **Industry Category Average** | -20.5 | 30.3 | 11.5 |

Morningstar.com, AIM Investments Mutual Funds Family Snapshot, August 25, 2006, http://quicktake.morningstar.com (password required).

55.     More evidence of the Shelf-Space Funds' poor performance can be found in industry analysts' publications. For example, industry analyst Morningstar provides a fund

17

family score, which is an asset-weighted average of all of a fund company's Morningstar ratings (also known as star ratings) within an asset class. The fund family score can help investors determine a firm's overall profitability within a specific asset class (domestic stock, international stock, municipal bond or taxable bond), and can range from 1.0 to 5.0. A score below 2.5 is an indication that the fund company has met with little success in that asset class. A score between 2.5 and 3.5 indicates the fund company is about average, while a score above 3.5 indicates the fund company has a fair amount of prowess. The more funds a firm manages per asset class, the stronger the significance of the fund family score with respect to fund's performance. In this regard, the majority of AIM's assets were not successful and the remaining were only average, as illustrated by the chart below:

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.5 | 75.07 |
| **Taxable Bond** | 1.6 | 4.99 |
| **International Stock** | 3.0 | 14.03 |
| **Municipal Bond** | 2.9 | 2.15 |

*Id.*

56.    John Hancock Mutual Funds, another of the Shelf-Space Funds, also had total returns substantially below the category average and a poor fund family score:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **JH's Total Return** | -11.7 | 21.8 | 8.6 |
| **Industry Category Average** | -9.7 | 23.6 | 10.1 |

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.3 | 58.05 |
| **International Stock** | 2.0 | 5.26 |
| **Taxable Bond** | 2.7 | 16.02 |
| **Municipal Bond** | 2.8 | 1.79 |

Morningstar.com, *John Hancock Fund Family Snapshot,* August 25, 2006,

http://quicktake.morningstar.com (password required).

57.     MFS, another of the Shelf-Space Funds, also followed the same trend as other

Shelf-Space Funds, yielding total returns that were generally below the industry's category

average returns.

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| **MFS's Total Return** | -18.2 | 21.1 | 11.5 |
| **Industry Category Average** | -16.5 | 23.6 | 10.0 |

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.5 | 47.83 |
| **Taxable Bond** | 2.6 | 10.41 |
| **Municipal Bond** | 3.2 | 6.85 |
| **International Stock** | 3.6 | 16.89 |

Morningstar.com, *MFS Mutual Funds Family Snapshot*, August 25, 2006,

http://quicktake.morningstar.com (password required).

58.     Putnam, another of the Shelf-Space Funds, followed the same trend, having total

returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **Putnam's Total Return** | -16.9 | 23.5 | 10.0 |
| **Industry Category Average** | -16.0 | 25.4 | 10.8 |

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 3.1 | 56.83 |
| **Taxable Bond** | 2.5 | 12.35 |
| **Municipal Bond** | 2.6 | 8.30 |
| **International Stock** | 2.8 | 13.01 |

Morningstar.com, *Putnam Mutual Funds Family Snapshot,* August 25, 2006,

http://quicktake.morninstar.com (password required).

Pacific, another of the Shelf-Space Funds, followed the same trend, having total returns

that were well below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **Putnam's Total Return** | -12.4 | 15.3 | 9.1 |
| **Industry Category Average** | -8.5 | 24.2 | 10.3 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | -- | 51.11 |
| Taxable Bond | 2.1 | 13.48 |
| Municipal Bond | -- | -- |
| International Stock | 1.3 | 10.85 |

Morningstar.com, *Pacific Mutual Funds Family Snapshot,* August 25, 2006,

http://quicktake.morninstar.com (password required).

59.     As is illustrated by the pattern of their under-performance relative to their peers,

the Shelf-Space Funds' performance played no role in why the AIG Brokers promoted these

fund families over others. In fact, the performance of the Shelf-Space Funds relative to their

peers demonstrates that Defendants' financial advisors should have referred other funds than the

Shelf-Space Funds to investors, but that the incentives and pressure biased the AIG Brokers and

caused them to do otherwise.


**H.      The Shelf-Space Arrangements Resulted in Investors Paying Higher Fees to the AIG Brokers**

60.     Investors paid more than a sales load to the AIG Brokers as a result of the Shelf-

Space arrangements. As a result of these kickback agreements, additional assets were deducted

from investors' invested principal in the Shelf-Space Funds to compensate the AIG Brokers for

providing biased pre-determined advice to investors. Specifically, brokerage commissions,

shareholder fees, advisory fees and 12b-1 fees were deducted from the investors' principal to pay

the AIG Brokers for their role in steering investors into the Shelf-Space Funds.

61.     As explained above, directed brokerage is the practice whereby investment

advisers direct underlying portfolio securities transactions to broker dealers that sell shares of the fund in order to remunerate those brokers for pushing the advisers' mutual funds shares onto investors. This practice directly harms investors, especially where, as here, the fund is alleged to be "paying up," or trading securities at commission rates higher than the fund would otherwise pay if it were not indirectly paying for distribution through directing brokerage. Directed brokerage creates a material conflict of interest because the investment adviser has a strong incentive to use brokerage commissions to increase the size of its funds (thereby increasing management/advisory fees) and to avoid paying financial advisors out of its own assets. Directed brokerage may also be used to circumvent NASD rules on sales charges, undermining the protection afforded to investors under § 22(b) of the ICA, which states that:

> [T]he price at which such security is offered or sold to the public shall not include an excessive sales load but shall allow for reasonable compensation for sales personnel, broker/dealers, and underwriters, and for reasonable sales loads to investors. . .

15 U.S.C. § 80a-22(b)(1).

62.     In connection with managing the underlying portfolios' funds, the Shelf-Space Funds' investment advisers often directed excessive commissions on such trades to the AIG Brokers, among others. In return for the efforts of the AIG Brokers to steer their clients into the Shelf-Space Funds, the Funds paid them directed brokerage commissions that were in excess of what they would have paid under an agreement reached with the broker/dealers through arm's-length bargaining. The investment advisers would use these excessive commissions, which are Fund assets belonging to investors, to meet their revenue sharing commitments.

63.     From January 2001 through December 2003, twelve of the Shelf-Space Funds paid the AIG Brokers more than $41 million in kickback payments by directing brokerage

commissions for portfolio transactions to the AIG Brokers, for their benefit. NASD Letter of

Acceptance, Waiver and Consent (No. CE2050011).

64.     The Shelf-Space Funds paid the directed brokerage to the AIG Brokers through

an intermediary clearing firm for the AIG Brokers, or through other clearing firms.  The Shelf-

Space Funds would label the trade as "for the benefit of" the AIG Brokers.  Most of the

commission, typically from 70-90%, would then be directed to the AIG Brokers from the

clearing firms.  *Id.*

> I.     **The Shelf-Space Funds' Prospectuses, Their Statements of Additional
>        Information and Defendants' Public Statements Were Materially False and
>        Misleading Regarding the Shelf-Space Arrangements**

65.     The kickback activities engaged in by Defendants as described above created

conflicts of interest with respect to the AIG Brokers' investment advice given to their clients and

the management of their client accounts. These conflicts of interest were not disclosed to

Plaintiffs and the Class, and were actively concealed from clients. Disclosure of these kickbacks

were necessary for the AIG Brokers' clients to make informed investment decisions.

66.     The AIG Brokers disclosed information to their customers concerning mutual

fund purchases primarily through supplying customers with the prospectuses and if requested,

the statements of additional information ("SAIs") issued by the mutual funds.

67.     A mutual fund's prospectus and its SAIs are required to disclose all material facts

in order to provide investors with information that will assist them in making an informed

decision about whether to invest in a mutual fund. The law requires that such disclosures be in

straightforward and easy to understand language such that it is readily comprehensible to the

average investor. *See* Plain English Disclosure, Securities and Exchange Commission, SEC

Release Nos. 33-7497, 34-39593 (Oct. 1, 1998) (to be codified at 17 C.F.R. pts. 228, 229, 230,

239 and 274).

68.     Prior to investing in any of the Shelf-Space Funds, Plaintiffs and each member of the Class were entitled to receive the appropriate prospectuses. The SAI is not distributed to investors, but is available to them on request. The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Shelf-Space Funds.

69.     Each of the Shelf-Space Funds prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them. As seen below, each of the prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding directed brokerage, 12b-1 fees and soft dollars. For example, the April 1, 2003 Prospectus for the Massachusetts Financial Services ("MFS") Investors Growth Stock Fund — one of the Shelf-Space Funds identified in Exhibit A — is identical in substance to all the other Shelf-Space Fund prospectuses issued during the Class Period in that it states under the heading "Portfolio Transactions And Brokerage Commissions":

> In connection with the selection of broker dealers and the placing of Fund portfolio transactions, the Adviser seeks to achieve for the Fund the best overall price and execution available from responsible brokerage firms, taking account of all factors it deems relevant, including by way of illustration: price; the size of the transaction; the nature of the market for the security; the amount of the commission; the timing and impact of the transaction taking into account market prices and trends; the reputation, experience and financial stability of the broker or dealer involved; and the quality of services rendered by the broker or dealer in other transactions.
>
> In the case of securities traded in the over-the-counter market, the Adviser normally seeks to deal directly with the primary market makers, unless in its opinion, best execution may be available elsewhere. In the case of securities purchased from underwriters, the

24

cost of such securities generally includes a fixed underwriting commission or concession. From time to time, soliciting dealer fees are available to the Adviser on tender or exchange offers. Such soliciting or dealer fees are in effect recaptured by the MFS Funds. At present, no other recapture arrangements are in effect.

As permitted by Section 28(e) of the Securities Exchange Act of 1934, as amended, the Adviser may cause the Fund to pay a broker or dealer which provides brokerage and research services to the Adviser an amount of commission for effecting a securities transaction for the Fund in excess of the amount other brokers or dealers would have charged for the transaction if the Adviser determines in good faith that the greater commission is reasonable in relation to the value of the brokerage and research services provided by the executing broker or dealer viewed in terms or either a particular transaction or the Adviser's overall responsibilities to the Fund and its other clients. "Commissions," as interpreted by the SEC, include fees paid to brokers for trades conducted on an agency basis, and certain mark-ups, mark-downs, commission equivalents and other fees received by dealers in riskless principal transactions placed in the over-the-counter market.

Although commissions paid on every transaction will, in the judgment of the Adviser, be reasonable in relation to the value of the brokerage and research services provided, commissions exceeding those which another broker might charge may be paid to broker/dealers who were selected to execute transactions on behalf of the Fund and the Adviser's other clients in part for providing such brokerage and research services.

The term "brokerage and research services" includes advice as to the value of securities, the advisability of investing in, purchasing or selling securities, and the availability of securities or purchasers or sellers of securities; furnishing analyses and reports concerning issues, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement).

Broker/dealers may be willing to furnish statistical, research and other factual information or service ("Research") to the Adviser for no consideration other than brokerage or underwriting commissions. Securities may be bought or sold from time to time through such broker/dealers on behalf of the Fund and the Adviser's other clients.

The Adviser's investment management personnel seek to evaluate the quality of Research provided by brokers. Results of this effort are made available to the Adviser's Equity Trading Department which sometimes uses this information as a consideration in the selection of brokers to execute portfolio transactions. However, the Adviser is unable to quantify the amount of commissions which were paid as a result of such Research because a substantial number of transactions are effected through brokers which provide Research but which were selected principally because of their execution capabilities.

The advisory fee paid by the Fund to the Adviser is not reduced as a consequence of the Adviser's receipt of Research. To the extent the Fund's portfolio transactions are used to obtain Research, the brokerage commissions paid by the Fund might exceed those that might otherwise be paid, by an amount which cannot be currently determined. The Research received is useful and of value to the Adviser in serving both the Fund and other clients of the Adviser. While the Research is not expected to reduce the expenses of the Adviser, the Adviser would, through the use of the Research, avoid the additional expenses which would be incurred if it should attempt to develop comparable information through its own staff.

In effecting portfolio transactions on behalf of the Fund and the Adviser's other clients, the Adviser from time to time may instruct the broker/dealer that executes a transaction to allocate, or "step out," a portion of such transaction to another broker/dealer. The broker/dealer to which the Adviser has "stepped out" would then settle and complete the designated portion of the transaction, and the executing broker/dealer would settle and complete the remaining portion of the transaction that has not been "stepped out." Each broker/dealer would receive a commission or brokerage fee with respect to that portion of the transaction that it settles and completes.

Consistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser as a factor in the selection of broker/dealers to execute the Fund's portfolio transactions.

MFS Investors Growth Stock Funds, prospectus effective Mar. 30, 2003 (Form N-1 A) (Mar. 28, 2003).

70.     This MFS Shelf-Space Fund prospectus cited above is materially false and misleading, as are all of the Shelf-Space Fund prospectuses, in that it fails to disclose that

26

directed brokerage commissions were in fact paid from MFS to the AIG Brokers (or to any other

broker/dealers) to satisfy predetermined, negotiated arrangements for specific amounts of

brokerage commissions with the AIG Brokers. *See also, e.g.*; Putnam Discovery Growth Fund,

prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 30, 2003); AIM Real Estate Fund,

prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 25, 2003); Oppenheimer Multiple

Strategies Fund, prospectus effective Nov. 21, 2003 (Form N-1A) (Nov. 21, 2003); Columbia

Growth Fund, prospectus effective Jan. 1, 2004 (Form N-1A) (Dec. 31, 2003).

71.     In an SEC action against MFS filed March 31, 2004 for violation of the federal

securities laws, the SEC determined that such statements as those made in the Shelf-Space Fund

prospectus cited above are inadequate and in violation of the federal securities laws. The SEC

concluded that such statements "did not adequately disclose to ... shareholders that [MFS]

allocated fund brokerage commissions to satisfy strategic alliances." SEC Order Instituting

Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial

Sanctions, In the Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *at*

http://www.sec.gov/litigation/admin/ia-2224.htm. The SEC further explained that such

statements in Prospectuses did not effectively communicate and "**did not adequately disclose**

**that MFS had entered into bilateral arrangements with those broker/dealers to allocate**

**specific negotiated amounts to fund brokerage commissions for specified marketing and**

**distribution services**." *Id.* (emphasis added). Therefore, as the statements in the Shelf-Space

Funds' prospectuses are identical in substance to the inadequate disclosures made by MFS

referenced above, the Shelf-Space Funds' Prospectuses similarly violated the disclosure

requirements mandated by the federal securities laws.

72.     For example, the SEC has also fined and sanctioned Shelf-Space Fund

Franklin/Templeton for failing to adequately disclose the Shelf-Space arrangements it had with

broker/dealers. The SEC noted that:

> Although the SAIs stated that [Franklin/Templeton] could consider a
> broker/dealer's sales of fund shares when selecting a broker/dealer to
> execute portfolio transactions, they did not describe FTDI's practice
> of annually negotiating shelf space arrangements with certain
> broker/dealers. They did not make clear to fund shareholders that
> brokerage commissions were used to offset shelf space payment
> obligations under at least some of these shelf space arrangements.
> They also did not make clear that use of brokerage payments in this
> manner was specifically authorized by the funds' distribution plans
> approved by the FT [Franklin/Templeton] Fund Boards pursuant to
> Rule 12b-1.

SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings,

And Imposing Remedial Sanctions, In the Matter of Franklin Advisers, Inc. and

Franklin/Templeton Distributors, Inc., *at* http://www.sec.gov/litigation/admin/34-50841.htm. *See

also* SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making

Findings, And Imposing Remedial Sanctions, In the Matter of OppenheimerFunds, Inc. and

OppenheimerFunds Distributor, Inc., Sept. 14, 2005, *at* http://www.sec.gov/litigation/admin/34-

52420.pdf; SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making

Findings, And Imposing Remedial Sanctions, In the Matter of Putnam Investment Management,

LLC, Mar. 23, 2005, *at* http://www.sec.gov/litigation/admin/ia-2370.pdf

     73.     Additionally, the AIG Brokers' reliance on the Shelf-Space Funds' prospectuses

and SAIs to disclose the revenue sharing arrangements was insufficient to make investors aware

of the costs and risks associated with these arrangements. The SEC recently brought

administrative actions against broker/dealers for failing to adequately disclose their revenue

sharing relationships to investors by solely relying on Shelf-Space Funds' prospectuses and SAI.

As was explained in the SEC Administrative Cease-and-Desist Order brought against Citigroup

Global Corp ("CGMI"):

> CGMI relied on the participating funds' prospectuses and SAIs to
> satisfy its disclosure obligations with regard to its revenue sharing
> program.... [M]ost of the disclosures were generally vague and lacked
> sufficient information to inform CGMI's customers of the nature and
> scope of CGMI's revenue sharing program. For example, the
> prospectuses and SAIs did not specifically disclose the magnitude of
> the revenue sharing payments that CGMI received from the fund
> complexes or that certain fund complexes had greater access to, or
> increased visibility in, CGMI's retail network. As a result, CGMI's
> customers were not provided with sufficient information to appreciate
> the dimension of the conflict of interest the revenue sharing program
> created.

In the Matter of Citigroup Global Markets, Inc., Order Instituting Administrative and Cease-and-

Desist Proceedings, March 23, 2005, http://www.sec.gov/litigation/admin/33-8557.pdf.

74.    Likewise, in an SEC action against Edward D. Jones, another broker/dealer, the

SEC also came to the same conclusions, and noted that the:

> [P]referred families' prospectuses and SAIs fail to disclose adequate
> information about the source and the amount of revenue sharing
> payments to Edward Jones and the dimensions of the resulting
> potential conflicts of interest. Although the Preferred Families'
> prospectuses and SAI's contained various disclosures concerning
> payments to broker/dealers distributing their funds, few of these
> disclosures adequately described Edward Jones' potential conflict of
> interest.

In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and-

Desist Proceedings, December 22, 2004, http://www.sec.gov/litigation/admin/33-8520.htm.

75.    Here, as in the SEC's actions against Edward Jones and Citigroup, the AIG

Brokers improperly relied on prospectuses and SAIs that failed to disclose the financial quid pro

quo arrangements discussed above. The Shelf-Space Funds' prospectuses and SAIs also failed to

disclose that participants in the AIG Brokers' financial quid pro quo arrangements paid with

brokerage commissions, a portion of advisory fees and other fees derived from the Shelf-Space

Funds and their investors, in addition to the sales loads accompanying the initial purchase of shares. The AIG Brokers took no other steps to ensure that investors were made aware of the material scope of these arrangements, the nature of which was also not disclosed, leaving Shelf Fund investors unaware that the payments made by Shelf-Space Funds to the AIG Brokers were in exchange for the AIG Brokers steering investors into the Shelf-Space Funds. In fact, the additional fees were paid to sway the AIG Brokers into misrepresenting the value and performance of the Shelf-Space Funds. Defendants, therefore, misled investors into believing that the Shelf-Space Funds were given priority over other mutual funds due to their performance and the AIG Brokers' objective analyses of different mutual funds.

### J.    Defendants Were Materially Misleading in Their Public Statements Regarding Brokers' Compensation

76.    The AIG Brokers' statements regarding their revenue sharing arrangements and financial advisors' compensation were materially misleading. The websites of each of the AIG Brokers contained a "Disclosure Document For Mutual Fund And Variable Annuity Investors" which stated that "Registered representatives of [the AIG Broker] do not receive additional compensation from [the AIG Broker] in connection with sales of mutual funds offered by our Elite Partners (discussed below), as opposed to other mutual fund families."

77.    However, according to the NASD "[t]he Elite Partners funds were offered . . . increased access to the sales force, which included participation in Respondents' educational and sales conferences and meetings to reward top producing brokers."  NASD Letter Of Acceptance, Waiver And Consent (No. CE2050011).

### K.    Additional Scienter Allegations

78.    As alleged herein, Defendants acted with scienter in that Defendants knew, or in

the absence of recklessness, should have known, that the public statements issued or

disseminated in the name of AIG and the Shelf-Space Funds were materially false and

misleading, knew that such statements would be issued or disseminated to the investing public,

and knowingly and substantially participated or acquiesced or are responsible in the issuance or

dissemination of such statements as primary violations of the federal securities laws.  As set

forth elsewhere herein in detail, Defendants, by virtue of their knowledge of the true facts

regarding the kickback scheme and improper influence exerted to push the Shelf-Space Funds on

AIG clients, and their control over, and/or receipt and/or modification of Shelf-Space Funds'

materially misleading omissions and misstatements and/or their associations with AIG which

made them privy to confidential proprietary information concerning the Defendants' incentive

scheme, culpably participated in the fraudulent scheme alleged herein.  Defendants were highly

motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or

had actual knowledge of the fraudulent conduct alleged herein.

     **L.**     <u>**Plaintiffs and the Other Members of the Class Have Suffered Damages as a Result of Defendants' Illegal And Improper Actions**</u>

     79.     As a result of Defendants' conduct alleged above, Plaintiffs and the other

members of the Class have suffered damages. The damages suffered by Plaintiff and the other

members of the Class were a foreseeable consequence of Defendants' omissions and conduct,

particularly in light of the fact that the net returns on the Shelf-Space Funds were diminished as a

result of the improper kickbacks that the AIG Brokers took from the Shelf-Space Funds.

Plaintiffs and other members of the Class would not have purchased the Shelf-Space Funds, and

paid, directly or indirectly, the related commissions and fees associated with them, had they

known of the illegal and improper practices Defendants used to direct them into the Shelf-Space

Funds as alleged above. By investing in the Shelf-Space Funds, Plaintiffs and other members of the Class received a return on their investment that was substantially less than the return they would have received had they invested the same dollars in a comparable fund that did not participate in the revenue sharing program. Alternatively, investors could have invested fewer dollars in a non-Shelf-Space Fund to obtain a rate of return equal to or greater than that obtained at a higher price from the comparable Shelf-Space Fund.

80.     Additionally, Plaintiffs and other members of the Class were deceived into buying shares of the Shelf-Space Funds at an artificially inflated value. Plaintiffs and other members of the Class accepted, as an integral aspect of purchasing shares of the Shelf-Space Funds, that they would be required to pay fees and expenses against their ownership interests in the Shelf-Space Funds, with the understanding that those charges were legitimate outlays for services that would benefit the mutual fund and contribute positively to its value. In truth, a significant portion of those expenses was not being used to provide the services promised, but rather to increase the profits of AIG by financing the programs challenged in this lawsuit. As a result, the values of the Shelf-Space Funds were less than they appeared to be to members of the Class. Plaintiffs and the other members of the Class have also suffered damages through commissions paid by Plaintiffs and the other members of the Class for their purchase of shares of the Shelf-Space Funds. Had Plaintiffs and the other members of the Class known about the practices alleged above, Plaintiffs and the other members of the Class would not have paid such commissions. Plaintiffs' and the other members of the Class' damages, as a result of the commissions they paid for shares of the Shelf-Space Funds, were a foreseeable consequence of Defendants' failure to disclose.

81.     Additionally, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market

prices of the Shelf-Space Funds were distorted during the Class Period such that they did not

reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of the

fact that market prices of the shares were distorted, and relying directly or indirectly on the false

and misleading statements made by Defendants and/or on the absence of material adverse

information that was known to or recklessly disregarded by Defendants but not disclosed in

public statements by Defendants during the Class Period, Plaintiffs and the other members of the

Class acquired the shares or interest in the Shelf-Space Funds during the Class Period at

distorted prices and were damaged thereby.

## V.    CLASS ACTION ALLEGATIONS

82.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class (the "Class") of all persons or entities who

purchased shares or like interests in any of the Shelf-Space Funds between April 8, 2001 and

June 8, 2005, inclusive, and who were damaged thereby.  Excluded from the class are

Defendants, members of their immediate families and their legal representatives, heirs,

successors, or assigns and any entity in which Defendants have or had a controlling interest.

83.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, Plaintiffs believe that there are

thousands of members in the proposed class.  Record owners and the other members of the Class

may be identified from records maintained by the Shelf-Space Funds and AIG may be notified of

the pendency of this action by mail, using a form of notice similar to that customarily used in

securities class actions.  Plaintiffs' claims are typical of the claims of the members of the Class

as all members of the Class are similarly affected by Defendants' wrongful conduct in violation

of federal securities laws that is complained of herein.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein; and

      b.   To what extent the members of the Class have sustained damages and the proper measure of such damages.

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**VI.   CAUSES OF ACTION**

**COUNT I**

**AGAINST THE AIG BROKERS FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT**

86.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

87.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C.

34

§ 771(a)(2), against the AIG Brokers for their failure to disclose sales practices that created an insurmountable conflicts of interest.

88.     The AIG Brokers were the sellers, or the successors-in-interest to the sellers, within the meaning of the Securities Act, for one or more of the respective fund shares sold to Plaintiffs and the other Class members because they either: (a) transferred title of shares of the Shelf-Space Funds to members of the Class; (b) transferred title to shares of the Shelf-Space Funds to the Shelf-Space Funds distributors that in turn sold shares of the Shelf-Space Funds as agents for the Shelf-Space Funds; and/or (c) solicited the purchase of shares of the Shelf-Space Funds by members of the Class, motivated in part by a desire to serve its own financial interests or those of the Shelf-Space Funds.

89.     During its sale of the Shelf-Space Funds to Plaintiffs and the other members of the Class, the AIG Brokers failed to disclose the kickback payments and other improper incentives alleged herein that the AIG Brokers and their investment representatives received in exchange for pushing AIG clients into the Shelf-Space Funds. These incentives created an insurmountable conflict of interest which was never disclosed to investors.

90.     The AIG Brokers also caused to be issued to members of the Class the Shelf-Space Prospectuses that failed to disclose that fees and commissions from the Shelf-Space Funds would be used to pay the AIG Brokers for directing investors into the Shelf-Space Funds and the existence of the AIG Brokers' conflicts of interests described herein.

91.     As set forth herein, when they became effective, all Shelf-Space Funds' Prospectuses were misleading as they omitted the following material facts:

(a)     that the Shelf-Space Funds' investment advisers directed brokerage payments to the AIG Brokers in exchange for the AIG Brokers pushing their clients into the

Shelf-Space Funds;

       (b)     that the Shelf-Space Funds and/or the Shelf-Space Funds' investment advisers authorized the payment from fund assets of excessive revenue sharing payments to the AIG Brokers in exchange for the AIG Brokers pushing their clients into the Shelf-Space Funds; and

       (c)     that by accepting payment from the Shelf-Space Funds to push the Shelf-Space Funds onto their clients, the AIG Brokers had a conflict of interest material to investors.

92.     Class members have sustained damages due to the AIG Brokers' violations.

93.     At the time they purchased and/or held the Shelf-Space Funds shares pursuant to or traceable to the defective Prospectuses, Class members were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.

94.     By virtue of the material deception alleged above, Plaintiffs are entitled to a declaration that they may, at the option of each Class Member, rescind his or her purchase of the securities at issue, and upon the tender of the securities at issue, obtain reimbursement of the amounts paid.  If any plaintiff or Class Member no longer owns the securities at issue, he or she is entitled to damages.

95.     This claim was brought within the applicable statute of limitations.

**COUNT II**

**AGAINST AIG INC. FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**

96.     Plaintiffs repeat and re-allege each and every allegation contained above, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

36

97.     This claim is brought pursuant to Section 15 of the Securities Act against AIG Inc. as control person of the AIG Brokers.

98.     AIG Inc. is liable under Section 12(a)(2) of the Securities Act as set forth herein.

99.     AIG Inc. was a "control person" of AIG within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or 100% ownership.  At the time that the AIG Brokers sold one or more shares of the Shelf-Space Funds to Plaintiffs and the other members of the Class, by virtue of its position of control and authority over the AIG Brokers, AIG Inc. directly and indirectly, had the power and authority, and exercised the same, to cause the AIG Brokers to engage in the wrongful conduct complained of herein.

100.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, AIG Inc. is liable to Plaintiffs and the other members of the Class to the same extent as is the AIG Brokers for its primary violations of Section 12(a)(2) of the Securities Act.

101.    By virtue of the wrongful conduct alleged above, Plaintiffs and the other members of the Class are entitled to a declaration that they may, at the option of each Class Member, rescind his or her purchase of the securities at issue, and upon the tender of the securities at issue, obtain reimbursement of the amounts paid.  If any plaintiff or Class Member no longer owns the securities at issue, he or she is entitled to damages.

### COUNT III

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER

102.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

103.    During the Class Period, Defendants employed manipulative and deceptive

devices and contrivances in that they omitted to state material facts, i.e., the agreements with the Shelf-Space Funds whereby Defendants received improper incentives in exchange for pushing AIG clients into the Shelf-Space Funds and the inherent, insurmountable conflicts of interest such incentives created.

104.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the improper incentives and conflicts of interest alleged herein. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

105.    Defendants omitted to state material facts in order to profit from millions of dollars of incentive payments described above made to them by the Shelf-Space Funds from the assets of unwitting investors.  Defendants thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

106.    The Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, because they knew that the misconduct described herein was, *inter alia*, against SEC and NASD rules. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

107.    As a result of the Defendants' failure to disclose material facts, as set forth above, the Defendants manipulated the sales process by causing Plaintiffs and other Class members to purchase shares of the Shelf-Space Funds during the Class Period and pay commissions and mutual fund fees that Plaintiffs and the other members of the Class would have refused to have

38

paid had they known about the practices alleged herein.  In relying on the purported honesty of AIG's business practices, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired the shares or interests in the Shelf-Space Funds during the Class Period without receiving the impartial advice from their brokers required under the federal securities laws, and were damaged thereby.

108.    At the time of said omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the truth concerning the directed brokerage, revenue sharing and other improper practices complained of herein which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have held, purchased or otherwise acquired their shares of the Shelf-Space Funds, would not have paid any commissions or fees paid as a result of their acquisition of the Shelf-Space Funds, and would not have paid the fees and costs associated with ownership of the Shelf-Space Funds, or if they had acquired such shares or other interests during the Class Period, they would not have done so due to the purportedly fair and impartial advice for which they had paid.

109.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

110.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Shelf-Space Funds shares during the Class Period.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE

**EXCHANGE ACT AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER**

111.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

112.     During the Class Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive members of the Class, as alleged herein and caused members of the Class to purchase shares of the Shelf-Space Funds and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

113.     Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Shelf-Space Funds, including members of the Class, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing and market trends of the Shelf-Space Funds in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).  All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

114.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG and the Shelf-Space Funds' operations, as specified herein.

115.     Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Shelf-Space Funds alleged above and thereby engaged in transactions, practices and a course of conduct which

operated as a fraud and deceit upon members of the Class.

116.    Class members were ignorant of Defendants' fraudulent scheme.  Class members were injured because had Class members known of Defendants' unlawful scheme, they would not have held, purchased or otherwise acquired shares of the Shelf-Space Funds, would not have paid any commissions or fees as a result of their acquisitions of the Shelf-Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf-Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities.  Absent Defendants' wrongful conduct, Class members would not have been injured.

117.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

118.    As a direct and proximate result of Defendants' wrongful conduct, Class members suffered damages in connection with their purchases and acquisitions of Shelf-Space Funds during the Class Period.

### COUNT V

### AGAINST THE AIG BROKERS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-10 PROMULGATED THEREUNDER

119.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

120.    During the Class Period, the AIG Brokers effected transactions in the Shelf-Space Funds for or with the accounts of Class members, and/or induced Class members to purchase the Shelf-Space Funds.

121.    At or before completion of Class members' purchases of the Shelf-Space Funds,

the AIG Brokers failed to disclose the source and amount of remuneration that the AIG Brokers received from the Shelf-Space Funds in connection with Class members' purchases of the Shelf-Space Funds, as required by Rule 10b-10, promulgated under Exchange Act Section 10(b).

122. The Shelf-Space Funds' payment of such remuneration created insurmountable and undisclosed conflicts of interest. Class members were thus ignorant of the source and amount of remuneration the AIG Brokers received from the Shelf-Space Funds and of the resulting conflicts of interest. Had Class members known of the source and amount of such remuneration and the resulting conflicts of interest, they would not have held, purchased or otherwise acquired shares of the Shelf-Space Funds, would not have paid any commissions or fees paid as a result of their acquisitions of the Shelf-Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf-Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities.

123. Class members have sustained damages due to the AIG Brokers' violations of Rule 10b-10.

124. At the time they purchased or held the Shelf-Space Funds shares traceable to the defective disclosures, Class members were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.

## COUNT VI

### AGAINST AIG INC. FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

125. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

126.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against AIG Inc.

127.    As the parent company, AIG Inc. directly and indirectly was responsible for the content and causing the dissemination of the various statements which Plaintiffs contend are false and misleading. AIG Inc. had the ability to prevent the issuance of statements alleged to have failed to disclose the material information described herein.

128.    AIG Inc. had direct and supervisory involvement in the operations of the AIG Brokers.

129.    As set forth above, the Defendants violated Section 10(b) and Rules 10b-5 and 10b-10 promulgated thereunder by AIG's acts and omissions as alleged in this Complaint. AIG Inc. is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Shelf-Space Funds' securities during the Class Period.

VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the other members of the Class rescission of their contracts with the Defendants, including recovery of all fees which would otherwise apply and

recovery of all fees paid to the Defendants pursuant to such agreements;

    (d) Awarding Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

    (e) Such other and further relief as the Court may deem just and proper.

## VIII. <u>JURY TRIAL DEMANDED</u>

  Plaintiffs hereby demand a trial by jury.

Dated: August 25, 2006

           Respectfully submitted,

           **STULL, STULL & BRODY**


            /s/ James E. Lahm
           Jules Brody (JB-9151)
           Mark Levine (ML-0180)
           James Henry Glavin IV (JG-2188)
           James E. Lahm (JL-0242)
           6 East 45th Street
           New York, New York 10017
           Tel: (212) 687-7230
           Fax: (212) 490-2022

           ***Lead Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2006, the foregoing document was filed with the Clerk of the Court and served via ECF in accordance with the Federal Rules of Civil Procedure and the Eastern District's Rules on Electronic Service upon the following counsel for defendants:

Thomas J. Kavaler
Laura Fraher
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420


Dated: August 25, 2006                          s/ James E. Lahm
                                         James E. Lahm
                                         Stull, Stull & Brody
                                         6 East 45th Street
                                         New York, New York 10017