UNITED STATES DISTRICT COURT                    <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                    :
                                                    :
                                                    :
In re: AIG ADVISOR GROUP SECURITIES                 :         MEMORANDUM
LITIGATION.                                         :         <u>AND ORDER</u>
                                                    :
                                                    :         06 CV 1625 (JG)
                                                    :
                                                    :
--------------------------------------------------------------- X

A P P E A R A N C E S :

        STULL, STULL & BRODY
                6 East 45th Street
                New York, NY 10017
        By:     Mark Levine
                Attorneys for Plaintiffs

        CAHILL GORDON & REINDEL LLP
                80 Pine Street
                New York, NY 10005
        By:     Thomas J. Kavaler
                Attorneys for Defendants

JOHN GLEESON, United States District Judge:

        The named plaintiffs in this case purchased shares or like interests in certain

mutual funds ("the Shelf-Space Funds").[1]  Plaintiffs bring this putative class action[2] against (a)

AIG Financial Advisors, Inc.,[3] Advantage Capital Corp., FSC Securities Corp., and Royal

---

[1]      The named plaintiffs are: Joseph Martingano; Frances Martingano; Alan Bogage; Ethel J. Karabin, as beneficiary of the IRA FBO Ethel L. Karabin and trustee of the FBO The Residual Trust of The Karabin Trust U/A DTD 05/10/1985 and Survivor Trust of The Karabin Trust U/A DTD 05/10/1985; Sidney Perris; and Steven R. Wiskow.  Consolidated Amended Class Action Complaint ("Compl.") 1.  These plaintiffs are alleged to have purchased or sold shares of sixteen funds.  *See* Compl. Ex. B (listing plaintiffs' transactions involving Shelf-Space Funds).

[2]      The question of class certification is not before me now.

[3]      AIG Financial Advisors, Inc. combines the former entities SunAmerica Securities, Inc.; Sentra Securities Corp.; and Spellman & Co., Inc.  Compl. ¶ 23.

Alliance, Inc. (collectively, "the AIG Brokers"); and (b) AIG, Inc. ("AIG"), the corporate parent

of the AIG Brokers.  The AIG Brokers are registered broker-dealer entities.  They employ

financial advisors who, among other services, distribute mutual fund shares to would-be

investors.

Plaintiffs allege that "AIG participated in a self-serving kickback scheme referred

to as selling 'Shelf-Space,' whereby AIG used the AIG Brokers to direct AIG clients into the

Shelf-Space Funds in exchange for illegal kickback payments through revenue sharing and other

improper incentives that AIG received from the Shelf-Space Funds."  Consolidated Amended

Class Action Complaint ("Compl.") ¶ 2.  Ultimately, plaintiffs seek to represent a class of "all

persons or entities who purchased shares or like interests in any of the Shelf-Space Funds

between April 8, 2001 and June 8, 2005, inclusive, and who were damaged thereby."  *Id.* ¶ 82.[4]

Plaintiffs advance six claims for relief under the federal securities fraud laws.

*Count I* is brought against the AIG Brokers pursuant to Section 12(a)(2) of the Securities Act of

1933 ("the 1933 Act"), 15 U.S.C. § 77l(a)(2).[5]  *Count II* is brought against AIG pursuant to

Section 15 of the 1933 Act, 15 U.S.C. § 77o, alleging "control person" liability for the AIG

Brokers' alleged violations of Section 12(a)(2).  *Count III* is brought against all defendants

pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §

78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).  *Count IV* is

brought against all defendants pursuant to Section 10(b) and Rules 10b-5(a) and 10b-5(c), 17

C.F.R. §§ 240.10b-5(a), (c).  *Count V* is brought against the AIG Brokers pursuant to Section

---

[4]     The Shelf-Space Funds are not parties to this action.

[5]     The relevant statutory and regulatory provisions are set forth in an appendix to this Memorandum
and Order.

10(b) and Rule 10b-10, 17 C.F.R. § 240.10b-10.  Finally, *Count VI* is brought against AIG

pursuant to Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), as a "control person" for the AIG

Brokers' alleged liability under Counts III-V.

        Defendants move to dismiss the complaint[6] pursuant to Fed. R. Civ. P. 12(b)(1)

and Fed. R. Civ. P. 12(h)(3) for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P.

12(b)(6) for failure to state a claim upon which relief can be granted, and pursuant to Fed. R.

Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.*,

("PSLRA") for failure to adequately plead fraud.  For the reasons stated below, the complaint is

dismissed without prejudice to the filing of a second amended complaint on or before May 24,

2007.  Specifically, the Rule 12(b)(1) and Rule 12(h)(3) motion is granted; the Rule 12(b)(6)

motion is granted in part and denied in part; and the Rule 9(b) and PSLRA motion is granted.

BACKGROUND

        Plaintiffs allege that "[d]efendants cultivated a clandestine, incentive-driven

culture among AIG's brokerage arm to sell Shelf-Space Funds, regardless of the comparative

value of the funds."  Compl. ¶ 41.  Specifically, they contend that the AIG Brokers

"implemented and managed" a system called the "Elite Partners" program, *id.* ¶ 36, in which

participant funds would pay the AIG Brokers to "steer[]" their clients into investing in the funds,

*id.* ¶¶ 23-26.  According to the complaint, "Elite Partners" was something of a misnomer,

because defendants refused to sell interests in any funds that did not participate in the payment

system.  *Id.* ¶ 43.

        The alleged "steering" consisted, in part, of representations by the AIG Brokers

---

[6]     The term "complaint" as used here denotes the currently operative complaint, entitled "Consolidated Amended Class Action Complaint."

3

that the Shelf-Space Funds "would perform better" than other funds. *Id.* ¶ 37.  The AIG Brokers' financial advisors led their clients to believe that these representations were "based on objective analysis." *Id.*  In addition, according to a "Letter of Acceptance, Waiver and Consent," written by the National Association of Securities Dealers ("NASD") and quoted at length in the complaint, the Elite Partners program offered participant funds "increased visibility on the firms' websites . . . ; increased access to the sales force . . . ; the inclusion of materials relating to the Elite Partner funds in . . . internal marketing publications and newsletters; ticket charge waivers; and participation in joint marketing programs between [participant broker-dealers] and Elite Partner fund complexes." *Id.* ¶ 36 (citing NASD Letter of Acceptance, Waiver and Consent (No. CE2050011) ("NASD Letter")).

       The AIG Brokers' financial gain -- which plaintiffs repeatedly refer to as "kickbacks" -- took several forms.  First, there was "revenue sharing," *i.e.*, cash payments from the Shelf-Space Funds to the broker-dealers. *Id.* ¶ 32.  Plaintiffs allege revenue-sharing payments of "up to a 0.25% (i.e., 25 basis points) charge on the sales of shares," and "[q]uarterly fees, of up to 0.11% (i.e., 11 basis points) per year, of the amount of assets under management." *Id.* ¶ 38 (citing NASD Letter).

       Second, there was "directed brokerage," *i.e.*, "allotting trades -- and the lucrative commissions that are a result of the trades -- in [fund] securities . . . to a particular brokerage . . . in exchange for that brokerage pushing the sale of those mutual funds onto investors." *Id.* ¶ 33.  Plaintiffs allege that "[f]rom January 2001 through December 2003, twelve of the Shelf-Space Funds paid the AIG Brokers more than $41 million in kickback payments by directing brokerage commissions for portfolio transactions to the AIG Brokers." *Id.* ¶ 63 (citing NASD Letter).

4

Third, there were "other payments." *Id.* ¶ 35.  For example, in addition to ordinary fees charged in connection with offering Shelf-Space Funds for sale, AIG Brokers were allegedly reimbursed "for expenses incurred . . . during 'top producer' meetings and educational and training seminars," and were partially reimbursed for "certain administrative costs such as record keeping." *Id.* ¶ 39.  Defendants also "did not have to pay the usual 'ticket charge' of up to $12 per transaction when selling Shelf-Space Funds, raising the commission they received with each [such] sale." *Id.* ¶ 40.

The complaint also alleges "sponsorship" by participant funds "for company events, office parties, training and educational materials and conferences." *Id.* ¶ 42.  Shelf-Space Fund representatives "were given greater access to branch offices and were invited to corporate training and marketing events." *Id.*  The result: "increased opportunities" for Shelf-Space Fund representatives "to promote the sale of their mutual funds." *Id.*

In general, plaintiffs claim, "[t]he AIG Brokers gave the impression of providing the benefits of objective investment advice to investors." *Id.* ¶ 48.  The complaint quotes an AIG Broker's website as stating that it "offer[s] unbiased financial information based solely on your financial agenda and no one else's." *Id.* (quoting Advantage Capital Corporation Overview, http://www.advcap.net/overview/default.asp (last visited Apr. 17, 2007)).  The complaint cites to another website for the same statement. *See id.* (citing FSC Securities Corp. Overview, http://www.fscorp.net/overview/default.asp (last visited Apr. 17, 2007)).  In addition, plaintiffs allege, the AIG Brokers used Shelf-Space Fund prospectuses and Statements of Additional Information ("SAIs") to disclose mutual fund information, but did not disclose the Shelf-Space payment system in those documents. *Id.* ¶¶ 66, 68.  As an example, plaintiffs quote extensively

5

from the April 1, 2003 prospectus for the Massachusetts Financial Services Investors Growth Stock Fund,[7] which they claim is "identical in substance to all the other Shelf-Space Fund prospectuses issued during the Class Period." *Id.* ¶ 69.  Plaintiffs also cite to four prospectuses from other funds.  *See id.*

In reality, plaintiffs allege, the AIG Brokers' recommendations were "neither objective nor performance-based." *Id.* ¶ 42.  The AIG Brokers "actively concealed" from plaintiffs the "conflicts of interest" generated by the Shelf-Space system of payments "with respect to the . . . investment advice given to their clients and the management of their client accounts." *Id.* ¶ 65.  Plaintiffs claim that, as a result, the investment in Shelf-Space Funds resulted in below-average returns.  *See id.* ¶¶ 54-58.  Defendants' sale of Shelf-Space Funds also operated "to the detriment of investors" because of the "undisclosed kickbacks" of the Shelf-Space program.  *Id.* ¶ 49.  "Defendants took advantage of investors' reliance on their financial expertise and steered those investors into [investments] that incurred higher costs . . . ." *Id.* These costs, in their various forms, "were deducted from investors' principal" in the Shelf-Space Funds.  *Id.* ¶ 60.

## DISCUSSION

### A.  *Standing*

Defendants move pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(h)(3) to dismiss the complaint as to mutual funds of which the named plaintiffs did not own shares during the class period.  Plaintiffs wish to represent investors in one or more mutual fund families set forth in an exhibit to the complaint.  *See* Compl. Ex. A.  That exhibit lists 19 families

---

[7]      The complaint describes in detail an SEC action against that fund and three others.  *See* Compl. ¶¶ 71-72.

of funds. According to the next exhibit, however, the named plaintiffs owned shares in only 16 funds. *See id.* Ex B (listing details of named plaintiffs' transactions by fund). Defendants argue that I lack subject matter jurisdiction over causes of action relating to funds in which plaintiffs had no stake.

To invoke this Court's subject matter jurisdiction, plaintiffs must present a justiciable "Case[]" or "Controvers[y]." U.S. Const. art. III, § 2, cl. 1. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs present no such case or controversy if they lack standing to sue, *i.e.*, if they allege no (a) injury-in-fact that is (b) fairly traceable to the defendants' allegedly unlawful conduct, and (c) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). That plaintiffs would represent a class of similarly situated claimants does not exempt them from the requirement that "[a]t the pleading stage" they must set forth some "general factual allegations of injury resulting from the defendant's conduct." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan*, 504 U.S. at 561). In this securities fraud case, the named plaintiffs can allege no injury from the purchase or sale of funds they never invested in. *See* 15 U.S.C. § 77l(a) (limiting recovery under Section 12(a)(2) to purchasers or sellers of securities); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975) (holding that recovery under Section 10(b) and Rule 10b-5 is limited to purchasers or sellers of securities). They therefore have no standing to ask me to remedy injuries related to those funds.

Plaintiffs warn that my consideration of their standing at the pleading stage is premature. They argue that I should delay my decision until I decide whether plaintiffs have

satisfied the class-certification requirements of Fed. R. Civ. P. 23, because the question "whether

Plaintiffs may represent persons who bought shares in the other Shelf-Space Funds is . . .

intertwined with issues pertinent to class certification."  Plaintiffs' Corrected Memorandum of

Law in Opposition to Defendants' Motions To Dismiss the Consolidated Amended Class Action

Complaint ("Pl. Br.") 28.

    As support, plaintiffs invoke *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  In

*Ortiz*, the Supreme Court considered the validity of a class certification for a global settlement of

asbestos-related tort claims.  The Court held that the class certification issues before it were

"logically antecedent to Article III standing concerns," following *Amchem Products, Inc. v.*

*Windsor*, 521 U.S. 591 (1997).  *Ortiz*, 527 U.S. at 831 (internal quotation marks omitted).

*Amchem*, like *Ortiz*, reviewed a class action that attempted to settle a large fraction of "the

elephantine mass of asbestos cases," the number, length, complexity, redundancy, and expense

of which "defie[d] customary judicial administration and call[ed] for national legislation."  *Id.* at

821.  Indeed, the "class actions" in *Amchem* and *Ortiz* were not really actions at all -- they were

applications for a court to approve a pre-negotiated global settlement of actual and potential

claims.  *See id.* at 824-26 (relating how two settlement agreements binding actual and potential

claimants, the defendant, and defendant's insurers were negotiated and finalized before the filing

of the class action); *Amchem*, 521 U.S. at 601 (the class action, in which the complaint, motion

for certification, answer, and settlement agreement were all filed simultaneously, "was not

intended to be litigated").  In those cases, the Supreme Court did not conduct a threshold analysis

of the standing of so-called "exposure only" claimants, perhaps because its ultimate rejection of

the class certification made that analysis unnecessary -- there could be no further litigation (or

settlement) without court approval of the class.  *See In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 166 (D. Mass. 2004) (in *Amchem* and *Ortiz*, "without class certification there would be no settlement; and without a global settlement, the case would not have proceeded as constituted").  It is in that way that the class certification question, being "dispositive" in the unique circumstance of a global settlement, was "logically antecedent to the existence of any Article III issues."  *Amchem*, 521 U.S. at 612.

Class certification is not similarly dispositive in this case.  No pre-negotiated settlement agreement has been filed indicating that the purpose of filing this case was to formalize a global agreement.  Defendants do not challenge the named plaintiffs' standing with respect to funds in which they have owned shares, *see* Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Def. Br.") 43, so the case can move forward on the plaintiffs' claims, whether or not similarly situated plaintiffs are brought into the action pursuant to Rule 23.  *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK), 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005), *vacated in part on other grounds*, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ("[B]ecause Plaintiffs clearly have standing to sue on behalf of the . . . Funds in which they own shares, addressing class certification would not be outcome determinative.").  Moreover, unlike the "exposure only" plaintiffs in *Amchem* and *Ortiz*, the question whether the named plaintiffs here have standing to litigate claims about funds of which they did not own shares would have to be answered whether or not the plaintiffs filed their claim as part of a class.  *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002) ("In the instant case, in contrast to *Ortiz* and *Amchem*, the standing question would exist whether Rivera filed her claim alone or as part of a

class; class certification did not create the jurisdictional issue.").

Courts in this circuit and elsewhere have rejected similar attempts to delay consideration of Article III standing until the class certification stage, concluding that *Ortiz* and *Amchem* are limited to the unique circumstances of global mass-tort settlements.  *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("[T]he Article III standing determination should precede that of class certification.  With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements."); *In re Merrill Lynch Investment Management Funds Sec. Litig.*, 434 F. Supp. 2d 233, 236 (S.D.N.Y. 2006) (denying plaintiffs' attempt to "assert claims on behalf of shareholders of all of the Shelf Space Funds" for want of standing); *AllianceBernstein*, 2005 WL 2677753, at *9 ("As a straighforward securities case, many of the concerns triggering the exception mentioned by the Supreme Court in *Ortiz* are noticeably absent here."); *see also Rivera*, 283 F.3d at 319 n.6; *Pederson v. La. State Univ.*, 213 F.3d 858, 866 n.5 (5th Cir. 2000) (treating Article III standing as a threshold issue "[b]ecause the class certification issue presented here is not outcome determinative"); *Eaton Vance*, 220 F.R.D. at 166; *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003) ("[T]he *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class.").[8]

Plaintiffs' appeal to cases applying the juridical link doctrine does not alter my

---

[8]     At least one case outside this circuit can be read to find *Ortiz* to require courts, as a general matter, "to consider issues of class certification prior to issues of standing."  *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003).  As I have explained, I read *Ortiz* differently.

decision to consider plaintiffs' standing prior to class certification.  The juridical link doctrine

relates to whether, *once class certification is at issue*, named plaintiffs ought to be allowed to

represent other claimants injured by other, related defendants.  *See Eaton Vance*, 220 F.R.D. at

164-65; *see also La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973).  The

doctrine provides an exception to the general rule that "a plaintiff who has been subject to

injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in

litigating conduct of another kind, although similar, to which he has not been subject."  *Blum v.

Yaretsky*, 457 U.S. 991, 999 (1982).  But we are not yet at the point where I need to decide the

validity of plaintiffs' proposed class.  And nothing in the juridical link doctrine requires me to

depart from the Supreme Court's longstanding instruction to decide Article III standing as a

threshold issue.[9]  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Warth*, 422 U.S. at

498.

I therefore dismiss the complaint insofar as it relates to funds other than the ones

in which plaintiffs allege they actually invested.

B.     *Legal Sufficiency Challenges*

Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for

failure to state a claim upon which relief can be granted.  Plaintiffs' core fraud claims -- Counts I

and III -- are brought against the AIG Brokers pursuant to Section 12(a)(2) of the 1933 Act and

Section 10(b) of the 1934 Act (and Rule 10b-5(b)) for alleged misrepresentations and omissions.

---

[9]     Certain types of cases are exceptions to this general rule for policy reasons.  *See Wilder v. Bernstein*, 499 F. Supp. 980, 993 (S.D.N.Y. 1980) (rejecting a standing challenge to class certification because "courts have traditionally applied a 'broad and accommodating concept of standing in civil rights cases'" (quoting *La Mar*, 489 F.2d at 469)).  Plaintiffs advance no argument that this securities fraud case merits such exceptional treatment.

In pressing for dismissal with prejudice, defendants argue that (a) the statements and omissions, as alleged, are immaterial as a matter of law, and, in the alternative, (b) the alleged misconduct cannot have caused plaintiffs any cognizable economic loss.  Defendants also argue, among other things, that (c) plaintiffs' claims are at least partially time-barred, and (d) plaintiffs seek certain remedies that are unavailable.[10]

    1.    <u>The Motion To Dismiss Standard of Review</u>

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal, not the factual, sufficiency of the complaint.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted)).  Accordingly, I must accept the factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor.  *See Sheppard v.*

---

[10]     Two of plaintiffs' other claims -- *Count II* (Section 12(a)(2) "control person" liability pursuant to Section 15 of the 1933 Act)  and *Count VI* (Section 10(b) "control person" liability pursuant to Section 20(a) of the 1934 Act) -- depend upon the success of the core claims.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) ("In order to establish a prima facie case of controlling-person liability [for Section 10(b) pursuant to Section 20(a) of the 1934 Act], a plaintiff must show [among other things] a primary violation by the controlled person . . . ."); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 233 (S.D.N.Y. 2004) ("Since Section 15 of the Securities Act and Section 20 of the Exchange Act are substantially the same, the Court considers the analysis of each section interchangeable.  Thus, to withstand a motion to dismiss either a § 15 or a § 20(a) claim, plaintiffs must allege . . . an underlying primary violation by the controlled person . . . .") (citations omitted).  I do not address those dependent claims because, for the reasons discussed in Section C *infra*, I conclude the core claims are inadequately pleaded.  I also postpone until Section C discussion of *Count IV* (Rules 10b-5(a) and 10b-5(c)) and *Count V* (Rule 10b-10).

*Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *cert. denied*, 513 U.S. 816 (1994).  Moreover, I may

not grant the defendants' Rule 12(b)(6) motion unless it appears beyond doubt that plaintiffs can

prove no set of facts that entitle them to relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957);

*Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

   In deciding defendants' motion, I may consider documents attached to the

complaint as exhibits, or statements incorporated by reference.  *Chambers v. Time Warner, Inc.*,

282 F.3d 147, 152-53 (2d Cir. 2002).  I may also consider publicly available documents -- such

as prospectuses and SAIs -- relied upon or referenced in a complaint.  *Press v. Quick & Reilly,*

*Inc.*, 218 F.3d 121, 129 (2d Cir. 2000) ("We have consistently recognized that publicly filed

information may be considered when evaluating a claim of securities fraud.").

  2. <u>Materiality</u>

   A legally sufficient securities fraud claim under Section 12(a)(2) or Section 10(b)

alleges, among other things, a misrepresentation or omission of a "material" fact.  Section

12(a)(2) provides:

> Any person who . . . offers or sells a security . . . by means of a prospectus or oral
> communication, which includes an untrue statement of a *material* fact or omits to
> state a *material* fact necessary in order to make the statements, in the light of the
> circumstances under which they were made, not misleading . . . shall be liable . . .
> to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a) (emphasis added).   Similarly, "[t]o state a cause of action under Section 10(b)

and Rule 10b-5, a plaintiff must plead [among other things] that the defendant made a false

statement or omitted a *material* fact."  *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)

(emphasis added).[11]

Defendants argue that the misrepresentations and omissions identified in the complaint are immaterial as a matter of law.  Plaintiffs counter that they are material because they concern a "conflict of interest" on the part of the AIG Brokers arising out of the Shelf-Space system of payments.  Pl. Br. 6.  In substance, plaintiffs claim that because of the AIG Brokers' misleading statements and omissions, plaintiffs never knew that money (revenue sharing, directed brokerage, and other compensation) flowing from their fund assets to the AIG Brokers paid for defendants' "Shelf-Space" services (promoting the fund to potential investors), not services that would accrue to the plaintiffs' benefit.  *See* Compl. ¶ 49.

"[W]hen presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  In the case of omissions, "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976));

---

[11]    For an omission to be actionable, the defendant must also be "subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), *cert. denied*, 511 U.S. 1017 (1994).  The distinction between materiality and the duty to disclose "has meaning only in certain contexts," however, and where, as here, "the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce."  *Id.*  One consequence of this doctrinal coalescence is that sometimes a defendant's compliance with a duty to disclose certain facts will render its omission of additional closely related facts immaterial as a matter of law. As I discuss below, that does not appear to be the case here.

14

*see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997).  Measured by this standard, the subject

of the misrepresentations and omissions alleged by plaintiffs was not immaterial as a matter of

law.

The alleged misrepresentations and omissions concerned the potential bias of the

AIG Brokers.  Plaintiffs cite two misrepresentations in this regard.  The first, which appeared on

the website[12] of Advantage Capital Corp., stated that that defendant's financial advisors "offer

unbiased financial information based solely on your financial agenda and no one else's."  Compl.

¶ 29.  Plaintiffs also reference a statement by FSC Securities Corp.  *See id.*  The topic of the

Advantage statement is the lack of bias in the information provided by financial advisors

employed by Advantage Capital Corp.

On the omissions side, plaintiffs allege that all the Shelf-Space Funds'

"prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants'

practice of steering investors into Shelf-Space Funds."  *Id.* ¶ 68.[13]  As context, plaintiffs set forth

a lengthy disclosure by Massachusetts Financial Services Investors Growth Stock Fund ("the

MFS Fund") and a string citation to four other prospectuses.[14]  *Id.* ¶¶ 69-70.

---

[12]    Because the complaint cites no misrepresentations in prospectuses or SAIs, the identified misrepresentations can only support Count III, plaintiffs' Section 10(b) claim.  Section 12(a)(2) only covers affirmative statements in "a prospectus or oral communication."  15 U.S.C. § 77l(a).

[13]    Plaintiffs link the defendants to the Shelf-Space Funds' prospectuses and SAIs by alleging defendants' "reliance" upon them "to disclose the revenue sharing arrangements."  Compl. ¶ 73.  In general, broker-dealers may rely on fund prospectuses and other public documents to discharge their disclosure obligations.  *See Press*, 218 F.3d at 129 (Rule 10b-10).  Defendants dispute that they actually did so in this case, *see* Def. Br. 22 n.10 ("Defendants did not, as broker-dealers, control the content of such disclosures."), but that dispute may not properly be resolved on a motion to dismiss.

[14]    For the reasons discussed in Section A *supra*, named plaintiffs have no standing to bring an action against the MFS Fund because no plaintiff is alleged to have been a purchaser or seller of shares in that fund.  *See* Compl. Ex. B.  For the reasons discussed in Section C *infra*, the complaint's assurance that the MFS Fund prospectus "is identical in substance to" those of the funds that are the subject of this action, and its string citation to four other funds, Compl. ¶¶ 69-70, does not, at least at this stage, bring the MFS Fund prospectus within the scope of

With respect to commissions, the MFS Fund prospectus states that (a) brokers or dealers who provide "brokerage and research services" to the fund may receive from the fund "an amount of commission for effecting a securities transaction for the Fund in excess of the amount other brokers or dealers would have charged,"[15] and (b) such transaction commissions may be paid "in part for providing such brokerage and research services." *Id.* ¶ 69.  The prospectus also mentions that (a) certain brokerage or underwriting commissions might be paid as "consideration" by the fund to broker-dealers in return for certain research services, (b) some brokers might be "selected" for such commission-research bargains "principally because of their execution capabilities," and (c) some of these brokerage commissions "might exceed those that might otherwise be paid." *Id.*

In sum, the prospectus (at least, the text plaintiffs quote) states only that commissions would be paid to broker-dealers in return for their brokerage and research.  What the prospectus does not mention is that commissions might also be paid out from fund assets in return for broker-dealers promoting the fund to would-be investors.  If such a payment system existed, it would create an incentive for broker-dealers to push the fund when advising potential investors.  That undisclosed[16] interest would conflict with a potential investor's interest in not

---

this litigation.  Nevertheless, the text of the prospectus -- the only such text in the complaint -- provides a basis for me to answer a principal question raised by defendants' Rule 12(b)(6) motion, *i.e.*, whether omissions that concern the objectivity or bias of a broker dealer are immaterial as a matter of law.  I decide that question now to streamline the litigation attending any future amended complaint.

[15]    Plaintiffs claim that the prospectus is also misleading "in that it fails to disclose that directed brokerage commissions were in fact paid."  Compl. ¶ 70.  This argument fails.  The statement in the prospectus "served to put prospective investors on notice" of the possibility of such commissions, "such that investors could pursue that line of inquiry with their financial advisors if they were concerned about broker incentives."  *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005).

[16]    Defendants argue that the prospectuses of various Shelf-Space Funds did, in fact, disclose Shelf-Space-type payments.  I do not address that argument now, because, as discussed in Section C *infra*, plaintiffs never specify what prospectuses are actually at issue in this litigation, or what form the alleged Shelf-Space payments

paying commissions which, unlike the brokerage and research services mentioned in the prospectus, deplete fund assets with no corresponding return to owners of those assets.[17]  The MFS prospectus thus illustrates that the failure of a prospectus to disclose the payment system alleged by plaintiffs amounts to a failure to disclose a conflict of interest presented by broker-dealers who stand to receive those payments.

From the point of view of a potential investor, such a conflict of interest is materially undesirable.  The more conflicted the broker-dealer, the greater the possibility that his advice will not be consistent with the investor's self-interest.  One can debate, of course, whether investment information is ever totally objective or free from bias, and, in that vein defendants argue that Advantage's statement that its financial advisors offer "unbiased financial information based solely on your financial agenda and no one else's" is mere "corporate puffery."  Def. Br. 19.  But the question presented here is not so metaphysical; it is whether reasonable minds could differ on the importance of information about the conflict of interest alleged by plaintiffs.  I conclude that they could: a substantial change in the information presented to a reasonable investor about a conflict of interest on the part of her financial advisor could significantly alter the "total mix" of information relevant to the prospective transaction.  Accordingly, insofar as the misrepresentations and omissions by the AIG Brokers in fact concerned such a conflict of interest, they were not immaterial as a matter of law.

This conclusion is supported by the purpose of the securities laws at issue, which counsels for a generous construction of plaintiffs' fraud theory.  The "'fundamental purpose [of

---

actually took.  Without those details, I cannot address whether the defendants adequately disclosed the payments alleged.

[17]        *See* subsection 3 *infra*.

the those laws is] to substitute a philosophy of full disclosure for the philosophy of caveat

emptor and thus to achieve a high standard of business ethics in the securities industry.'"

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains*

*Research Bureau*, 375 U.S. 180, 186 (1963)).  Accordingly, "Congress intended securities

legislation enacted for the purpose of avoiding frauds to be construed 'not technically and

restrictively, but flexibly to effectuate its remedial purposes.'"  *Id.* (quoting 375 U.S. at 195).

My conclusion is also supported by the Second Circuit, which has noted in dicta in a similar case

that "knowledge that [investors'] broker-dealers have a conflict of interest, *i.e.*, that their broker-

dealers are paid by the money market funds the broker-dealers selected for 'automatic sweeps' of

plaintiffs' uncommitted account balances, is material."  *Press*, 218 F.3d at 130 (holding that

omission of that fact was nonetheless not actionable because the court was required to defer to

the SEC's opinion that defendants' disclosures were in compliance with Rule 10b-10).

       For reasons I discuss in detail below, I leave open the question whether

information about the alleged bias of the AIG Brokers (in the form of the payment structure

generally alleged by plaintiffs) would "significantly" alter the total mix of information available

to a reasonable investor.  Certain types of information about the bias of investment advice are

insignificant as a matter of law.  *See, e.g.*, *In re Morgan Stanley & Van Kampen Mut. Fund Sec.*

*Litig.*, No. 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758, at *32-*33 (S.D.N.Y. Apr. 18,

2006) (information about fees of "mere fractions of a percentage point," sales contests "limited

in geographical scope and in duration," and prizes "primarily of minimal value" was immaterial

as a matter of law); *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL

342050, at *9 (S.D.N.Y. June 25, 1998) (the mere fact a fund and broker-dealer were owned by

the same company was immaterial as a matter of law).  Such information need not be disclosed,

especially since all disclosure comes at a processing cost, as any layperson who has attempted to

read a prospectus can attest.  But I cannot address whether or not the payment system alleged by

plaintiffs is significant as a matter of law in this case, because, as I discuss below, plaintiffs have

not pled that system with adequate particularity.

Defendants suggest that their nondisclosures cannot form the basis of fraud

liability because they met the disclosure obligations of SEC Form N1-A, which "requires the

disclosure of the total fees paid by the investor in connection with a securities purchase, as well

as total commissions paid by the fund."  *Morgan Stanley*, 2006 U.S. Dist. LEXIS 20758, at *30.

*See* Def. Br. 22-23 ("[D]isclosures as to the subject of Plaintiffs' allegations were governed by

specific regulations, and disclosures that complied with that regulatory regime were adequate as

a matter of law." (citation omitted)).  While the question whether defendants met their Form N1-

A disclosure obligations is likely relevant to plaintiffs' Rule 10b-10 claim,[18] it does not affect my

conclusion about the materiality of defendants' alleged nondisclosure of the Shelf-Space

payments to the AIG Brokers because, as defendants acknowledge, Form N1-A  "does not

require disclosure of how differential compensation is allocated."  Def. Br. 22 (citing *Morgan

Stanley*, 2006 U.S. Dist. LEXIS 20758, at *30).  "[T]he disclosure requirements of Rule 10b-5

still apply to those categories of information not specifically covered by Rule 10b-10."  *Press*,

218 F.3d at 132 n.12; *see also Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th

Cir. 2005) ("Current SEC regulations, including Form N1-A, do not impose a disclosure

---

[18]     Rule 10b-10 establishes that broker-dealers must disclose certain information to their clients "at or
before completion of a transaction."  17 C.F.R. § 240.10b-10.  I address Count V, which attempts to advance a claim
pursuant to Rule 10b-10, in Section C *infra*.

obligation with respect to broker compensation.  Therefore, Defendants had no duty to disclose that information *unless it was necessary to make another statement contained in the prospectus not misleading*." (emphasis added)).  So even if defendants are correct that they fully complied with their Form N1-A disclosure obligations, it does not follow that their failure to disclose the AIG Brokers' alleged conflict of interest is necessarily immaterial.

       3.    <u>Loss Causation</u>

       Defendants move for dismissal on the ground that, even if they misrepresented or omitted a material fact, that misconduct could not have caused plaintiffs any cognizable harm. Defendants argue plaintiffs cannot allege loss causation under Section 10(b), as the PSLRA requires them to do.  *See* 15 U.S.C. § 78u-4(b)(4) (providing that actions pursuant to Section 10(b) carry "the burden of proving that the act or omission of the defendant alleged to violate [Section 10(b)] caused the loss for which the plaintiff seeks to recover damages"); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 421 (2005).  Defendants argue the affirmative defense of a lack of loss causation[19] under Section 12(a)(2) "appears on the face of the complaint" and thus provides a valid basis for dismissal. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999).  I conclude that dismissal is unwarranted, because one version of plaintiffs' loss

---

[19]    The statute provides for the affirmative defense as follows:

    In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77l(b).

causation theory withstands the motion.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell*, 396 F.3d at 172 (internal quotation marks omitted). Proper pleading of that causal link requires alleging "'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id.* at 173 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis omitted).

Three theories of loss causation are discernable from the complaint. First, plaintiffs claim that, absent defendants' misrepresentations and nondisclosures, they would have not bought shares in the Shelf-Space Funds. *See* Compl. ¶ 79 ("Plaintiffs . . . would not have purchased the Shelf-Space Funds, and paid . . . the related commissions and fees . . . had they known of [the Shelf-Space system of payments]."). Instead, they could have bought shares in other funds with a greater return or spent less money for an equivalent return. *Id.* ("By investing in the Shelf-Space Funds, Plaintiffs . . . received a return on their investment that was substantially less than the return they would have received had they invested the same dollars in a comparable fund that did not participate in the revenue sharing program. Alternatively, investors could have invested fewer dollars in a non-Shelf-Space Fund to obtain a rate of return equal to or greater than that obtained at a higher price from the comparable Shelf-Space Fund.").

This claim does not allege loss causation. That plaintiffs would not have purchased shares in the Shelf-Space Funds but for defendants' misconduct may show *transaction* causation. *See Salomon Smith Barney*, 441 F. Supp. 2d at 589 ("With regard to Plaintiffs' assertion that they would not have purchased the Fund shares had they known of the

21

complained-of practices, this assertion makes out transaction causation -- not loss causation.").[20]

And plaintiffs' hypothesis that they would have gotten a better deal on a different investment is

too speculative to support a pleading of loss causation.  As the Supreme Court has recognized in

a related context, if it were sufficient to allege a "largely conjectural and speculative recovery"

based entirely upon "the plaintiff's subjective hypothesis," there would be a "very real risk" of

"recovery of substantial damages on the part of one who offers only his own testimony" as proof

to the jury.  *Blue Chip Stamps*, 421 U.S. at 734, 746 (plaintiffs who merely allege they would

have purchased a security but for a misrepresentation or omission have no standing to sue under

Rule 10b-5); *see also Morgan Stanley*, 2006 U.S. Dist. LEXIS 20758, at *38-*39.[21]

        Second, plaintiffs claim that defendants' misrepresentations and omissions

"distorted" the "market prices" at which plaintiffs bought Shelf-Space Fund shares "such that

[the prices] did not reflect the risks and costs of the continuing course of conduct alleged."

Compl. ¶ 81.  But, as plaintiffs acknowledge, the price of mutual fund shares is set not by the

market but by law.  *See* Pl. Br. 23.  The price of a share is calculated by reference to the "Net

Asset Value" ("NAV") of the fund, *i.e.*, the value of the assets less liabilities.  *See* 17 C.F.R.

270.22c-1; *Morgan Stanley*, 2006 U.S. Dist. LEXIS 20758, at *35-*36.  Plaintiffs nowhere

allege that the total amount of liabilities (fees and commissions) at issue were anything but fully

disclosed to investors.  Accordingly, plaintiffs cannot reasonably allege that the prices were

---

[20]     I do not mean to hold here that plaintiffs have adequately pled reliance for the purposes of their Section 10(b) claims.  As discussed in Section C *infra*, I cannot yet reach that question.

[21]     Even if such allegations could support a loss causation claim at the pleading stage, plaintiffs fail to plead them with the required specificity.  For example, they do not specify the return they received on the Shelf-Space Fund shares they purchased, or which shares, if any, would have generated more return.
     In any event, plaintiffs themselves disclaim reliance upon this argument in their opposition papers. *See* Pl. Br. 24.

somehow "distorted."[22]

Third, plaintiffs claim that defendants misled them into buying Shelf-Space Funds "at an artificially inflated value."  Compl. ¶ 80.  This theory appears to be that defendants misled plaintiffs into thinking certain fees and commissions they paid were "legitimate outlays for services" accruing to the benefit of plaintiffs, whereas in fact the fees went to Shelf-Space promotional services, accruing to the benefit of the defendants.  *Id.*

Defendants argue that the relevant prospectuses and SAIs disclosed the total amount of Shelf-Space Fund fees,[23] so any complaint of "loss" is really just a complaint about the allocation of particular fees within that total amount.  Courts have held that challenges to the mere allocation of fees that were disclosed in their total amount fail as a matter of law to establish loss causation.  In *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998), for example, the district court rejected a Section 10(b) and Rule 10b-5 claim based upon, *inter alia*, allegedly excessive commissions charged to the plaintiffs' investment principal.  "It is the total fees charged," the court held, "that would affect the asset value of a mutual fund and the decision to invest.  The prospectus disclosed these amounts."  *Id.* at *5.

*Castillo*'s reasoning does not require the rejection of plantiffs' third loss causation theory as a matter of law.  In *Castillo*, the investors' willingness to purchase shares knowing the total fee amount to be charged to their principal -- *i.e.*, the potential diminution of the funds'

---

[22]    Consistent with this analysis, plaintiffs drop all discussion of "distortion" in their opposition papers and rely fully upon the third argument.

[23]    Counsel for plaintiffs conceded this point at oral argument.  *See* Tr. 15 ("The total amount in the prospectuses . . . are the amounts that were paid.").

NAV -- indicated that even absent the nondisclosures there would still have been an equivalent amount of diminution in NAV.  The investors had no quarrel with paying the disclosed total amount of fees for the services they received in return.  They just objected to the allocation of a certain fee *f* to a service *s*.

Here, by contrast, the investors do quarrel with paying the total amount of fees, because defendants did not disclose the "Shelf-Space" services that certain of the fees were paying for.  The plaintiffs allege that they assumed wrongly -- because of defendants' nondisclosure and misrepresentation -- that they were paying (out of their principal, *see* Compl. ¶ 60) only fees for services that accrued to their benefit.  *See* Compl. ¶ 80.  In reality, plaintiffs' principal was funding the Shelf-Space system of payments.  So plaintiffs challenge not the allocation of a fee *f* to a service *s*, but rather the very existence of *f*.  *See Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *12 (N.D. Cal. Aug. 14, 2006) (finding sufficient pleading of loss causation when plaintiff alleged not "a failure to disclose the overall amount of all fees" but "that defendants deceived him into thinking the fees were for worthwhile investment advice or something else of value to shareholders when, in fact, these fees were merely a cover for funneling kickbacks to broker-dealers").  Accordingly, plaintiffs sufficiently allege that the Shelf-Space system of payments caused them an economic loss: absent those payments, plaintiffs' total amount of fees, and thus the resulting diminution of their investment's asset value, would have been smaller.  Indeed, plaintiffs claim they never would have paid the Shelf-Space fees had the nature of the fees been disclosed.

I find that a rational jury, if it credited plaintiffs' allegations, could conclude that the subject of defendants' alleged nondisclosure and misrepresentation caused economic harm to

the plaintiffs.[24]  I therefore conclude that dismissal of the complaint with prejudice is

unwarranted.

       4.     <u>Statute of Limitations</u>

         Defendants move to dismiss as time-barred any 1933 Act claim arising more than

three years prior to the April 7, 2006 filing of this action and any 1934 Act claim arising more

than five years prior.  Section 804 of the Sarbanes-Oxley reform legislation lengthened to five

years the limitations period for private causes of action pursuant to Section 10(b).  The statute

provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or
> contrivance in contravention of a regulatory requirement concerning the securities
> laws . . . may be brought not later than the earlier of --
>
> > (1) 2 years after the discovery of the facts constituting the violation; or
> > (2) 5 years after such violation.

28 U.S.C. § 1658(b).  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d

192, 208 (S.D.N.Y. 2004) ("There is little doubt that Section 804's expanded statute of

limitations applies to § 10(b) claims.").  Defendants contend, and plaintiffs do not dispute, that

Sarbanes Oxley did not alter the three-year period applicable to 1933 Act claims, however.  *See*

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 412-13 (S.D.N.Y. 2005) (Sarbanes-Oxley

Section 804 does not apply to Section 12(a)(2) claims).  The relevant statute provides: "In no

event shall any such action be brought to enforce a liability created . . . under [Section 12(a)(2)]

more than three years after the sale."  15 U.S.C. § 77m.

         Plaintiffs do not contest this aspect of defendants' motion.  Accordingly, any

---

[24]    To the extent that *Morgan Stanley*, 2006 U.S. Dist. LEXIS 20758 at *35-*36; *Salomon Smith Barney*, 441 F. Supp. 2d at 590, and *Merrill Lynch*, 424 F. Supp. 2d at 238, reject this theory of loss causation as a matter of law, I disagree with those decisions.

1934 Act claims arising prior to April 7, 2001 are time-barred, and any 1933 Act claims arising prior to April 7, 2003 are time-barred.  For plaintiff Bogage, this means all his claims relating to the October 31, 2000 purchase of Shelf-Space Fund shares are dismissed for failure to state a claim upon which relief can be granted,[25] and his 1933 Act claims relating to the October 4, 2001, February 6, 2003, and February 7, 2003 purchases and sales of Shelf-Space Funds are likewise dismissed.  For plaintiff Perris, this means all claims relating to the February 15, 2001 purchase of Shelf-Space Funds are dismissed.[26]

Because I ultimately dismiss this complaint without prejudice to plaintiffs specifying their allegations in greater detail, I decline to address at this point defendants' other timeliness arguments, which concern whether and when plaintiffs were on notice of the misconduct they allege.

5.    Remedies

Defendants move to dismiss plaintiffs' Section 12(a)(2) claims insofar as plaintiffs seek rescission.  The complaint requests a "declaration" that plaintiffs who still own Shelf-Space Fund shares "may, at the option of each Class Member, rescind his or her purchase of the securities at issue, and upon the tender of the securities at issue, obtain reimbursement of the amounts paid."  Compl. ¶ 94.  But plaintiffs must plead tender or, at least, an offer of tender to obtain rescission.  *Morin v. Trupin*, 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990).  I deny plaintiffs' request that I grant them the "option" to tender; such relief would essentially guarantee plaintiffs a floor price on their investment.  Accordingly, that claim for relief is

---

[25]    In any event, this purchase falls outside the claimed class period.

[26]    This purchase, too, falls outside the claimed class period.

dismissed, without prejudice to an adequate pleading of tender or an offer of tender.

Defendants argue for dismissal insofar as plaintiffs seek damages, because plaintiffs have not alleged sale of their shares at a loss.  This is denied.  The complaint states that "[i]f any plaintiff . . . no longer owns the securities at issue, he or she is entitled to damages." Compl. ¶ 94.  Drawing all inferences in plaintiffs' favor, that allegation sufficiently pleads a loss. Defendants also argue that, as a matter of fact, plaintiffs have suffered no damages because at least some of their shares appreciated in value.  I decline to address this argument unless and until plaintiffs amend their complaint with greater specificity.

C.      *Pleading Sufficiency*

Defendants also move pursuant to Rule 9(b), which requires in relevant part that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Second Circuit has elaborated on this requirement:  A complaint pleading fraud must "'(1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  To the extent plaintiffs allege fraud, the PSLRA also requires that their pleadings "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

Plaintiffs' allegations sound in fraud.  Though they repeatedly protest that they "expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct," Compl. ¶¶ 86, 96, the complaint deploys language that

27

describes secretive and culpable acts. *See, e.g.*, *id.* ¶ 41 ("Defendants cultivated a clandestine, incentive-driven culture among AIG's brokerage arm to sell Shelf-Space Funds, regardless of the comparative value of the funds."); *id.* ¶ 49 (defendants promoted Shelf-Space Funds "for undisclosed kickbacks" and "took advantage of investors' reliance on their financial expertise and steered those investors into unsuitable mutual funds, inappropriate class shares and brokerage programs that incurred higher costs to the investor"). If the AIG Brokers "carefully participated in an institutional revenue sharing scheme wherein [they] received secret payments from the Shelf-Space Funds," *id.* ¶ 30, they could not have done so negligently.

I decline to construe the complaint as alleging negligence in the alternative, for it is unreasonable to believe the payment arrangements, as alleged, came about by accident. The elaborate yet "secret" payment structure and the "clandestine" culture that promoted it were, if true, by definition non-negligent. Plaintiffs may not escape the particularity requirements of Rule 9(b) and the PLSRA merely by including template language disclaiming fraud. *See Alstom SA*, 406 F. Supp. 2d at 411 ("[A]s now drafted, Plaintiffs' Complaint, their disclaimers to the contrary notwithstanding, sounds in fraud.") (internal quotation marks and citation omitted); *see also Rombach*, 355 F.3d at 172 (plaintiffs alleged only fraud due to the "classically" fraud-based "wording and imputations of the Complaint").

Applying those pleading requirements, I conclude that plaintiffs have failed to allege with sufficient particularity the "circumstances" of the fraud in two principal respects.

First, plaintiffs fail to allege facts that link their claims to the defendants. As discussed above, plaintiffs mention explicitly the misrepresentation of only one defendant. *See* Compl. ¶ 29. They merely cite, without any explication, a statement by another defendant. *See*

28

*id.* This falls far short of the particular identification of each speaker and statement required by Rule 9(b) and the PSLRA.  To be sure, plaintiffs extensively quote one prospectus in the complaint, *id.* ¶ 69, but they do not link that statement to a defendant; indeed, as discussed above, no plaintiff has even alleged an injury relating to that fund.  And plaintiffs cannot discharge their responsibility to plead statements with particularity by averring that the quoted prospectus is "identical *in substance* to all the other Shelf-Space Fund prospectuses issued during the Class Period."  *Id.* (emphasis added).  Furthermore, to the extent plaintiffs' Section 10(b) claims are based upon misrepresentations, plaintiffs nowhere allege that any particular individual relied upon those misrepresentations.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir. 1999) ("Reliance, also referred to as 'transaction causation,' is an essential element of a section 10(b) and Rule 10b-5 claim.").

Second, plaintiffs fail to adequately plead that disclosure of the Shelf-Space payment arrangements would "significantly" alter the total mix of information available to a reasonable investor (*i.e.*, whether it was material).[27]  For example, plaintiffs recite that the AIG Brokers received payments of up to 25 basis points "on the sales of shares" and up to 11 basis points of quarterly fees per year, calculated by reference to assets under management.  Compl. ¶ 38.  Calculating the actual size of these payments is impossible, however, because plaintiffs nowhere mention the amount of assets under management for any fund.  Similarly, plaintiffs allege that defendants received "revenue through reimbursement for expenses incurred during certain meetings and seminars," and compensation of certain "administrative costs such as

---

[27]    As suggested above, because I cannot yet determine whether plaintiffs have pled materiality, I cannot yet address defendants' argument that plaintiffs have not sufficiently pled reliance.  "Reliance can be presumed in some cases of omission or non-disclosure, but only where the defendant has misrepresented or omitted a material fact."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d at 539 (citations and internal quotation marks omitted).

record keeping," *id.* ¶ 39, but nowhere allege how much these payments were for any broker-dealer.  Plaintiffs allege "kickbacks" based on sales of Shelf-Space Funds, citing an example of a $12 transaction-charge forgiveness, *id.* ¶ 40, but nowhere allege how much those kickbacks added up to.  Plaintiffs allege the use of directed brokerage as reimbursement of broker-dealers, *id.* ¶ 33, but nowhere allege how much directed brokerage they are talking about.  Plaintiffs allege that the Shelf-Space Funds "were more expensive with respect to fees," *id.* ¶ 49, but nowhere allege how the compensation received by AIG Brokers for promoting Shelf-Space Funds was significantly different than they compensation they received for promoting other funds.  In fact, plaintiffs nowhere mention the total amount of fees received by any given broker-dealer.  Accordingly, without further information, it is impossible to assess whether the money allegedly received by the broker-dealers was significant.

       The lack of specifics about statements, speakers, and payment arrangements also makes it impossible to consider defendants' remaining arguments for dismissal.  The details of the alleged payment system are too sparse to permit a determination whether its disclosure would be material, much less whether the facts support a "strong inference" of the requisite scienter.  15 U.S.C. § 78u-4(b)(2) (requiring that a pleading "with respect to each . . . omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *Rombach*, 355 F.3d at 171.  The lack of particularity poses the same impediment to a determination whether defendants' actions constituted a "scheme" for Rule 10b-5(a) and 10b-5(c) purposes.  *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. MDL NO. 1744, 04 Civ. 8144(SWK), 2006 WL 2057194, at *32 (S.D.N.Y. July 20, 2006) (requiring "particularized allegations of the individual defendants' active participation in a scheme" and not merely

"allegations that the individual defendants made, or allowed to be made, false or misleading statements").  Finally, without knowing what prospectuses and SAIs are actually at issue, and what specific statements (or omissions) in them are at issue, I cannot determine the sufficiency of plaintiffs' Rule 10b-10 disclosure claims.[28]

CONCLUSION

The motion pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(h)(3) to dismiss the complaint, insofar as it relates to funds other than the ones in which plaintiffs allege they actually owned shares, is granted.  The motion pursuant to Fed. R. Civ. P. 12(b)(6) is granted in part and denied in part.  The motion pursuant to Fed. R. Civ. P. 9(b) and the PSLRA is granted.  Accordingly, the complaint is dismissed without prejudice to the filing of a second amended complaint on or before May 24, 2007.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       April 25, 2007

---

[28]     I do not now address the question whether plaintiffs have a private right of action to allege such a claim in the first place.  *See Press*, 218 F.3d at 126 n.7.

APPENDIX

**15 U.S.C. § 77l. Civil liabilities arising in connection with prospectuses and communications**

(a) In general

Any person who --

> . . .

>> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

(b) Loss causation

In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

**15 U.S.C. § 77o. Liability of controlling persons**

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**15 U.S.C. § 78j(b).  Manipulative and deceptive devices**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

> . . .

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**17 C.F.R. § 240.10b-5 Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**15 U.S.C.A. § 78t. Liability of controlling persons and persons who aid and abet violations**

(a) Joint and several liability; good faith defense

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.