**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE AIG FINANCIAL ADVISORS, INC.
SECURITIES LITIGATION

Master File No.
06-CV-01625(JG)(JMA)

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Jurisdiction and Venue ............................................................................................. 6

III.    Parties ........................................................................................................................ 6

   A.   Plaintiffs ................................................................................................................ 6
   B.   The Parent Company .......................................................................................... 7
   C.   The AIG Brokers ................................................................................................. 8

IV.    Substantive Allegations ........................................................................................... 9

   A.   Defendants' Conflict of Interest ...................................................................... 9
   B.   The Payments Which Caused Defendants' Conflict Of Interest ................... 20
   C.   The Shelf-Space Funds' Prospectuses, Their Statements of Additional Information and Defendants' Public Statements Were Materially False and Misleading Regarding the Shelf-Space Arrangements ................................................................................ 24
   D.   Defendants' Scheme, and the Resulting Conflict of Interest is Finally Disclosed by the NASD .............................................................................................................. 57
   E.   Additional Scienter Allegations ..................................................................... 59
   F.   Plaintiffs and the Other Members of the Class Have Suffered Damages as a Result of Defendants' Illegal And Improper Actions ................................................... 60

V.     Class Action Allegations ........................................................................................ 62

VI.    Causes of Action ..................................................................................................... 63

   Count I
   Against All Defendants, Except AIG Inc., for Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder ............................................. 63

   Count II
   Against All Defendants, Except AIG Inc., for Violation of Section 10(b) of The Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder ................................ 66

   Count III
   Against the AIG Brokers for Violation of Section 10(b) of The Exchange Act and Rule 10b-10 Promulgated Thereunder ................................................................... 68

   Count IV
   Against AIG Inc. for Violations of Section 20(a) of the Exchange Act .......................... 69

VII.   Prayer for Relief ..................................................................................................... 70

VIII.  Jury Trial Demanded .............................................................................................. 70

i

Lead Plaintiffs Joseph Martingano, Alan Bogage, Ethel J. Karabin, as beneficiary of the

IRA FBO Ethel J. Karabin and trustee of the FBO The Residual Trust of The Karabin Trust U/A

DTD 05/10/1985 and Survivor Trust of The Karabin Trust U/A DTD 05/10/1985, Steven R.

Wiskow, and Edsel F. Young (the "Martigano Group" or "Plaintiffs"),[1] by and through counsel,

allege the following based upon the investigation of counsel, which included a review of United

States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings,

reports, and advisories, press releases, and media reports about American International Group,

Inc. ("AIG Inc.") and its related entities also named herein as defendants (collectively

"Defendants" or "AIG").

I.     **INTRODUCTION**

1.     This is a federal class action arising out of Defendants' serious, undisclosed

conflict of interest arising from a scheme designed to improperly enrich Defendants at the

expense of Plaintiffs and the other members of the class from April 7, 2001 through June 8,

2005, inclusive (the "Class Period").

2.     AIG Inc.'s broker/dealers (the "AIG Brokers") employ financial advisors who

distribute mutual fund shares to investors.  During the Class Period Defendants participated in a

self-serving kickback scheme referred to as selling "Shelf-Space," whereby AIG Inc. used the

AIG Brokers to direct AIG clients into the Shelf-Space Funds in exchange for illegal kickback

payments and other incentives, such as revenue sharing, directed brokerage, and other incentives,

---

[1]     The Court previously dismissed Plaintiffs' claims for violation of the Securities Act of
1933.  As a result of the decision, Plaintiffs Sidney Perris and Frances Martingano would not
have standing to assert claims.  However, Plaintiffs do not waive these claims and reserve the
right to include such claims if an appeal is filed in this action.

that Defendants received from a small group of funds known as the Shelf-Space Funds.[2]

3.      Defendants cultivated a clandestine, incentive driven culture among the AIG Brokers to sell Shelf-Space Funds, regardless of the comparative value of the funds. Specifically, the Defendants implemented and managed a system in which Shelf-Space Funds would pay the AIG Brokers to steer clients into investing in those funds.  To add insult to injury, the money paid to Defendants as part of the kickback scheme originated from mutual fund fees paid, in part, by AIG investors who had already been steered into purchasing the Shelf-Space Funds.

4.      The AIG Brokers steered investors into the Shelf-Space Funds by representing that they would perform better than other funds.  The AIG Brokers' financial advisors led their clients to believe that such representations were based on objective analysis.  The AIG Brokers even went so far as to represent that they "offer[] one of the most personalized" services in the industry, are "unbiased" and  give recommendations "based solely on your financial agenda and no one else's."  *See*, *e.g.*, http://web.archive.org/web/20040411075602/www.advcap.net/ profile.asp (page last updated July 14, 2003); http://web.archive.org/web/20040402002902/ www.fscorp.com/profile.asp (page last updated July 14, 2003).

In addition, the Shelf-Space Funds had increased visibility on the Defendants' websites, increased access to the Defendants' sales force, the inclusion of materials relating to the Shelf-Space funds in internal marketing publications and newsletters, and participation in joint marketing programs between the AIG Brokers and the Shelf-Space Fund complexes.  NASD Letter of Acceptance, Waiver and Consent, No. CE2050011 ("NASD Letter"). [3]

---

[2]      A list of the Shelf-Space Funds is attached hereto as Exhibit A.

[3]      The NASD Letter, attached as Exhibit B, though not executed, based upon Plaintiffs'

5.      The Defendants' financial gain for implementing and maintaining the Shelf-Space program took several forms, none of which was adequately disclosed to Plaintiffs or the other members of the Class.

6.      First, there was "revenue sharing" (*i.e.*, cash payments from the Shelf-Space Funds to the broker-dealers).  The revenue-sharing payments included up to a 0.25% (*i.e.*, 25 basis points) charge on the sales of shares, and quarterly fees, of up to 0.11% (*i.e.*, 11 basis points) per year, of the amount of assets under management.

7.      Second, there was directed brokerage (*i.e.*, allotting trades -- and the lucrative commissions that are a result of the trades -- in fund securities to a particular brokerage in exchange for that brokerage pushing the sale of those mutual funds onto investors).  From January 2001 through December 2003, twelve of the Shelf-Space Funds paid the AIG Brokers more than $41 million in kickback payments by directing brokerage commissions for portfolio transactions to the AIG Brokers.  The payments received by AIG Brokers pursuant to directed brokerage agreements were paid by fund assets of the Shelf-Space Funds, and, thus, were a liability charged against the underlying assets of the funds.

8.      Third, there was the ticket charge (*i.e.*, a transaction fee meant to cover the costs of a transaction such as record-keeping) incentive.  At AIG, the ticket charges were a minimum of $12 during  the Class Period.  To boost sales of the Shelf-Space Funds, the Shelf-Space companies paid the ticket charges on behalf of the AIG advisors whose customers buy their funds.  This meant the AIG advisors had to pay ticket charges on all transactions involving non-Shelf-Space Funds, but when customers put money into Shelf-Space Funds, however, the advisor did not have to pay ticket charges.

counsel's diligent investigation into the matter, is identical to the executed version of the letter.

9.     Fourth, there were over-and-above incentives.  For example, in addition to ordinary fees charged in connection with offering Shelf-Space Funds for sale, AIG Brokers were reimbursed for expenses incurred during 'top producer' meetings and educational and training seminars, and were partially reimbursed for certain administrative costs.  The over-and-above incentives were only paid by the Shelf-Space Funds.

10.     In addition, the Shelf-Space Funds provided sponsorship for company events, office parties, vacations, training and educational materials and conferences, and Shelf-Space Fund representatives were given greater access to branch offices and were invited to corporate training and marketing events.  The result was increased opportunities for Shelf-Space Fund representatives to promote the sale of their mutual funds.

11.     All the while, the AIG Brokers gave the impression of providing the benefits of objective investment advice to investors.  In reality, the AIG Brokers' recommendations were neither objective nor performance-based.  Realizing that disclosure of this scheme and the inherent conflicts of interest it created would undermine any investment recommendation made by their financial advisors, Defendants failed to disclose any of their improper conduct to Plaintiffs and the other members of the Class, thereby concealing information significant to any reasonable person deciding how to invest his or her money.  The AIG Brokers actively concealed from Plaintiffs the facts related to this conduct and the conflicts of interest generated by the Shelf-Space system of payments with respect to the investment advice given to their clients and the management of their client accounts.

12.     In addition, the Shelf-Space Fund prospectuses and Statements of Additional Information ("SAIs") did not adequately disclose the Shelf-Space payment system.

13.     The Shelf-Space Funds incurred fees borne by Plaintiffs and the other Class

4

members in order to maintain the Shelf-Space program.  Defendants took advantage of investors'

reliance on their financial expertise and steered those investors into Shelf-Space investments that

incurred fees to maintain the Shelf-Space program.  These fees, in their various forms, were

deducted from investors' principal in the Shelf-Space Funds.  As a result, Plaintiffs were misled

into thinking that the fees and commissions they paid on the Shelf-Space Funds were legitimate

outlays for services accruing to their benefit, when in actuality, the fees went to Shelf-Space

promotional services, accruing to the benefit of Defendants.

14.     The truth about AIG was revealed on June 8, 2005 when the NASD fined and

censured the AIG Brokers for the exact conduct alleged in this complaint.[4] *See* Press Release,

NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines Totaling More

Than $34 Million, (June 8, 2005), *at* http://www.nasd.com/PressRoom/NewsReleases/

2005NewsReleases/NASDW_014340 ("NASD Press Release") (attached as Exhibit C).

15.     Plaintiffs seek to recover damages caused by Defendants' violations of the

Securities Exchange Act of 1934 (the "Exchange Act"). [5]

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1391.  A substantial part of the events giving rise to the claims

---

[4]     The AIG Brokers were also found to have violated Section 17(a) of the Securities and Exchange Act, Rule 17a-4 thereunder, and NASD Conduct Rules 3110 and 2110 for failing to retain emails for the required time period.

[5]     The Court previously dismissed Plaintiffs' claims for violation of the Securities Act of 1933.  Plaintiffs do not waive these claims and reserve the right to include such claims if an

set forth herein occurred within this District.

18.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

19.     Plaintiff Joseph Martingano purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mr. Martingano are listed in Exhibit D.[6]

20.     Plaintiff Alan Bogage purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mr. Bogage are listed in Exhibit D.

21.     Plaintiff Ethel J. Karabin, as beneficiary of the IRA FBO Ethel J. Karabin and trustee of the FBO The Residual Trust of The Karabin Trust U/A DTD 05/10/1985 and Survivor Trust of The Karabin Trust U/A DTD 05/10/1985, purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Ms. Karabin are listed in Exhibit D.

22.     Plaintiff Steven R. Wiskow purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Fund acquired by Mr. Wiskow are

---

appeal is filed in this action.

[6]     Attached as Exhibit D is a chart detailing Plaintiffs' transactions in the Shelf-Space Funds during the Class Period, the annual year-end total assets for each of these funds is attached as Exhibit E.

listed in Exhibit D.

23.     Plaintiff Edsel F. Young purchased shares of the Shelf-Space Funds during the Class Period and was thereby damaged.  The Shelf-Space Funds acquired by Mr. Young are listed in Exhibit D.

**B.     The Parent Company**

24.     Defendant AIG Inc. is the ultimate parent of all Defendants named in the Complaint and is incorporated in Delaware.  AIG Inc. is a U.S.-based international insurance and financial services organization and the largest underwriter of commercial and industrial insurance in the United States.  Through its subsidiaries, AIG Inc. offers a wide range of general and life insurance products for commercial, institutional and individual customers in approximately 130 countries and jurisdictions throughout the world.  AIG Inc.'s global businesses also include financial services, retirement savings and asset management. The Company's financial services businesses include aircraft leasing, financial products, trading and market making and consumer finance.  AIG Inc. has one of the largest retirement savings businesses in the United States and is a leader in asset management for the individual and institutional markets, with specialized investment management capabilities in equities, fixed income, alternative investments and real estate.  The Company is headquartered at 70 Pine Street, New York, New York 10270.  AIG Inc. is the ultimate beneficiary of the undisclosed plan and scheme to push Shelf-Space Funds as alleged herein.  AIG Inc. was the ultimate beneficiary of the scheme alleged herein.

**C.     The AIG Brokers**

25.     Defendants SunAmerica, Sentra and Spelman were combined to form Defendant AIG Financial Advisors, Inc. ("AIGFA") on October 31, 2005.  SunAmerican, Sentra and

Spelman entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.[7]   Defendant AIGFA is incorporated in Arizona and its offices are located at 2800 N. Central Ave, Suite 2100, Phoenix, AZ 85004.

26.     Defendant Advantage is incorporated in New York and is a wholly owned subsidiary of AIG Inc.  Advantage entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

27.     Defendant FSC is incorporated in Delaware and is a wholly owned subsidiary of AIG Inc.  FSC entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia 30339.

28.     Defendant Royal Alliance is incorporated in Delaware and is a wholly owned subsidiary of AIG Inc.  Royal Alliance entered into "shelf-space" arrangements during the Class Period, steering clients into the Shelf-Space Funds, in exchange for financial gain.  Its offices are located at 733 Third Avenue, New York, New York 10017.

29.     Defendants Advantage, FSC, Royal Alliance, SunAmerica, Sentra, and Spelman operated throughout the Class Period under the marketing designation "AIG Advisor Group." The AIG Advisor Group now consists of AIGFA, Advantage, FSC, and Royal Alliance.

30.     Herein, Defendants AIGFA, Advantage, FSC, and Royal Alliance will be referred to as the "AIG Brokers."

---

[7]     The last trade date for SunAmerica, Sentra and Spelman was October 28, 2005.

IV.      **SUBSTANTIVE ALLEGATIONS**

A.      **Defendants' Conflict of Interest**

31.      The AIG Brokers represent the fifth-largest retail securities sales force in the

nation.  Upon information and belief, their operating income is over $1.5 billion per year.  They

earn fees or investment income on more than $142 billion in assets under management.

http://web.archive.org/web/20040402001648/www.fscorp.com/parents.asp (August 14, 2003).

AIG employs approximately 2,275 financial advisors.

32.      AIG Brokers have represented that their advisors offer unbiased financial

information based solely on their clients' financial agendas and no one else's and have complete

flexibility to choose only those investment products that best match their client's financial needs.

33.      For instance, FSC represented that their clients have: **"Freedom.** It's what you

want in your financial advisor.  Someone who offers unbiased financial information based solely

on your financial agenda and no one else's.  That's what FSC Securities Corporation gives your

financial advisor-the freedom to do what they do best: helping you ensure your financial growth

and stability.  In the highly volatile securities industry, you and your financial advisor can use a

competitive advantage, and with FSC Securities Corporation that's what you get."(emphasis in

original). These are the first words under the FSC profile webpage. http://web.archive.org/

web/20040402002902/www.fscorp.com/profile.asp (page last updated July 14, 2003).  FSC

further assured its customers:  "**Trust.** With FSC Securities Corporation, you and your financial

advisor get so much more than solid financial advice and backing. You get a lasting relationship

based on mutual trust and integrity. You get a team that makes your interests and needs their

daily priority." http://web.archive.org/web/20040402002902/www.fscorp.com/profile.asp (page

last updated July 14, 2003) (emphasis in original).  FSC further stated that its broker-dealers "are

9

dedicated to attaining their clients' financial goals." http://web.archive.org/web/ 20040402002902/www.fscorp.com/profile.asp (page last updated July 14, 2003).  FSC said that it offered "The stability of nearly fifty years of experience in satisfying the unique investment and insurance needs of its clients." http://web.archive.org/web/20040402002902/ www.fscorp.com/profile.asp (page last updated July 14, 2003).  The President and CEO of FSC, Joseph B. Gruber, stated that "[w]ith FSC Securities Corporation, you get a lasting relationship based on mutual trust and integrity. You get a team that makes your interests and needs their daily priority." http://web.archive.org/web/20040402004523/www.fscorp.com/pwelcome.asp (page last updated July 14, 2003).

34.     The very first words that appeared on Royal Alliance's website during the Class Period were: "Defining the Independent Broker-Dealer." http://web.archive.org/web/ 20020413235412/www.royalalliance.com/index.html.  In fact, the slogan "Defining the Independent Broker-Dealer" would also appear at the top of anyone's browser window in the "title bar" when on any of the Royal Alliance webpages during the Class Period and as the title of the webpage when anyone added a Royal Alliance webpage to their list of "bookmarks" or "favorites."  In addition, Royal Alliance represented its service as follows:  "With a Royal Alliance Registered Representative as your financial advisor, you'll not only find strategies to meet your personal goals, you'll have a comprehensive source for most or even all of your financial planning needs." http://web.archive.org/web/20040811002156/www.royalalliance.com/ aboutus/co.html (page last updated on March 12, 2004).  Royal Alliance further represented that it offered investors a "large range [of] families of funds" that were "designed to meet a variety of investment needs." http://web.archive.org/web/20040708082553/www.royalalliance.com/ products/mf.html (page last updated July 29, 2003).  Royal Alliance further represented that it

offered funds from 145 different mutual fund families (*id.*), although it was steering plaintiffs

almost exclusively into the 19 fund families that comprised the Shelf Space Funds, and that it

"follow[ed] a strict due diligence process in selecting these [fund families] for the Royal

Alliance Approved Product Listing." http://web.archive.org/web/20020205042600/

www.royalalliance.com/about/products/index.html.

      35.    Sentra and Spellman represented that:  "Many people don't know that in the

securities industry companies like ours are often referred to as 'broker-dealers.'  That's because

we don't actually create or sell financial services and products ourselves; rather, independent and

entrepreneurial financial professionals who are affiliated with us sell these services and

products." http://web.archive.org/web/20040405161835/sentraspelman.com/investors/

default.html (page last updated July 28, 2003).  Sentra and Spellman further stated the following

about its broker-dealers:  "Their entrepreneurial style of business allows them to be unbiased in

terms of the products they can provide to you, which means you'll always have many excellent

options to meet your specific life planning needs." http://web.archive.org/web/20040405161835/

sentraspelman.com/investors/default.html (page last updated July 28, 2003).  Sentra and

Spellman further stated that:  "Sentra and Spelman Representatives are dedicated to offering you

innovative financial choices, they maintain the highest level of integrity, they operate in full

compliance with the industry's strict regulations, and they maintain a strong commitment to the

fact that client needs come first!" http://web.archive.org/web/20040405161835/

sentraspelman.com/investors/default.html (page last updated July 28, 2003). Sentra and

Spellman also stated that "[t]he entrepreneurial style of the financial professionals who are

affiliated with us allows them to be unbiased in terms of the products they can provide to you,

which means you'll always have many excellent options to meet your specific life planning

needs." http://web.archive.org/web/20040405152442/sentraspelman.com/aboutus/default.html
(page last updated July 28, 2003).

36.     SunAmerica's website is almost a direct copy of the website used by both
Spellman and Sentra.  SunAmerica stated that its broker-dealers' "entrepreneurial style of
business allows them to be unbiased in terms of the products they can provide to you, which
means you'll always have many excellent options to meet your specific life planning needs."
http://web.archive.org/web/20040423110412/www.sunamericasecurities.com/investors/default.h
tml (page last updated July 28, 2003).  SunAmerica further stated that "[L]ike us, the
Representatives are dedicated to offering you innovative financial choices, they maintain the
highest level of integrity, they operate in full compliance with the industry's strict regulations,
and they maintain a strong commitment to the fact that *client needs come first!*" (emphasis in
original) http://web.archive.org/web/20040423110412/www.sunamericasecurities.com/investors/
default.html (page last updated July 28, 2003).  SunAmerica further stated that "[t]he
entrepreneurial style of the financial professionals who are affiliated with us allows them to be
unbiased in terms of the products they can provide to you, which means you'll always have many
excellent options to meet your specific life planning needs." http://web.archive.org/web/
20040423105225/www.sunamericasecurities.com/aboutus/default.html (page last updated July
28, 2003).

37.     Advantage's website is also almost a direct copy of the website used by FSC.
Advantage represented that its financial advisors offered:  **"Freedom.**  It's what you want in your
financial advisor.  Someone who offers unbiased financial information based solely on your
financial agenda and no one else's.  That's what Advantage Capital Corporation gives your
financial advisor-the freedom to do what they do best: helping you ensure your financial growth

12

and stability.  In the highly volatile securities industry, you and your financial advisor can use a

competitive advantage, and with Advantage Capital Corporation that's what you get."(emphasis

in original). These are the first words under the Advantage company overview webpage.

http://web.archive.org/web/20040411075602/www.advcap.net/

profile.asp (page last updated July 14, 2003).  Advantage further assured their customers:

"**Trust.** With Advantage Capital Corporation, you and your financial advisor get so much more

than solid financial advice and backing. You get a lasting relationship based on mutual trust and

integrity. You get a team that makes your interests and needs their daily priority."

http://web.archive.org/web/20040411075602/www.advcap.net/profile.asp (page last updated

July 14, 2003).  Advantage further stated that its broker-dealers "are dedicated to attaining their

clients' financial goals." http://web.archive.org/web/20040411075602/www.advcap.net/

profile.asp (page last updated July 14, 2003).  Advantage said that it offered "[u]ncompromising

service for more than $2.8 billion in assets under management," and "[t]he stability of nearly

fifty years of experience in satisfying the unique investment and insurance needs of its clients."

http://web.archive.org/web/20040411075602/www.advcap.net/profile.asp (page last updated

July 14, 2003). The President and CEO of FSC, Joseph B. Gruber, stated that "[w]ith Advantage

Capital Corporation, you get a lasting relationship based on mutual trust and integrity. You get a

team that makes your interests and needs their daily priority." http://web.archive.org/web/

20040411080159/www.advcap.net/pwelcome.asp (page last updated July 14, 2003).

     38.    Plaintiffs relied on their belief that they were receiving objective advice from the

AIG advisors, but the Defendants, in fact, carefully participated in an institutional revenue

sharing scheme wherein the AIG Brokers received secret payments from the Shelf-Space Funds

in exchange for recommending such funds regardless of their suitability to clients of AIG or the

comparative value of the funds.  Defendants' evaluation of the Shelf-Space Funds was neither objective nor performance-based.

39.     Investors can avoid the huge fees associated with the services of distribution professionals, such as financial advisors, by determining all the above-mentioned issues for themselves and purchasing mutual funds directly from a fund company.  Many investors choose, however, to pay the substantial fees and commissions to obtain financial guidance from financial advisors.  These commissions are often known as a "sales load" or "sales charge." There are two general types of sales loads—a front-end sales load investors pay when they purchase fund shares and a back-end or deferred sales load investors pay when they redeem their shares. 12b-1 fees can also be used to compensate brokers in place of part of their sales load. Securities and Exchange Commission, Mutual Fund Fees and Expenses, *at* http://www.sec.gov/answers/ mffees.htm.

40.     The AIG Brokers put themselves into conflicts of interest that were even more egregious in light of the fact that the kickback payments received were the result of improper fees charged to the funds' investors and therefore the AIG clients.  These charges reduced the net asset value ("NAV") of the underlying funds.

41.     While promoting the Shelf-Space Funds to its clients, the AIG Brokers represented the Shelf-Space Funds as being better for its clients than other funds available.  AIG clients were led to believe that AIG financial advisors were recommending the Shelf-Space Funds based on objective analysis which indicated that such funds would perform better than offerings from other fund companies.  Only 19 mutual fund families out of over 140 fund families with which AIG Brokers had distribution agreements participated as Shelf-Space Funds. AIG Brokers' advisors were required to receive approval from their manager if they attempted to

14

sell non-Shelf-Space Funds to their clients.  However, only Shelf-Space Funds were on the

managers' approved list of funds they could sell, and advisors only received training on how to

sell Shelf-Space Funds.

42.     Defendants' decision to steer investors into Shelf-Space Funds over other funds

was the result of bias, as is illustrated by many of the Shelf-Space Funds' relatively poor

performance. For example, during the Class Period, AIM Mutual Funds, a Shelf-Space Fund,

posted returns that were below the industry's category average returns:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **AIM's Total Return** | -20.8 | 29.6 | 11.1 |
| **Industry Category Average** | -20.5 | 30.3 | 11.5 |

Morningstar.com, AIM Investments Mutual Funds Family Snapshot, August 25, 2006,

http://quicktake.morningstar.com (password required).

43.     More evidence of the Shelf-Space Funds' poor performance can be found in

industry analysts' publications. For example, industry analyst Morningstar provides a fund

family score, which is an asset-weighted average of all of a fund company's Morningstar ratings

(also known as star ratings) within an asset class. The fund family score can help investors

determine a firm's overall profitability within a specific asset class (domestic stock, international

stock, municipal bond or taxable bond), and can range from 1.0 to 5.0. A score below 2.5 is an

indication that the fund company has met with little success in that asset class. A score between

2.5 and 3.5 indicates the fund company is about average, while a score above 3.5 indicates the

fund company has a fair amount of prowess. The more funds a firm manages per asset class, the

stronger the significance of the fund family score with respect to fund's performance. In this

regard, the majority of AIM's assets were not successful and the remaining were only average, as illustrated by the chart below:

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.5 | 75.07 |
| Taxable Bond | 1.6 | 4.99 |
| International Stock | 3.0 | 14.03 |
| Municipal Bond | 2.9 | 2.15 |

*Id.*

44.    John Hancock Mutual Funds, another of the Shelf-Space Funds, also had total returns substantially below the category average and a poor fund family score:

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| JH's Total Return | -11.7 | 21.8 | 8.6 |
| Industry Category Average | -9.7 | 23.6 | 10.1 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.3 | 58.05 |
| International Stock | 2.0 | 5.26 |
| Taxable Bond | 2.7 | 16.02 |
| Municipal Bond | 2.8 | 1.79 |

Morningstar.com, *John Hancock Fund Family Snapshot,* August 25, 2006,

http://quicktake.morningstar.com (password required).

45.    MFS, another of the Shelf-Space Funds, also followed the same trend as other

16

Shelf-Space Funds, yielding total returns that were generally below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| MFS's Total Return | -18.2 | 21.1 | 11.5 |
| Industry Category Average | -16.5 | 23.6 | 10.0 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.5 | 47.83 |
| Taxable Bond | 2.6 | 10.41 |
| Municipal Bond | 3.2 | 6.85 |
| International Stock | 3.6 | 16.89 |

Morningstar.com, *MFS Mutual Funds Family Snapshot*, August 25, 2006, http://quicktake.morningstar.com (password required).

     46.     Putnam, another of the Shelf-Space Funds, followed the same trend, having total returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Putnam's Total Return | -16.9 | 23.5 | 10.0 |
| Industry Category Average | -16.0 | 25.4 | 10.8 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 3.1 | 56.83 |
| Taxable Bond | 2.5 | 12.35 |
| Municipal Bond | 2.6 | 8.30 |
| International Stock | 2.8 | 13.01 |

Morningstar.com, *Putnam Mutual Funds Family Snapshot,* August 25, 2006,

http://quicktake.morninstar.com (password required).

47.     Pacific, another of the Shelf-Space Funds, followed the same trend, having total

returns that were well below the industry's category average returns.

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Putnam's Total Return | -12.4 | 15.3 | 9.1 |
| Industry Category Average | -8.5 | 24.2 | 10.3 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | -- | 51.11 |
| Taxable Bond | 2.1 | 13.48 |
| Municipal Bond | -- | -- |
| International Stock | 1.3 | 10.85 |

Morningstar.com, *Pacific Mutual Funds Family Snapshot,* August 25, 2006,

http://quicktake.morninstar.com (password required).

48.     As is illustrated by the pattern of their under-performance relative to their peers,

the Shelf-Space Funds' performance played no role in why the AIG Brokers promoted these

fund families over others.  In fact, the performance of many of the Shelf-Space Funds relative to

their peers demonstrates that Defendants' financial advisors should have referred other funds than the Shelf-Space Funds to investors, but that the incentives and pressure biased the AIG Brokers and caused them to do otherwise.

49.     Unbeknownst to Plaintiffs and the other members of the Class, Defendants blatantly solicited the sponsorship of the Shelf-Space Funds' distributors and investment advisors for company events, vacations for investment advisors, office parties, training and educational meetings and conferences in exchange for the inclusion of their funds in the Shelf-Space Fund list.  Shelf-Space Funds were favorably perceived as having achieved a higher, preferred status based on their performance, while representatives from these funds were given greater access to branch offices and were invited to corporate training and marketing events. Consequently, representatives from the Shelf-Space Funds were given increased opportunities to interact with AIG's financial advisors to promote the sale of their mutual funds.

**B.     The Payments Which Caused Defendants' Conflict Of Interest**

50.     Throughout the Class Period, the AIG Brokers received undisclosed kickbacks from the Shelf-Space Funds in exchange for steering investors into the Shelf-Space Funds.  The AIG Brokers received these kickback payments in several forms.

51.     First, there was revenue-sharing.  Revenue sharing occurs when a mutual fund's investment advisor or its affiliate makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that fund over other funds. Revenue sharing arrangements are problematic, *inter alia,* because financial advisors cannot uphold their fiduciary responsibilities when they choose to include or exclude a fund based solely on the fund's participation in a revenue sharing arrangement rather than based on the benefit to the investor. Additionally, the SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest,

19

but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds." 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004).

52.     The AIG Brokers implemented and managed a revenue-sharing program called the "Elite Partners" program for Shelf-Space Funds.  Defendants required the Shelf-Space Funds to pay the AIG Brokers in order for their financial advisors to promote the Shelf-Space-Funds to investors.  According to the NASD:

> The Elite Partners funds were offered increased visibility on the firms' websites, which included Elite Partners sections incorporating content provided by the participating fund complexes (such as sales ideas, product-specific data, and hyperlinks to the fund complexes' own web sites); increased access to the sales force, which included participation in [the AIG Brokers'] educational and sales conferences and meetings to reward top producing brokers,  receipt of lists of registered representatives, and meetings between fund complex personnel and [the AIG Brokers'] branch offices; the inclusion of materials relating to the Elite Partner funds in [the AIG Brokers'] internal marketing publications and newsletters; ticket charge waivers; and participation in joint marketing programs between [the AIG Brokers] and Elite Partner fund complexes.

NASD Letter.

53.     The AIG Brokers received the following revenue sharing payments from its Shelf-Space Funds:

- A payment of up to a 0.25% (*i.e.*, 25 basis points) charge on the sales of shares; and

- Quarterly fees, of up to 0.11% (*i.e.*, 11 basis points) per year, of the amount of assets under management.

*See* NASD Letter; Royal Alliance Associates, Inc.'s Disclosure Document for Mutual Fund, Variable Product, Real Estate Investment Trust, Direct Participation Program and Third Party Money Manager Investors *at*

http://www.royalalliance.com/language/RARevSharingLanguage6_06.pdf

54.     Second, there was "directed brokerage."  The use of directed brokerage was the

primary method used by the Shelf-Space Funds to pay the AIG Brokers the fees necessary for

participation in the revenue sharing program. Directed brokerage involves allotting trades — and

the lucrative commissions that are a result of the trades — in the securities that make up a mutual

fund investment portfolio to a particular brokerage (such as an AIG Broker or an intermediary)

in exchange for that brokerage pushing the sale of those mutual funds onto investors.  As stated

by the NASD in its sanction and fine of the AIG Brokers, such conduct violates NASD Rule

2830(k):

> The rule provides, in pertinent part:
>
> (1)  No member shall, directly or indirectly, favor or disfavor the sale
> or distribution of shares of any particular investment company or
> group of investment companies on the basis of brokerage
> commissions received or expected by such member from any source,
> including such investment company, or any covered account.
>
> *          *          *
>
> (6)  No member shall, … (B)  recommend specific investment companies
> to sales personnel, or establish "recommended," "selected," or "preferred"
> lists of investment companies…, if such companies are recommended or
> selected on the basis of brokerage commissions received or expected from
> any source ….
>
> *          *          *
>
> By receiving brokerage commissions to pay for the fund complexes'
> participation in the shelf space programs, Respondents violated
> NASD Conduct Rules 2830(k) and 2110.

NASD Letter.

55.     The mechanism for paying the directed brokerage amounts was established by

having the Shelf-Space Fund complexes enter into an arrangement with the clearing firm for

Defendants, or with other clearing firms, in which the Shelf-Space Fund complexes would direct

some of their portfolio trade executions to one of the designated clearing firms, and indicate to

the clearing firm that the trade was "for the benefit of" one or more of the Defendants.  As part

of the arrangement, Defendants were deemed introducing brokers by the clearing firms.  A large

portion of the commission – generally 70-90% –from trades made under this arrangement would

be credited or paid to one or more of the Defendants.[8]  Because 10-30% of the commission

amount was retained by the clearing firms, the Shelf-Space Fund companies needed to produce

more in directed commissions than the amounts they owed to Defendants. NASD Letter.

56.    As stated by the NASD in its censure and multi-million dollar fine of the AIG

Brokers, Defendants violated NASD rule 2830(k) by arranging and accepting $41.5 million

dollars of directed brokerage from January 2001 through December 2003.  *Id.*

57.    Third, there was the ticket charge incentive.  The fees Defendants charged to its

advisors were mainly ones called "ticket charges." While almost unknown to investors, ticket

charges are commonly applied in the investment industry to advisors.  Ticket charges are

essentially transaction fees, meant to cover costs such as record-keeping.

58.    At AIG, the ticket charges were a minimum of $12 during the Class Period.  To

boost sales of the Shelf-Space Funds, the Shelf-Space companies paid the ticket charges on

behalf of the AIG advisors whose customers buy their funds.  This meant the AIG advisors had

to pay ticket charges on all transactions involving non-Shelf-Space Funds, but when customers

put money into Shelf-Space Funds, however, the advisor did not have to pay a ticket charge.

59.    The effect of the ticket charge policy at AIG was staggering.  A typical AIG

advisor conducted approximately 4,867 transactions per year during the Class Period.  Applying

---

[8]    At times, the payments had to be reallocated internally among Defendants, since some of
the fund complexes directed all of their payments to one of the six AIG Brokers or otherwise

the minimum ticket charge of $12, this meant that each AIG advisor would earn approximately $58,400 more from selling Shelf-Space Funds than from selling non-Shelf-Space funds. Conversely, an advisor would earn approximately $58,400 less if he did not sell Shelf-Space Funds.  In aggregate, the AIG advisors made approximately $132,860,000 per year selling Shelf-Space Funds.

60.     Fourth, there were various over-and-above incentives.  On top of the sales load and the commissions or concessions charged in connection with the mutual fund's offering, Defendants also received revenue through paid trips and bonuses for financial advisors who steered unusually high numbers of clients into Shelf-Space Funds and reimbursement for expenses incurred by the AIG Brokers during "top producer" meetings and educational and training conference seminars.  The AIG Brokers also were able to share certain administrative costs such as record keeping with the fund families.

61.     The "directed brokerage," "revenue sharing," and other payments received by AIG during the Class Period are jointly referred to as the "kickback payments" below.

C.      **The Shelf-Space Funds' Prospectuses, Their Statements of Additional Information and Defendants' Public Statements Were Materially False and Misleading Regarding the Shelf-Space Arrangements**

62.     The kickback activities engaged in by Defendants as described above created conflicts of interest with respect to the AIG Brokers' investment advice given to their clients and the management of their client accounts. These conflicts of interest were not disclosed to Plaintiffs and the Class, and were actively concealed from clients. Disclosure of these kickbacks was necessary for the AIG Brokers' clients to make informed investment decisions.

63.     The AIG Brokers disclosed information to their customers concerning mutual

_____

failed to allocate the payments appropriately.

fund purchases primarily through supplying customers with the prospectuses, and, if requested, the statements of additional information issued by the mutual funds.

64.     A mutual fund's prospectus and its SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor. *See* Plain English Disclosure, Securities and Exchange Commission, SEC Release Nos. 33-7497, 34-39593 (Oct. 1, 1998) (to be codified at 17 C.F.R. pts. 228, 229, 230, 239 and 274).

65.     Prior to investing in any of the Shelf-Space Funds, Plaintiffs and each member of the Class were entitled to receive the appropriate prospectuses.  The SAI is not distributed to investors, but is available to them on request.  The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Shelf-Space Funds and the financial incentives received by the AIG Brokers for such activities.

66.     Each of the Shelf-Space Funds prospectuses and their SAIs issued during the Class Period omitted material information about the mutual funds and the fees and costs associated with them. As seen below, each of the SAIs contained substantively the same materially false and misleading statements and omissions regarding revenue sharing, directed brokerage, 12b-1 fees and soft dollars.

67.     For example, the March 1, 2003 SAI for the American Funds ("American") Investment Company of America mutual fund — one of the Shelf-Space Funds identified in Exhibit A and a Shelf-Space Fund purchased by Plaintiffs during the Class Period — is similar in substance to all the other Shelf-Space Fund prospectuses issued during the Class Period in that

24

it states the following:

### EXECUTION OF PORTFOLIO TRANSACTIONS

The Investment Advisor places orders for the fund's portfolio securities transactions. The Investment Advisor strives to obtain the best available prices in its portfolio transactions taking into account the costs and quality of executions. When, in the opinion of the Investment Advisor, two or more brokers (either directly or through their correspondent clearing agents) are in a position to obtain the best price and execution, preference may be given to brokers who have sold shares of the fund or who have provided investment research, statistical, or other related services to the Investment Advisor. The fund does not consider that it has an obligation to obtain the lowest available commission rate to the exclusion of price, service and qualitative considerations.

There are occasions on which portfolio transactions for the fund may be executed as part of concurrent authorizations to purchase or sell the same security for other funds served by the Investment Advisor, or for trusts or other accounts served by affiliated companies of the Investment Advisor. Although such concurrent authorizations potentially could be either advantageous or disadvantageous to the fund, they are effected only when the Investment Advisor believes that to do so is in the interest of the fund. When such concurrent authorizations occur, the objective is to allocate the executions in an equitable manner. The fund will not pay a mark-up for research in principal transactions.

Brokerage commissions paid on portfolio transactions, including dealer concessions on underwritings, if applicable, for the fiscal years ended 2002, 2001 and 2000, amounted to $45,817,000, $33,794,000 and $25,958,000. The volume of securities subject to brokerage commissions and dealer concessions purchased by the fund increased during the 2002 fiscal year, resulting in an increase in total commissions paid on portfolio transactions.

The Investment Company of America, SAI effective Mar. 1, 2003 (Form 485BPOS) (Feb. 28, 2003).

68.     Similarly, the November 22, 2002 SAI for the Oppenheimer Limited-Term Government Fund, another Shelf-Space Fund purchased by Plaintiffs during the Class Period,

states the following:

### Brokerage Policies of the Fund

Brokerage Provisions of the Investment Advisory Agreement. One of the duties of the Manager under the investment advisory agreement is to arrange the portfolio transactions for the Fund. The advisory agreement contains provisions relating to the employment of broker-dealers to effect the Fund's portfolio transactions. The Manager is authorized by the advisory agreement to employ broker-dealers, including "affiliated" brokers, as that term is defined in the Investment Company Act. The Manager may employ broker-dealers that the Manager thinks, in its best judgment based on all relevant factors, will implement the policy of the Fund to obtain, at reasonable expense, the "best execution" of the Fund's portfolio transactions. "Best execution" means prompt and reliable execution at the most favorable price obtainable. The Manager need not seek competitive commission bidding. However, it is expected to be aware of the current rates of eligible brokers and to minimize the commissions paid to the extent consistent with the interests and policies of the Fund as established by its Board of Trustees.

Under the investment advisory agreement, the Manager may select brokers (other than affiliates) that provide brokerage and/or research services for the Fund and/or the other accounts over which the Manager or its affiliates have investment discretion. The commissions paid to such brokers may be higher than another qualified broker would charge, if the Manager makes a good faith determination that the commission is fair and reasonable in relation to the services provided. Subject to those considerations, as a factor in selecting brokers for the Fund's portfolio transactions, the Manager may also consider sales of shares of the Fund and other investment companies for which the Manager or an affiliate serves as investment advisor.

Brokerage Practices Followed by the Manager. Most securities purchases made by the Fund are in principal transactions at net prices. The Fund usually délas directly with the selling or purchasing principal or market maker without incurring charges for the services of a broker on its behalf unless the Manager determines that a better price or execution may be obtained by using the services of a broker. Therefore, the Fund does not incur substantial brokerage costs. Portfolio securities purchased from underwriters include a commission or concession paid by the issuer to the underwriter in the price of the security. Portfolio securities purchased from dealers

include a spread between the bid and asked price. The Fund seeks to obtain prompt execution of these orders at the most favorable net price.

The Manager allocates brokerage for the Fund subject to the provisions of the investment advisory agreement and the procedures and rules described above. Generally, the Manager's portfolio traders allocate brokerage based upon recommendations from the Manager's portfolio managers. In certain instances, portfolio managers may directly place trades and allocate brokerage. In either case, the Manager's executive officers supervise the allocation of brokerage.

Transactions in securities other than those for which an exchange is the primary market are generally done with principals or market makers. Brokerage commissions are paid primarily for effecting transactions in listed securities or for certain fixed-income agency transactions in the secondary market. Otherwise brokerage commissions are paid only if it appears likely that a better price or execution can be obtained by doing so. In an option transaction, the Fund ordinarily uses the same broker for the purchase or sale of the option and any transaction in the securities to which the option relates.

Other funds advised by the Manager have investment policies similar to those of the Fund. Those other funds may purchase or sell the same securities as the Fund at the same time as the Fund, which could affect the supply and price of the securities. If two or more funds advised by the Manager purchase the same security on the same day from the same dealer, the transactions under tose combined orders are averaged as to price and allocated in accordance with the purchase or sale orders actually placed for each account.

The investment advisory agreement permits the Manager to allocate brokerage for research services. The investment research services provided by a particular broker may be useful only to one or more of the advisory accounts of the Manager and its affiliates. The investment research received for the commissions on those other accounts may be useful both to the Fund and one or more of the Manager's other accounts. Investment research may be supplied to the Manager by a third party at the instance of a broker through which trades are placed.

Investment research services include information and analysis on particular companies and industries as well as market or economic trends and portfolio strategy, market quotations for portfolio

evaluations, information systems, computer hardware and similar products and services. If a research service also assists the Manager in a non-research capacity (such as bookkeeping or other administrative functions), then only the percentage or component that provides assistance to the Manager in the investment decision-making process may be paid in commission dollars.

The Board of Trustees permits the Manager to use stated commissions on secondary fixed-income agency trades to obtain research if the broker represents to the Manager that: (i) the trade is not from or for the broker's own inventory, (ii) the trade was executed by the broker on an agency basis at the stated commission, and (iii) the trade is not a riskless principal transaction. The Board of Trustees permits the Manager to use commissions on fixed-price offerings to obtain research, in the same manner as is permitted for agency transactions.

The research services provided by brokers broadens the scope and supplements the research activities of the Manager. That research provides additional views and comparisons for consideration, and helps the Manager to obtain market information for the valuation of securities that are either held in the Fund's portfolio or are being considered for purchase. The Manager provides information to the Board about the commissions paid to brokers furnishing such services, together with the Manager's representation that the amount of such commissions was reasonably related to the value or benefit of such services.

Oppenheimer Limited-Term Government Fund, SAI effective Nov. 22, 2002 (Form 485BPOS) (Nov. 22, 2002).

69.     The January 30, 2003 SAI for the Putnam California Tax Exempt Income Fund, another Shelf-Space Fund purchased by Plaintiffs during the Class Period, states the following:

Portfolio Transactions

Investment decisions.  Investment decisions for the fund and for the other investment advisory clients of Putnam Management and its affiliates are made with a view to achieving their respective investment objectives.  Investment decisions are the product of many factors in addition to basic suitability for the particular client involved.  Thus, a particular security may be bought or sold for certain clients even though it could have been bought or sold for

other clients at the same time.  Likewise, a particular security may be bought for one or more clients when one or more other clients are selling the security.   In some instances, one client may sell a particular security to another client.  It also sometimes happens that two or more clients simultaneously purchase or sell the same security, in which event each day's transactions in such security are, insofar as possible, averaged as to price and allocated between such clients in a manner which in Putnam Management's opinion is equitable to each and in accordance with the amount being purchased or sold by each. There may be circumstances when purchases or sales of portfolio securities for one or more clients will have an adverse effect on other clients.

Brokerage and research services.   Transactions on U.S. stock exchanges, commodities markets and futures markets and other agency transactions involve the payment by the fund of negotiated brokerage commissions. Such commissions vary among different brokers.  A particular broker may charge different commissions according to such factors as the difficulty and size of the transaction. Transactions in foreign investments often involve the payment of fixed brokerage commissions, which may be higher than those in the United States.  There is generally no stated commission in the case of securities traded in the over-the-counter markets, but the price paid by the fund usually includes an undisclosed dealer commission or mark-up.   In underwritten offerings, the price paid by the fund includes a disclosed, fixed commission or discount retained by the underwriter or dealer.  It is anticipated that most purchases and sales of securities by funds investing primarily in tax-exempt securities and certain other fixed-income securities will be with the issuer or with underwriters of or dealers in those securities, acting as principal. Accordingly, those funds would not ordinarily pay significant brokerage commissions with respect to securities transactions.  See "Charges and expenses" in Part I of this SAI for information concerning commissions paid by the fund.

It has for many years been a common practice in the investment advisory business for advisors of investment companies and other institutional investors to receive brokerage and research services (as defined in the Securities Exchange Act of 1934, as amended (the "1934 Act")) from broker-dealers that execute portfolio transactions for the clients of such advisors and from third parties with which such broker-dealers have arrangements. Consistent with this practice, Putnam Management receives brokerage and research services and other similar services from many broker-dealers with which Putnam Management places the fund's portfolio transactions and from third

parties with which these broker-dealers have arrangements. These services include such matters as economic analysis, investment research and database services, industry and company reviews, evaluations of investments, recommendations as to the purchase and sale of investments, performance measurement services, subscriptions, pricing services, quotation services, news services and computer equipment (investment-related hardware and software) utilized by Putnam Management's managers and analysts. Where the services referred to above are used by Putnam Management not exclusively for research purposes, Putnam Management, based upon its own allocations of expected use, bears that portion of the cost of these services which directly relates to their non-research use. Some of these services are of value to Putnam Management and its affiliates in advising various of their clients (including the fund), although not all of these services are necessarily useful and of value in managing the fund. The management fee paid by the fund is not reduced because Putnam Management and its affiliates receive these services even though Putnam Management might otherwise be required to purchase some of these services for cash.

Putnam Management places all orders for the purchase and sale of portfolio investments for the fund and buys and sells investments for the fund through a substantial number of brokers and dealers. In so doing, Putnam Management uses its best efforts to obtain for the fund the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions as described below. In seeking the most favorable price and execution, Putnam Management, having in mind the fund's best interests, considers all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security or other investment, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker-dealer involved and the quality of service rendered by the broker-dealer in other transactions.

As permitted by Section 28(e) of the 1934 Act, and by the Management Contract, Putnam Management may cause the fund to pay a broker-dealer which provides "brokerage and research services" (as defined in the 1934 Act) to Putnam Management an amount of disclosed commission for effecting securities transactions on stock exchanges and other transactions for the fund on an agency basis in excess of the commission which another broker-dealer would have charged for effecting that transaction. Putnam Management's authority to cause the fund to pay any such greater commissions is

subject to such policies as the Trustees may adopt from time to time. Putnam Management does not currently intend to cause the fund to make such payments. It is the position of the staff of the Securities and Exchange Commission that Section 28(e) does not apply to the payment of such greater commissions in "principal" transactions. Accordingly Putnam Management will use its best effort to obtain the most favorable price and execution available with respect to such transactions, as described above.

The Management Contract provides that commissions, fees, brokerage or similar payments received by Putnam Management or an affiliate in connection with the purchase and sale of portfolio investments of the fund, less any direct expenses approved by the Trustees, shall be recaptured by the fund through a reduction of the fee payable by the fund under the Management Contract.  Putnam Management seeks to recapture for the fund soliciting dealer fees on the tender of the fund's portfolio securities in tender or exchange offers.  Any such fees which may be recaptured are likely to be minor in amount.

Consistent with the Conduct Rules of the National Association of Securities Dealers, Inc. and subject to seeking the most favorable price and execution available and such other policies as the Trustees may determine, Putnam Management may consider sales of shares of the fund (and, if permitted by law, of the other Putnam funds) as a factor in the selection of broker-dealers to execute portfolio transactions for the fund.

Putnam California Tax Exempt Income Fund, SAI effective Jan. 30, 2003 (Form 485BPOS)

(Jan. 30, 2003).

70.    The January 30, 2002 SAI for the SunAmerica Growth Opportunities Fund, a

Shelf-Space Fund purchased by Plaintiffs during the Class Period, states the following:

PORTFOLIO TRANSACTIONS AND BROKERAGE

As discussed in the Prospectus, the Advisor is responsible for decisions to buy and sell securities for each Fund, selection of broker-dealers and negotiation of commission rates. Purchases and sales of securities on a securities exchange are effected through broker-dealers who charge a negotiated commission for their services. Orders may be directed to any broker-dealer including, to the extent and in the manner permitted by applicable law, an affiliated

brokerage subsidiary of the Advisor.

In the over-the-counter market, securities are generally traded on a "net" basis with dealers acting as principal for their own accounts without a stated commission (although the price of the security usually includes a profit to the dealer). In underwritten offerings, securities are purchased at a fixed price that includes an amount of compensation to the underwriter, generally referred to as the underwriter's concession or discount. On occasion, certain money market instruments may be purchased directly from an issuer, in which case no commissions or discounts are paid.

The Advisor's primary consideration in effecting a security transaction is to obtain the best net price and the most favorable execution of the order. However, the Advisor may select broker-dealers that provide it with research services -- analyses and reports concerning issuers, industries, securities, economic factors and trends -- and may cause a Fund to pay such broker-dealers commissions that exceed those that other broker-dealers may have charged, if in its view the commissions are reasonable in relation to the value of the brokerage and/or research services provided by the broker-dealer. Certain research services furnished by brokers may be useful to the Advisor with clients other than the Trust and may not be used in connection with the Trust. No specific value can be determined for research services furnished without cost to the Advisor by a broker. The Advisor is of the opinion that because the material must be analyzed and reviewed by its staff, its receipt does not tend to reduce expenses, but may be beneficial in supplementing the Advisor's research and analysis. Therefore, it may tend to benefit the Funds by improving the quality of the Advisor's investment advice. The investment advisory fees paid by the Funds are not reduced because the Advisor receives such services. When making purchases of underwritten issues with fixed underwriting fees, the Advisor may designate the use of broker-dealers who have agreed to provide the Advisor with certain statistical, research and other information.

Subject to applicable law and regulations, consideration may also be given to the willingness of particular brokers to sell shares of a Fund as a factor in the selection of brokers for transactions effected on behalf of a Fund, subject to the requirement of best price and execution.

The Advisor may effect portfolio transactions through an affiliated broker-dealer, acting as an agent and not as principal, in accordance with Rule 17e-1 under the 1940 Act and other applicable securities

laws.

Although the objectives of other accounts or investment companies that the Advisor manages may differ from those of the Funds, it is possible that, at times, identical securities will be acceptable for purchase by one or more of the Funds and one or more other accounts or investment companies that the Advisor manages. However, the position of each account or company in the securities of the same issue may vary with the length of the time that each account or company may choose to hold its investment in those securities. The timing and amount of purchase by each account and company will also be determined by its cash position. If the purchase or sale of a security is consistent with the investment policies of one or more of the Funds and one or more of these other accounts or companies is considered at or about the same time, transactions in such securities will be allocated in a manner deemed equitable by the Advisor. The Advisor may combine such transactions, in accordance with applicable laws and regulations, where the size of the transaction would enable it to negotiate a better price or reduced commission. However, simultaneous transactions could adversely affect the ability of a Fund to obtain or dispose of the full amount of a security that it seeks to purchase or sell, or the price at which such security can be purchased or sold.

SunAmerica Equity Funds, SAI effective Nov. 16, 2001 (Form 485BPOS) (Nov. 16, 2001).  The

January 28, 2003 SAI for the SunAmerica Growth Opportunities Fund contains the same

language under the Portfolio Transactions and Brokerage heading as that described above for the

January 30, 2002 SAI for the fund, but also includes the following paragraph:

On behalf of the Funds, the Advisor has entered into directed brokerage agreements. A directed brokerage agreement includes those arrangements under which products or services (other than execution of securities transactions), expenses reimbursements, or commissions are recaptured for a client from or through a broker dealer, in exchange for directing the client's brokerage transactions to that broker-dealer. The Board of Trustees has determined that a directed brokerage arrangement with State Street Brokerage, Lynch Jones and Ryan and/or any other comparable broker-dealer in the best interest of each Fund and its shareholders and, therefore has conveyed the information to Sub-advisors. A Fund may participate in directed brokerage agreements, provided the portfolio manager can still obtain the best price and execution for trades. Directed brokerage

33

arrangements are generally subject to a maximum of 20% of a Fund's eligible commissions. Thus, a Fund may benefit from the products or services or recapture commissions obtained through the directed brokerage transactions. As long as the trader executing the transaction for a Fund indicates that this is a directed brokerage credited back to the Fund. These credits are hard dollars and could be used to offset the Fund's custody expenses or to pay other Fund expenses (excluding expenses payable to affiliates). By entering into a brokerage/Service arrangement, a Fund can reduce expenses reported to shareholders in its statement of operations, fee table and expense ratio and can increate its reported yield.

SunAmerica Equity Funds, SAI effective Jan. 28, 2003 (Form 485BPOS) (Jan. 28, 2003).  The

February 1, 2004 SAI for the SunAmerica Growth Opportunities Fund contains the same

language under the Portfolio Transactions and Brokerage heading as that described above for the

January 30, 2002 SAI for the fund, includes the additional paragraph of the January 28, 2003

SAI, and also includes the following new paragraph:

Also, subject to best price and execution and consistent with applicable securities laws and regulations, the Board of Directors may instruct an Advisor to direct brokerage to certain broker-dealers under an agreement whereby these broker-dealers would pay designated Fund expenses. Currently the Funds have such an agreement with Lynch, Jones & Ryan and State Street Brokerage; however a Fund may enter in agreements with other broker-dealers as well. It is possible that broker-dealers participating in this program in the future might be affiliated with an Advisor, subject to applicable legal requirements. The brokerage of one Fund will not be used to help pay the expenses of any other SunAmerica Mutual Fund. SunAmerica will continue to waive its fees or reimburse expenses for any Fund for which it has agreed to do so. All expenses paid through the directed brokerage arrangements will be over and above such waivers and/or reimbursements, so that SunAmerica will not receive any direct or indirect economic benefit from the directed brokerage arrangements.

SunAmerica Equity Funds, SAI effective Feb. 2, 2004 (Form 485BPOS) (Feb. 2, 2004)

34

(accepted Jan. 30, 2004).[9]

71.     The October 1, 2004 SAI for the American Funds Income Fund of America, a

Shelf-Space Fund purchased by Plaintiffs during the Class Period, states the following:

EXECUTION OF PORTFOLIO TRANSACTIONS

The investment advisor places orders with broker-dealers for the fund's portfolio transactions. The investment advisor strives to obtain best execution on the fund's portfolio transactions, taking into account a variety of factors to produce the most favorable total price reasonably attainable under the circumstances. These factors include the size and type of transaction, the cost and quality of executions, and the broker-dealer's ability to offer liquidity and anonymity. The fund does not consider the investment advisor as having an obligation to obtain the lowest available commission rate to the exclusion of price, service and qualitative considerations. Subject to the considerations outlined above, the investment advisor may place orders for the fund's portfolio transactions with broker-dealers who have sold shares of the funds managed by the investment advisor, or who have provided investment research, statistical or other related services to the investment advisor. In placing orders for the fund's portfolio transactions, the investment advisor does not commit to any specific amount of business with any particular broker-dealer. Further, when the investment advisor places orders for the fund's portfolio transactions, it does not give any consideration to whether a broker-dealer has sold shares of the funds managed by the investment advisor. The investment advisor may, however, give consideration to investment research, statistical or other related services provided to the advisor in placing orders for the fund's portfolio transactions.

Portfolio transactions for the fund may be executed as part of concurrent authorizations to purchase or sell the same security for other funds served by the investment advisor, or for trusts or other accounts served by affiliated companies of the investment advisor. When such concurrent authorizations occur, the objective is to allocate the executions in an equitable manner.

Brokerage commissions paid on portfolio transactions, including

---

[9]     The SunAmerica Equity Funds' Jan. 28, 2003 and Feb. 1, 2004 SAIs also purport to show the brokerage commissions paid to affiliated broker-dealers; however, the prospectus fails to report that in fact, as described above, the directed brokerage was funneled to affiliates through intermediary clearing firms.

investment dealer concessions on underwritings, if applicable, for the fiscal years ended July 31, 2004, 2003 and 2002 amounted to $38,953,000, $40,825,000 and $28,054,000, respectively. The volume of trading activity increased from 2002 to 2003, resulting in an increase in brokerage commissions and dealer concessions paid on portfolio transactions.

The fund is required to disclose information regarding investments in the securities of its "regular" broker-dealers (or parent companies of its regular broker-dealers) that derive more than 15% of their revenue from broker-dealer, underwriter or investment advisor activities. A regular broker-dealer is (a) one of the 10 broker-dealers that received from the fund the largest amount of brokerage commissions by participating, directly or indirectly, in the fund's portfolio transactions during the fund's most recent fiscal year; (b) one of the 10 broker-dealers that engaged as principal in the largest dollar amount of portfolio transactions of the fund during the fund's most recent fiscal year; or (c) one of the 10 broker-dealers that sold the largest amount of securities of the fund during the fund's most recent fiscal year. At the end of the fund's most recent fiscal year, the fund held equity securities of Bank of America Corp. in the amount of $993,723,000; J.P. Morgan Chase & Co. in the amount of $442,360,000; Wachovia Corp. in the amount of $188,317,000; and Citigroup Inc. in the amount of $50,483,000 and debt securities of J.P. Morgan Chase & Co. in the amount of $132,634,000; Bank of America Corp. in the amount of $79,812,000; and Credit Suisse First Boston, Inc. in the amount of $5,118,000.

American Funds Income Series, SAI effective Oct. 1, 2004 (Form 485BPOS) (Oct. 1, 2004).

72.     The Jan. 29, 2004 SAI for the Fidelity Equity Income Fund and the Fidelity

Dividend Growth Fund, Shelf-Space Funds purchased by Plaintiffs during the Class Period,

states the following:

PORTFOLIO TRANSACTIONS

All orders for the purchase or sale of portfolio securities are placed on behalf of the fund by FMR pursuant to authority contained in the management contract. FMR may also be responsible for the placement of portfolio transactions for other investment companies and investment accounts for which it has or its affiliates have investment discretion. In selecting brokers or dealers (including affiliates of FMR), FMR generally considers: the execution price; the

36

size and type of the transaction; the nature and character of the markets for the security to be purchased or sold; the execution efficiency, settlement capability, and financial condition of the firm; the execution services rendered on a continuing basis; the reasonableness of any compensation paid; arrangements for payment of fund expenses, if applicable; and the provision of additional brokerage and research products and services.

For futures transactions, the selection of an FCM is generally based on the overall quality of execution and other services, including research, provided by the FCM.

If FMR grants investment management authority to a sub-advisor (see the section entitled "Management Contract"), that sub-advisor is authorized to provide the services described in the sub-advisory agreement, and will do so in accordance with the policies described in this section.

Purchases and sales of securities on a securities exchange are effected through brokers who receive compensation for their services. Compensation may also be paid in connection with riskless principal transactions (in both OTC securities and securities listed on an exchange) and agency OTC transactions executed with an electronic communications network (ECN) or an alternative trading system.

Securities may be purchased from underwriters at prices that include underwriting fees.

Generally, compensation relating to investments traded on foreign exchanges will be higher than for investments traded on U.S. exchanges and may not be subject to negotiation.

Futures transactions are executed and cleared through FCMs who receive compensation for their services.

The fund may execute portfolio transactions with brokers or dealers that provide products and services. These products and services may include: economic, industry, or company research reports or investment recommendations; subscriptions to financial publications or research data compilations; compilations of securities prices, earnings, dividends, and similar data; computerized databases; quotation equipment and services; research or analytical computer software and services; products or services that assist in effecting transactions, including services of third-party computer systems developers directly related to research and brokerage activities; and

effecting securities transactions and performing functions incidental thereto (such as clearance and settlement). The receipt of these products and services has not reduced FMR's normal research activities in providing investment advice to the fund. FMR's expenses could be increased, however, if it attempted to generate these additional products and services through its own efforts.

Certain of the products and services FMR receives from brokers or dealers are furnished by brokers or dealers on their own initiative, either in connection with a particular transaction or as part of their overall services. In addition, FMR may request a broker or dealer to provide a specific proprietary or third-party product or service. While FMR takes into account the products and services provided by a broker or dealer in determining whether compensation paid is reasonable, neither FMR nor the fund incurs an obligation to the broker, dealer, or third party to pay for any product or service (or portion thereof) by generating a certain amount of compensation or otherwise.

Brokers or dealers that execute transactions for the fund may receive compensation that is in excess of the amount of compensation that other brokers or dealers might have charged, in recognition of the products and services they have provided. Before causing the fund to pay such higher compensation, FMR will make a good faith determination that the compensation is reasonable in relation to the value of the products and services provided viewed in terms of the particular transaction for the fund or FMR's overall responsibilities to the fund or other investment companies and investment accounts. Typically, these products and services assist FMR or its affiliates in terms of its overall investment responsibilities to the fund and other investment companies and investment accounts; however, each product or service received may not benefit the fund.

FMR may place trades with certain brokers with which it is under common control, including National Financial Services LLC (NFS), provided it determines that this affiliate's products, services, and costs are comparable to those of non-affiliated, qualified brokerage firms. FMR may also place trades with Archipelago ECN (Archipelago), an ECN in which a wholly-owned subsidiary of FMR Corp. has an equity ownership interest, if the compensation is fair, reasonable, and comparable to compensation charged by non-affiliated, qualified brokerage firms for similar services. Prior to January 1, 2002, FMR placed trades with Fidelity Brokerage Services (Japan) LLC (FBSJ), an indirect, wholly-owned subsidiary of FMR Corp.

38

FMR may allocate brokerage transactions to brokers or dealers (including affiliates of FMR) who have entered into arrangements with FMR under which the broker-dealer allocates a portion of the compensation paid by a fund toward the reduction of that fund's expenses.

The Trustees of the fund periodically review FMR's performance of its responsibilities in connection with the placement of portfolio transactions on behalf of the fund and review the compensation paid by the fund over representative periods of time to determine if they are reasonable in relation to the benefits to the fund.

For the fiscal periods ended November 30, 2003 and 2002, the fund's portfolio turnover rates were 32% and 49%, respectively.

The fund may pay compensation including both commissions and spreads in connection with the placement of portfolio transactions.

For the fiscal years ended November 30, 2003, 2002, and 2001, the fund paid brokerage commissions of $3,356,132, $3,480,742, and $960,786, respectively. Significant changes in brokerage commissions paid by the fund from year to year may result from changing asset levels throughout the year.

During the fiscal years ended November 30, 2003, 2002, and 2001, the fund paid brokerage commissions of $192,293, $105,308, and $49,381, respectively, to NFS. NFS is paid on a commission basis. During the fiscal year ended November 30, 2003, this amounted to approximately 5.74% of the aggregate brokerage commissions paid by the fund for transactions involving approximately 11.25% of the aggregate dollar amount of transactions for which the fund paid brokerage commissions. The difference between the percentage of aggregate brokerage commissions paid to, and the percentage of the aggregate dollar amount of transactions effected through, NFS is a result of the low commission rates charged by NFS.

During the fiscal years ended November 30, 2003, 2002, and 2001, the fund paid brokerage commissions of $0, $0, and $475, respectively, to FBSJ. FBSJ is paid on a commission basis.

During the fiscal years ended November 30, 2003, 2002, and 2001, the fund paid brokerage commissions of $733, $0, and $0, respectively, to Archipelago. Archipelago is paid on a commission basis. During the fiscal year ended November 30, 2003, this amounted to approximately 0.02% of the aggregate brokerage

commissions paid by the fund for transactions involving approximately 0.14% of the aggregate dollar amount of transactions for which the fund paid brokerage commissions.

During the fiscal year ended November 30, 2003, the fund paid $2,821,081 in brokerage commissions to firms for providing research services involving approximately $729,806,221 of transactions. The provision of research services was not necessarily a factor in the placement of all this business with such firms.

The Trustees of the fund have approved procedures in conformity with Rule 10f-3 under the 1940 Act whereby a fund may purchase securities that are offered in underwritings in which an affiliate of FMR participates. These procedures prohibit the fund from directly or indirectly benefiting an FMR affiliate in connection with such underwritings. In addition, for underwritings where an FMR affiliate participates as a principal underwriter, certain restrictions may apply that could, among other things, limit the amount of securities that the fund could purchase in the underwritings.

From time to time the Trustees will review whether the recapture for the benefit of the fund of some portion of the compensation paid by the fund on portfolio transactions is legally permissible and advisable. The Trustees intend to continue to review whether recapture opportunities are available and are legally permissible and, if so, to determine in the exercise of their business judgment whether it would be advisable for the fund to participate, or continue to participate, in the commission recapture program.

Although the Trustees and officers of the fund are substantially the same as those of other funds managed by FMR or its affiliates, investment decisions for the fund are made independently from those of other funds or investment accounts (including proprietary accounts) managed by FMR or its affiliates. The same security is often held in the portfolio of more than one of these funds or investment accounts. Simultaneous transactions are inevitable when several funds and investment accounts are managed by the same investment advisor, particularly when the same security is suitable for the investment objective of more than one fund or investment account.

When two or more funds or investment accounts are simultaneously engaged in the purchase or sale of the same security, including a futures contract, the prices and amounts are allocated in accordance with procedures believed to be appropriate and equitable to each fund

or investment account. In some cases this system could have a detrimental effect on the price or value of the security as far as the fund is concerned. In other cases, however, the ability of the fund to participate in volume transactions will produce better executions and prices for the fund. It is the current opinion of the Trustees that the desirability of retaining FMR as investment advisor to the fund outweighs any disadvantages that may be said to exist from exposure to simultaneous transactions.

Fidelity Advisor Series I, SAI effective Jan. 29, 2004 (Form 485BPOS) (Jan. 28, 2004).

      73.    The Dec. 29, 2003 SAI for the Fidelity International Growth and Income Fund, a

Shelf-Space Fund purchased by Plaintiffs during the Class Period, states the following:

PORTFOLIO TRANSACTIONS

All orders for the purchase or sale of portfolio securities are placed on behalf of each fund by FMR pursuant to authority contained in the management contract. FMR may also be responsible for the placement of portfolio transactions for other investment companies and investment accounts for which it has or its affiliates have investment discretion. In selecting brokers or dealers (including affiliates of FMR), FMR generally considers: the execution price; the size and type of the transaction; the nature and character of the markets for the security to be purchased or sold; the execution efficiency, settlement capability, and financial condition of the firm; the execution services rendered on a continuing basis; the reasonableness of any compensation paid; arrangements for payment of fund expenses, if applicable; and the provision of additional brokerage and research products and services.

For futures transactions, the selection of an FCM is generally based on the overall quality of execution and other services, including research, provided by the FCM.

If FMR grants investment management authority to a sub-advisor (see the section entitled "Management Contracts"), that sub-advisor is authorized to provide the services described in the sub-advisory agreement, and will do so in accordance with the policies described in this section.

Purchases and sales of securities on a securities exchange are effected through brokers who receive compensation for their services. Compensation may also be paid in connection with riskless principal

transactions (in both OTC securities and securities listed on an exchange) and agency OTC transactions executed with an electronic communications network (ECN) or an alternative trading system.

Securities may be purchased from underwriters at prices that include underwriting fees.

Generally, compensation relating for investments traded on foreign exchanges will be higher than for investments traded on U.S. exchanges and may not be subject to negotiation.

Futures transactions are executed and cleared through FCMs who receive compensation for their services.

Each fund may execute portfolio transactions with brokers or dealers that provide products and services. These products and services may include: economic, industry, or company research reports or investment recommendations; subscriptions to financial publications or research data compilations; compilations of securities prices, earnings, dividends, and similar data; computerized databases; quotation equipment and services; research or analytical computer software and services; products or services that assist in effecting transactions, including services of third-party computer systems developers directly related to research and brokerage activities; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement). The receipt of these products and services has not reduced FMR's normal research activities in providing investment advice to the funds. FMR's expenses could be increased, however, if it attempted to generate these additional products and services through its own efforts.

Certain of the products and services FMR receives from brokers or dealers are furnished by brokers or dealers on their own initiative, either in connection with a particular transaction or as part of their overall services. In addition, FMR may request a broker or dealer to provide a specific proprietary or third-party product or service. While FMR takes into account the products and services provided by a broker or dealer in determining whether compensation paid is reasonable, neither FMR nor a fund incurs an obligation to the broker, dealer, or third party to pay for any product or service (or portion thereof) by generating a certain amount of compensation or otherwise.

Brokers or dealers that execute transactions for a fund may receive compensation that are in excess of the amount of compensation that other brokers or dealers might have charged, in recognition of the

products and services they have provided. Before causing a fund to pay such higher compensation, FMR will make a good faith determination that the compensation is reasonable in relation to the value of the products and services provided viewed in terms of the particular transaction for the fund or FMR's overall responsibilities to the fund or other investment companies and investment accounts. Typically, these products and services assist FMR or its affiliates in terms of its overall investment responsibilities to the fund and other investment companies and investment accounts; however, each product or service received may not benefit the fund.

FMR may place trades with certain brokers with which it is under common control, including National Financial Services LLC (NFS), provided it determines that this affiliate's products, services, and costs are comparable to those of non-affiliated, qualified brokerage firms. FMR may also place trades with Archipelago ECN (Archipelago), an ECN in which a wholly-owned subsidiary of FMR Corp. has an equity ownership interest, if the compensation is fair, reasonable, and comparable to compensation charged by non-affiliated, qualified brokerage firms for similar services. Prior to January 1, 2002, FMR placed trades with Fidelity Brokerage Services (Japan) LLC (FBSJ), an indirect, wholly-owned subsidiary of FMR Corp. Prior to September 20, 2002, FMR placed trades with REDIBook ECN LLC (REDIBook), in which a wholly-owned subsidiary of FMR Corp. had an equity ownership interest.

FMR may allocate brokerage transactions to brokers or dealers (including affiliates of FMR) who have entered into arrangements with FMR under which the broker-dealer allocates a portion of the compensation paid by a fund toward the reduction of that fund's expenses.

The Trustees of each fund periodically review FMR's performance of its responsibilities in connection with the placement of portfolio transactions on behalf of the fund and review the compensation paid by the fund over representative periods of time to determine if they are reasonable in relation to the benefits to the fund.

* * *

The Trustees of each fund have approved procedures in conformity with Rule 10f-3 under the 1940 Act whereby a fund may purchase securities that are offered in underwritings in which an affiliate of FMR participates. These procedures prohibit the funds from directly or indirectly benefiting an FMR affiliate in connection with such

underwritings. In addition, for underwritings where an FMR affiliate participates as a principal underwriter, certain restrictions may apply that could, among other things, limit the amount of securities that the funds could purchase in the underwritings.

From time to time the Trustees will review whether the recapture for the benefit of the funds of some portion of the compensation paid by the funds on portfolio transactions is legally permissible and advisable. The Trustees intend to continue to review whether recapture opportunities are available and are legally permissible and, if so, to determine in the exercise of their business judgment whether it would be advisable for each fund to participate, or continue to participate, in the commission recapture program.

Although the Trustees and officers of each fund are substantially the same as those of other funds managed by FMR or its affiliates, investment decisions for each fund are made independently from those of other funds or investment accounts (including proprietary accounts) managed by FMR or its affiliates. The same security is often held in the portfolio of more than one of these funds or investment accounts. Simultaneous transactions are inevitable when several funds and investment accounts are managed by the same investment advisor, particularly when the same security is suitable for the investment objective of more than one fund or investment account.

When two or more funds or investment accounts are simultaneously engaged in the purchase or sale of the same security, including a futures contract, the prices and amounts are allocated in accordance with procedures believed to be appropriate and equitable to each fund or investment account. In some cases this system could have a detrimental effect on the price or value of the security as far as each fund is concerned. In other cases, however, the ability of the funds to participate in volume transactions will produce better executions and prices for the funds. It is the current opinion of the Trustees that the desirability of retaining FMR as investment advisor to each fund outweighs any disadvantages that may be said to exist from exposure to simultaneous transactions.

Fidelity Investment Trust, SAI effective Dec. 29, 2003 (Form 485BPOS) (Dec. 29, 2003).

74.     The May 1, 2001 SAI for the AIM Value Fund (n/k/a AIM Charter Fund; also

f/k/a AIM Premier Equity Fund) and the December 2, 2002 SAI for the AIM Intermediate

Government Fund, Shelf-Space Funds purchased by Plaintiffs during the Class Period, state the

following:

BROKERAGE SELECTION

Section 28(e) of the Securities Exchange Act of 1934 provides that AIM, under certain circumstances, lawfully may cause an account to pay a higher commission than the lowest available. Under Section 28(e), AIM must make a good faith determination that the commissions paid are "reasonable in relation to the value of the brokerage and research services provided ... viewed in terms of either that particular transaction or [AIM's] overall responsibilities with respect to the accounts as to which it exercises investment discretion." The services provided by the broker also must lawfully and appropriately assist AIM in the performance of its investment decision-making responsibilities. Accordingly, in recognition of research services provided to it, a Fund may pay a broker higher commissions than those available from another broker.

Research services received from broker-dealers supplement AIM's own research (and the research of its affiliates), and may include the following types of information: statistical and background information on the U.S. and foreign economies, industry groups and individual companies; forecasts and interpretations with respect to the U.S. and foreign economies, securities, markets, specific industry groups and individual companies; information on federal, state, local and foreign political developments; portfolio management strategies; performance information on securities, indexes and investment accounts; information concerning prices of securities; and information supplied by specialized services to AIM and to the [board of] trustees with respect to the performance, investment activities, and fees and expenses of other mutual funds. Broker-dealers may communicate such information electronically, orally, in written form or on computer software. Research services may also include the providing of custody services, as well as the providing of equipment used to communicate research information, the providing of specialized consultations with AIM personnel with respect to computerized systems and data furnished to AIM as a component of other research services, the arranging of meetings with management of companies, and the providing of access to consultants who supply research information.

The outside research assistance is useful to AIM since the broker-dealers used by AIM tend to follow a broader universe of securities

and other matters than AIM's staff can follow. In addition, the research provides AIM with a diverse perspective on financial markets. Research services provided to AIM by broker-dealers are available for the benefit of all accounts managed or advised by AIM or by its affiliates. Some broker-dealers may indicate that the provision of research services is dependent upon the generation of certain specified levels of commissions and underwriting concessions by AIM's clients, including the Funds. However, the Funds are not under any obligation to deal with any broker-dealer in the execution of transactions in portfolio securities.

In some cases, the research services are available only from the broker-dealer providing them. In other cases, the research services may be obtainable from alternative sources in return for cash payments. AIM believes that the research services are beneficial in supplementing AIM's research and analysis and that they improve the quality of AIM's investment advice. The advisory fee paid by the Funds is not reduced because AIM receives such services. However, to the extent that AIM would have purchased research services had they not been provided by broker-dealers, the expenses to AIM could be considered to have been reduced accordingly.

AIM may determine target levels of commission business with various brokers on behalf of its clients (including the Funds) over a certain time period. The target levels will be based upon the following factors, among others: (1) the execution services provided by the broker; (2) the research services provided by the broker; and (3) the broker's interest in mutual funds in general and in the Funds and other mutual funds advised by AIM or AIM Capital Management, Inc. (collectively, the "AIM Funds") in particular, including sales of the Funds and of the other AIM Funds. In connection with (3) above, the Funds' trades may be executed directly by dealers that sell shares of the AIM Funds or by other broker-dealers with which such dealers have clearing arrangements. AIM will not use a specific formula in connection with any of these considerations to determine the target levels.

AIM Funds Group, SAI effective Mar. 1, 2001 (Form 485BPOS) (Mar. 1, 2001); AIM

Investment Securities Funds, SAI effective Nov. 30, 2002 (Form 485BPOS) (Nov. 20, 2002)

75.     The May 1, 2001, May 1, 2002, April 17, 2003, and May 2004 SAIs for the

Pioneer Fund, a Shelf-Space Fund purchased by Plaintiffs during the Class Period, states the

following:

## 9.   PORTFOLIO TRANSACTIONS

All orders for the purchase or sale of portfolio securities are placed on behalf of the fund by Pioneer pursuant to authority contained in the fund's management contract. Pioneer seeks to obtain the best execution on portfolio trades. The price of securities and any commission rate paid are always factors, but frequently not the only factors, in judging best execution. In selecting brokers or dealers, Pioneer considers various relevant factors, including, but not limited to, the size and type of the transaction; the nature and character of the markets for the security to be purchased or sold; the execution efficiency, settlement capability and financial condition of the dealer; the dealer's execution services rendered on a continuing basis; and the reasonableness of any dealer spreads. Transactions in non-U.S. equity securities are executed by broker-dealers in non-U.S. countries in which commission rates may not be negotiable (as such rates are in the U.S.).

Pioneer may select broker-dealers that provide brokerage and/or research services to the fund and/or other investment companies or other accounts managed by Pioneer. In addition, consistent with Section 28(e) of the Securities Exchange Act of 1934, as amended, if Pioneer determines in good faith that the amount of commissions charged by a broker-dealer is reasonable in relation to the value of the brokerage and research services provided by such broker, the fund may pay commissions to such broker-dealer in an amount greater than the amount another firm may charge. Such services may include advice concerning the value of securities; the advisability of investing in, purchasing or selling securities; the availability of securities or the purchasers or sellers of securities; providing stock quotation services, credit rating service information and comparative fund statistics; furnishing analyses, electronic information services, manuals and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy, and performance of accounts and particular investment decisions; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement). Pioneer maintains a listing of broker-dealers who provide such services on a regular basis. However, because many transactions on behalf of the fund and other investment companies or accounts managed by Pioneer are placed with broker-dealers (including broker-dealers on the listing) without regard to the furnishing of such services, it is not possible to estimate the proportion of such transactions directed to such dealers solely because such services

were provided. Pioneer believes that no exact dollar value can be calculated for such services.

The research received from broker-dealers may be useful to Pioneer in rendering investment management services to the fund as well as other investment companies or other accounts managed by Pioneer, although not all such research may be useful to the fund. Conversely, such information provided by brokers or dealers who have executed transaction orders on behalf of such other accounts may be useful to Pioneer in carrying out its obligations to the fund. The receipt of such research has not reduced Pioneer's normal independent research activities; however, it enables Pioneer to avoid the additional expenses which might otherwise be incurred if it were to attempt to develop comparable information through its own staff.

In circumstances where two or more broker-dealers offer comparable prices and executions, preference may be given to a broker-dealer which has sold shares of the fund as well as shares of other investment companies managed by Pioneer. This policy does not imply a commitment to execute all portfolio transactions through all broker-dealers that sell shares of the fund.

The Pioneer funds have entered into third-party brokerage and/or expense offset arrangements to reduce the funds' total operating expenses. Pursuant to third-party brokerage arrangements, certain of the funds that invest primarily in U.S. equity securities may incur lower custody fees by directing brokerage to third-party broker-dealers. Pursuant to expense offset arrangements, the funds incur lower transfer agency expenses by maintaining their cash balances with the custodian. See "Financial highlights" in the prospectus.

See the table in Appendix A for aggregate brokerage and underwriting commissions paid by the fund in connection with its portfolio transactions during recently completed fiscal years. The Board of Trustees periodically reviews Pioneer's performance of its responsibilities in connection with the placement of portfolio transactions on behalf of the fund.

Pioneer Fund, SAI effective May 1, 2001 (Form 485BPOS) (Apr. 30, 2001); Pioneer Fund, SAI effective May 1, 2002 (Form 485BPOS) (Apr. 30, 2001); Pioneer Fund, SAI effective April 17, 2003 (Form 485BPOS) (Apr. 16, 2003); and Pioneer Fund, SAI effective May 2004 (Form 485BPOS) (Apr. 8, 2004).

76.     The March 1, 2002 and March 1, 2003 SAIs for the WM Group of Funds, including the WM Balanced Fund, another Shelf-Space Fund purchased by Plaintiffs during the Class Period, included the following language:

SECURITIES TRANSACTIONS

Most of the purchases and sales of securities for a Fund, whether transacted on a securities exchange or over-the-counter, will be effected in the primary trading market for the securities. Decisions to buy and sell securities for a Fund are made by the Advisor or the relevant Sub-advisor, which also is responsible for placing these transactions, subject to the overall review of the Trusts' Board of Trustees. Although investment decisions for each Fund are made independently from those of the other accounts managed by the Advisor or the Sub-advisor, investments of the type the Fund may make may also be made by those other accounts. When a Fund and one or more other accounts managed by the Advisor or the Sub-advisor are prepared to invest in, or desire to dispose of, the same security, available investments or opportunities for sales will be allocated in a manner believed by the Advisor or the Sub-advisor to be equitable to each. In some cases, this procedure may adversely affect the price paid or received by a Fund or the size of the position obtained or disposed of by the Fund. In other cases, however, it is believed that coordination and the ability to participate in volume transactions will be to the benefit of the Fund.

Transactions on U.S. exchanges involve the payment of negotiated brokerage commissions. With respect to exchanges on which commissions are negotiated, the cost of transactions may vary among different brokers. There is generally no stated commission in the case of securities traded in the over-the-counter markets, but the prices of those securities include undisclosed commissions or concessions, and the prices at which securities are purchased from and sold to dealers include a dealer's mark-up or mark-down. U.S. Government securities may be purchased directly from the U.S. Treasury or from the issuing agency or instrumentality.

In selecting brokers or dealers to execute portfolio transactions on behalf of a Fund, the Advisor or the Fund's Sub-advisors seeks the best overall terms available. In assessing the best overall terms available for any transaction, the Advisor and each Sub-advisor will consider the factors that the Advisor or the Sub-advisors deems relevant, including the breadth of the market in the security, the price

49

of the security, the financial condition and execution capability of the broker or dealer and the reasonableness of the commission, if any, for the specific transaction and on a continuing basis. In addition, each advisory agreement among the Trusts authorizes the Advisor, and a sub-advisory agreement authorizes the Sub-advisor, in selecting brokers or dealers to execute a particular transaction and in evaluating the best overall terms available, to consider the brokerage and research services (as those terms are defined in Section 28(e) of the Securities Exchange Act of 1934, as amended) provided to the Trusts, the other Funds and/or other accounts over which the Advisor, the Sub-advisor or their affiliates exercise investment discretion. The fees under the advisory agreements between the Trusts, the Advisor and the Sub-advisors are not reduced by reason of their receiving such brokerage and research services. The Trusts' Board of Trustees will periodically review the commissions paid by the Funds to determine if the commissions paid over representative periods of time were reasonable in relation to the benefits received by the Trusts.

Consistent with applicable provisions of the 1940 Act, the rules and exemptions adopted by the Commission thereunder, and relevant interpretive and "no-action" positions taken by the Commission's staff, the Trusts' Board of Trustees has adopted procedures pursuant to Rule 17e-1 under the 1940 Act to ensure that all portfolio transactions with affiliates will be fair and reasonable. Under the procedures adopted, portfolio transactions for a Fund may be executed through any affiliated broker (other than affiliated persons of the Trust solely because the broker is an affiliated person of a sub-advisor of another Fund) if, subject to other conditions in the Rule 17e-1 procedures, in the judgment of the Advisor or the Fund's sub-advisor, the use of an affiliated broker is likely to result in price and execution at least as favorable as those of other qualified broker-dealers, and if, in the transaction an affiliated broker charges the Fund a rate consistent with those charged for comparable transactions in comparable accounts of the broker's most favored unaffiliated clients. Over-the-counter purchases and sales are transacted directly with principal market makers except in those cases in which better prices and executions may be obtained elsewhere.

WM Trust I, SAI effective Feb. 28, 2002 (Form 485BPOS) (Feb. 28, 2002); WM Trust I, SAI effective Feb. 27, 2003 (Form 485BPOS) (Feb. 27, 2003). The March 1, 2004 SAI for the WM Group of Funds, including the WM Balanced Fund, was nearly identical to that of the previous year's SAI:

## SECURITIES TRANSACTIONS

Most of the purchases and sales of securities for a Fund, whether transacted on a securities exchange or over-the-counter, will be effected in the primary trading market for the securities. Decisions to buy and sell securities for a Fund are made by WM Advisors or the relevant Sub-advisor, which also is responsible for placing these transactions, subject to the overall review of the Trusts' Board of Trustees. Although investment decisions for each Fund are made independently from those of the other accounts managed by WM Advisors or the Sub-advisor, investments of the type the Fund may make may also be made by those other accounts. When a Fund and one or more other accounts managed by WM Advisors or the Sub-advisor are prepared to invest in, or desire to dispose of, the same security, available investments or opportunities for sales will be allocated in a manner believed by WM Advisors or the Sub-advisor to be equitable to each. In some cases, this procedure may adversely affect the price paid or received by a Fund or the size of the position obtained or disposed of by the Fund. In other cases, however, it is believed that coordination and the ability to participate in volume transactions will be to the benefit of the Fund.

Transactions on U.S. exchanges involve the payment of negotiated brokerage commissions. With respect to exchanges on which commissions are negotiated, the cost of transactions may vary among different brokers. There is generally no stated commission in the case of securities traded in the over-the-counter markets, but the prices of those securities include undisclosed commissions or concessions, and the prices at which securities are purchased from and sold to dealers include a dealer's mark-up or mark-down. U.S. government securities may be purchased directly from the U.S. Treasury or from the issuing agency or instrumentality.

In selecting brokers or dealers to execute portfolio transactions on behalf of a Fund, WM Advisors or the Fund's Sub-advisors seeks the best overall terms available. In assessing the best overall terms available for any transaction, WM Advisors and each Sub-advisor will consider the factors that WM Advisors or the Sub-advisors deems relevant, including the breadth of the market in the security, the price of the security, the financial condition and execution capability of the broker or dealer and the reasonableness of the commission, if any, for the specific transaction and on a continuing basis. In addition, each advisory agreement among the Trusts authorizes WM Advisors, and a sub-advisory agreement authorizes the Sub-advisor, in selecting brokers or dealers to execute a particular

transaction and in evaluating the best overall terms available, to consider the brokerage and research services (as those terms are defined in Section 28(e) of the Securities Exchange Act of 1934, as amended) provided to the Trusts, the other Funds and/or other accounts over which WM Advisors, the Sub-advisor or their affiliates exercise investment discretion. The fees under the advisory agreements between the Trusts, WM Advisors and the Sub-advisors are not reduced by reason of their receiving such brokerage and research services. The Trusts' Board of Trustees will periodically review the commissions paid by the Funds to determine if the commissions paid over representative periods of time were reasonable in relation to the benefits received by the Trusts.

Consistent with applicable provisions of the 1940 Act, the rules and exemptions adopted by the Commission thereunder, and relevant interpretive and "no-action" positions taken by the Commission's staff, the Trusts' Board of Trustees has adopted procedures pursuant to Rule 17e-1 under the 1940 Act to ensure that all portfolio transactions with affiliates will be fair and reasonable. Under the procedures adopted, portfolio transactions for a Fund may be executed through any affiliated broker (other than affiliated persons of the Trust solely because the broker is an affiliated person of a Sub-advisor of another Fund) if, subject to other conditions in the Rule 17e-1 procedures, in the judgment of WM Advisors or the Fund's Sub-advisor, the use of an affiliated broker is likely to result in price and execution at least as favorable as those of other qualified broker-dealers, and if, in the transaction an affiliated broker charges the Fund a rate consistent with those charged for comparable transactions in comparable accounts of the broker's most favored unaffiliated clients. Over-the-counter purchases and sales are transacted directly with principal market makers except in those cases in which better prices and executions may be obtained elsewhere.

WM Trust I, SAI effective Mar. 1, 2003 (Form 485BPOS) (Mar. 1, 2003) (accepted Feb. 28, 2003).

77.    The above citations represent the operative prospectuses and SAIs of the Shelf-Space Funds in which Plaintiffs invested as detailed in Exhibit D.  In basing their decision to purchase through Defendants, Plaintiffs relied on the fact that they believed that Defendants were not subject to a conflict of interest and that they were not being caused economic harm

from the fees they were paying for the Shelf-Space Funds.

78.     The Shelf-Space Fund prospectuses cited above are materially false and misleading in that they failed to disclose that Plaintiffs were paying fees funding the Shelf-Space system of payments, including directed brokerage, that was in fact part of the quid pro quo agreements between the AIG Brokers and the Shelf-Space Funds whereby the AIG Brokers give preference to the Shelf-Space Funds and push them on their clients and whereby the AIG Brokers are guided by the need to satisfy the agreements with the Shelf-Space Funds over the AIG Brokers' obligations to offer the best mutual fund for the needs of the client.

79.     In an SEC action against Putnam Investment Management filed March 23, 2005 for violation of the federal securities laws, the SEC determined that such statements as those made in the Shelf-Space Fund prospectuses cited above, like those of the Putnam Funds, including Putnam California Tax Exempt Income Fund and the Putnam New Opportunity Fund, are inadequate and in violation of the federal securities laws.  The SEC concluded that such statements "did not adequately disclose to shareholders that [Putnam] had entered into arrangements for heightened visibility within broker-dealers' distribution systems for which Putnam, subject to best execution, directed brokerage commissions, the amounts of which were primarily determined by negotiated formulas." SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of Putnam Investment Management, LLC, Mar. 23, 2005, *at* http://www.sec.gov/litigation/admin/ia-2370.pdf.  Therefore, as the statements in the other Shelf-Space Funds' prospectuses are substantially similar in substance to the inadequate disclosures made by Putnam referenced above, the Shelf-Space Funds' prospectuses similarly violated the disclosure requirements mandated by the federal securities laws.  *See also* SEC Order Instituting Administrative And

Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the

Matter of OppenheimerFunds, Inc. and OppenheimerFunds Distributor, Inc., Sept. 14, 2005, *at*

http://www.sec.gov/litigation/admin/34-52420.pdf; SEC Order Instituting Administrative and

Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions, In the

Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *at* http://www.sec.gov/

litigation/admin/ia-2224.htm; SEC Order Instituting Administrative And Cease-And-Desist

Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of Franklin

Advisors, Inc. and Franklin/Templeton Distributors, Inc., *at* http://www.sec.gov/litigation/

admin/34-50841.htm.

      80.    Additionally, the AIG Brokers' reliance on the Shelf-Space Funds' prospectuses

and SAIs to disclose the revenue sharing arrangements was insufficient to make investors aware

of the costs and risks associated with these arrangements. The SEC recently brought

administrative actions against broker/dealers for failing to adequately disclose their revenue

sharing relationships to investors by solely relying on Shelf-Space Funds' prospectuses and SAI.

As was explained in the SEC Administrative Cease-and-Desist Order brought against Citigroup

Global Corp ("CGMI"):

> CGMI relied on the participating funds' prospectuses and SAIs to
> satisfy its disclosure obligations with regard to its revenue sharing
> program.... [M]ost of the disclosures were generally vague and lacked
> sufficient information to inform CGMI's customers of the nature and
> scope of CGMI's revenue sharing program. For example, the
> prospectuses and SAIs did not specifically disclose the magnitude of
> the revenue sharing payments that CGMI received from the fund
> complexes or that certain fund complexes had greater access to, or
> increased visibility in, CGMI's retail network. As a result, CGMI's
> customers were not provided with sufficient information to appreciate
> the dimension of the conflict of interest the revenue sharing program
> created.

In the Matter of Citigroup Global Markets, Inc., Order Instituting Administrative and Cease-and-Desist Proceedings, March 23, 2005, http://www.sec.gov/litigation/admin/33-8557.pdf.

81.     Likewise, in an SEC action against Edward D. Jones, another broker/dealer, the SEC also came to the same conclusions, and noted that the:

> [P]referred families' prospectuses and SAIs fail to disclose adequate information about the source and the amount of revenue sharing payments to Edward Jones and the dimensions of the resulting potential conflicts of interest. Although the Preferred Families' prospectuses and SAI's contained various disclosures concerning payments to broker/dealers distributing their funds, few of these disclosures adequately described Edward Jones' potential conflict of interest.

In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and-Desist Proceedings, December 22, 2004, http://www.sec.gov/litigation/admin/33-8520.htm.

82.     Here, as in the SEC's actions against Edward Jones and Citigroup, the AIG Brokers improperly relied on prospectuses and SAIs that failed to disclose the financial *quid pro quo* arrangements discussed above. The Shelf-Space Funds' prospectuses and SAIs also failed to disclose that participants in the AIG Brokers' financial *quid pro quo* arrangements paid, with brokerage commissions, a portion of advisory fees and other fees derived from the Shelf-Space Funds and their investors, in addition to the sales loads accompanying the initial purchase of shares. The AIG Brokers took no other steps to ensure that investors were made aware of the material scope of these arrangements, the nature of which was also not disclosed, leaving Shelf Fund investors unaware that the payments made by Shelf-Space Funds to the AIG Brokers were in exchange for the AIG Brokers steering investors into the Shelf-Space Funds. In fact, the additional fees were paid to sway the AIG Brokers into misrepresenting the value and performance of the Shelf-Space Funds. Defendants, therefore, misled investors into believing

that the Shelf-Space Funds were given priority over other mutual funds due to their performance

and the AIG Brokers' objective analyses of different mutual funds.

> **D.    Defendants' Scheme, and the Resulting Conflict of Interest is Finally Disclosed by the NASD**

83.    The truth about AIG's kickback scheme was revealed on June 8, 2005 when the

NASD censured and fined the AIG Brokers for the same conduct as alleged in this complaint:

> NASD found that the 14 retail firms, most of which sold funds
> offered by hundreds of different mutual fund complexes, operated
> "preferred partner" or "shelf space" programs that provided certain
> benefits to a relatively small number of mutual fund complexes in
> return for directed brokerage.  The benefits to mutual fund complexes
> of these quid pro quo arrangements included, in various cases, higher
> visibility on the firms' internal web sites, increased access to the
> firms' sales forces, participation in "top producer" or training
> meetings, and promotion of their funds on a broader basis than was
> available for other funds...The retail firms generally monitored the
> amount of directed brokerage received to ensure that the fund
> complexes were satisfying their revenue sharing obligations.  The use
> of directed brokerage allowed the fund complexes to use assets of the
> mutual funds instead of their own money to meet their revenue
> sharing obligations.

NASD Press Release (emphasis added).

84.    The NASD found that the AIG Brokers operated "shelf-space" programs that

provided certain benefits to a relatively small number of mutual fund complexes in return for

directed brokerage.  According to the NASD, the AIG Brokers monitored the amount of directed

brokerage received to ensure that the fund complexes were satisfying their revenue sharing

obligations. NASD Press Release.

85.    The NASD alleged that the Shelf-Space Fund companies directed trades to the

AIG Brokers to be in their "preferred partner" or "shelf-space" program.  The shelf-space fund

companies received "enhanced exposure," such as access to AIG salespeople and the right to

send prospecting letters to AIG's customers.  Walter Hamilton, Brokerages Settle Fund-Sale

Cases; Fifteen Firms Will Pay $34 Million to Resolve Charges of Promoting Mutual Funds

Based on the Fees They Paid, *The Los Angeles Times*, June 9, 2005, at C4.

86.     As a result, SunAmerica, FSC, Sentra, Spelman, Royal Alliance and Advantage

Capital Corp. were collectively fined $12,730,000 by the NASD for engaging in revenue sharing

and directed brokerage arrangements with different fund families.  NASD Press Release.

87.     The AIG brokers' websites, beginning in or about January 2004, contained a

document identifying the Shelf-Space program.  This document was only accessible to Plaintiffs

and the other member of the Class if they were on one of the AIG Brokers' websites and clicked

a small link entitled "2004 Revenue-Sharing Program Policy."  Significantly, the AIG Brokers'

statements regarding the Shelf-Space program in the document were materially misleading

because they omit to disclose facts necessary in order to make the statements not misleading.

The document omits the millions of dollars in directed brokerage that was being paid to AIG.

The document also omits to mention the *quid pro quo* arrangement Defendants had with the

Shelf-Space Funds (*i.e.*, there is no mention that Defendants were steering clients into Shelf-

Space Funds and giving biased recommendations in exchange for the payments from the Self-

Space Funds).  The document also misrepresents that "[r]egistered representatives of [the AIG

Broker] do not receive additional compensation from [the AIG Broker] in connection with sales

of mutual funds offered by our Elite Partners (discussed below), as opposed to other mutual fund

families."  According to the NASD, "[t]he Elite Partners funds were offered . . . increased access

to the sales force, which included participation in Respondents' educational and sales

conferences and meetings to reward top producing brokers."  NASD Letter.  Thus, the document

omits material information about such compensation.

E.    **Additional Scienter Allegations**

88.    As alleged herein, Defendants acted with scienter in that Defendants knew, or in the absence of recklessness, should have known, that the public statements issued or disseminated in the name of AIG and the Shelf-Space Funds were materially false and misleading, knew that such statements would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced or are responsible in the issuance or dissemination of such statements as primary violations of the federal securities laws.  The scheme implemented by Defendants, involving agreements about revenue sharing, directed brokerage, waiver of ticket charges, awards of vacations and prizes, and more, all with the purpose of generating more money for AIG in exchange for pushing Shelf-Space Funds on class members without regard to whether they are indeed the best fund for that clients was far too complex to have been the product of anything but actual knowledge.  .  As set forth elsewhere herein in detail, Defendants, by virtue of their knowledge of the true facts regarding the kickback scheme and improper influence exerted to push the Shelf-Space Funds on AIG clients, and their control over, and/or receipt and/or modification of Shelf-Space Funds' materially misleading omissions and misstatements and/or their associations with AIG which made them privy to confidential proprietary information concerning the Defendants' incentive scheme, culpably participated in the fraudulent scheme alleged herein.  Because of the kickback arrangements, Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.

F.    **Plaintiffs and the Other Members of the Class Have Suffered Damages as a Result of Defendants' Illegal And Improper Actions**

89.    As a result of Defendants' conduct alleged above, Plaintiffs and the other

members of the Class have suffered damages. The damages suffered by Plaintiffs and the other members of the Class were a foreseeable consequence of Defendants' omissions and conduct, particularly in light of the fact that the net returns on the Shelf-Space Funds were diminished as a result of the improper kickbacks that the AIG Brokers took from the Shelf-Space Funds, and that unbeknownst to the Plaintiffs or the other members of the Class assets of the underlying Shelf-Space Funds that were purchased by Plaintiffs and the other members of the Class were used to pay for Defendants' scheme.

90.      Plaintiffs and other members of the Class were relying on Defendants' nondisclosure and misrepresentations and thus were deceived into buying shares of the Shelf-Space Funds at an artificially inflated value.  Plaintiffs and other members of the Class accepted, as an integral aspect of purchasing shares of the Shelf-Space Funds, that they would be required to pay fees and expenses, with the understanding that those charges were legitimate outlays for services that would benefit them and contribute positively to their funds' value.  In truth, a significant portion of those expenses was not being used to provide the services promised, but rather to increase the profits of AIG by financing the programs challenged in this lawsuit. Plaintiffs' principal was funding the Shelf-Space system of payments.  Absent the fees being used to pay for Defendants' kickback programs, Plaintiffs' and the other members of the Class' total amount of fees, and, thus, the resulting diminution of their investment's asset value, would have been smaller.  As a result, the values of the Shelf-Space Funds were less than they appeared to be to members of the Class, and Plaintiffs and the other members of the Class would never have paid the Shelf-Space fees had the nature of those fees been disclosed.

91.      Plaintiffs and the other members of the Class have also suffered damages through commissions paid by Plaintiffs and the other members of the Class for their purchase of shares of

the Shelf-Space Funds.  Had Plaintiffs and the other members of the Class known about the

practices alleged above, Plaintiffs and the other members of the Class would not have paid such

commissions.  Plaintiffs' and the other members of the Class suffered damages as a result of the

commissions they paid for shares of the Shelf-Space Funds, which were a foreseeable

consequence of Defendants' failure to disclose.

92.    Brokerage commissions, shareholder fees, advisory fees and 12b-1 fees were

deducted from the investors' principal to pay the AIG Brokers for their role in steering investors

into the Shelf-Space Funds.  This practice also directly harms investors, especially where, as

here, the fund is alleged to be "paying up," or trading securities at commission rates higher than

the fund would otherwise pay if it were not indirectly paying for distribution through directing

brokerage.

93.    Specifically, the Shelf-Space Funds' investment advisors often directed excessive

commissions on such trades to the AIG Brokers, among others.  In return for the efforts of the

AIG Brokers to steer their clients into the Shelf-Space Funds, the Funds paid them directed

brokerage commissions that were in excess of what they would have paid under an agreement

reached with the broker/dealers through arm's-length bargaining. The investment advisors would

use these excessive commissions, which are Fund assets belonging to investors, to meet their

revenue sharing commitments.  From January 2001 through December 2003, twelve of the Shelf-

Space Funds paid the AIG Brokers more than $41 million in kickback payments by directing

brokerage commissions for portfolio transactions to the AIG Brokers, for their benefit. NASD

Letter.  The Shelf-Space Funds paid the directed brokerage to the AIG Brokers through an

intermediary clearing firm for the AIG Brokers, or through other clearing firms.  The Shelf-

Space Funds would label the trade as "for the benefit of" the AIG Brokers.  Most of the

commission, typically from 70-90%, would then be directed to the AIG Brokers from the clearing firms. *Id.*

## V.    CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") of all persons or entities who purchased shares or like interests in any of the Shelf-Space Funds between April 7, 2001 and June 8, 2005, inclusive, and who were damaged thereby.  Excluded from the class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

95.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed class.  Record owners and the other members of the Class may be identified from records maintained by the Shelf-Space Funds and AIG may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.  Whether the federal securities laws were violated by Defendants' acts as alleged herein; and

      b.   To what extent the members of the Class have sustained damages and the proper

measure of such damages.

    97.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it virtually impossible for members of the Class to

individually redress the wrongs done to them.  There will be no difficulty in the management of

this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I

**AGAINST ALL DEFENDANTS, EXCEPT AIG INC., FOR
VIOLATION OF SECTION 10(b) OF THE EXCHANGE
ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER**

    98.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

    99.    During the Class Period, Defendants employed manipulative and deceptive

devices and contrivances in that they omitted to state material facts, *i.e.*, the agreements with the

Shelf-Space Funds whereby Defendants received improper incentives in exchange for pushing

AIG clients into the Shelf-Space Funds and the inherent, insurmountable conflicts of interest

such incentives created.

    100.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal the adverse material information about the improper

incentives and conflicts of interest alleged herein. All Defendants are sued as primary

participants in the wrongful and illegal conduct and scheme charged herein.

101.    Defendants omitted to state material facts in order to profit from millions of dollars of incentive payments described above made to them by the Shelf-Space Funds from the assets of unwitting investors.  Defendants thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

102.    The Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, because they knew that the misconduct described herein was, *inter alia*, against SEC and NASD rules. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

103.    As a result of the Defendants' material misrepresentations and/or failure to disclose material facts, as set forth above, the Defendants manipulated the sales process by causing Plaintiffs and other Class members to purchase shares of the Shelf-Space Funds during the Class Period and pay commissions and mutual fund fees that Plaintiffs and the other members of the Class would have refused to have paid had they known about the practices alleged herein.  If Plaintiffs and the other class members had known the truth they would not have purchased shares in mutual funds which when held had their NAV impacted by charges against assets held by costs whose primary purpose was not to benefit plaintiffs and the other class members but rather the Defendants.   In relying on the purported honesty of AIG's business practices, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired the shares or interests in the Shelf-

Space Funds during the Class Period without receiving the impartial advice from their brokers required under the federal securities laws, and were damaged thereby.

104.    At the time of said omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the truth concerning the directed brokerage, revenue sharing and other improper practices complained of herein which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have held, purchased or otherwise acquired their shares of the Shelf-Space Funds, would not have paid any commissions or fees paid as a result of their acquisition of the Shelf-Space Funds, would not have held shares of mutual funds in the Shelf Space Funds whose NAV was impacted by charges against assets held by costs whose primary purpose was not to benefit plaintiffs and the other class members but rather the defendants and would not have paid the fees and costs associated with ownership of the Shelf-Space Funds, or if they had acquired such shares or other interests during the Class Period, they would not have done so due to the purportedly fair and impartial advice for which they had paid.

105.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

106.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Shelf-Space Funds shares during the Class Period.

## COUNT II

### AGAINST ALL DEFENDANTS, EXCEPT AIG INC., FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER

107.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

108.    During the Class Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive members of the Class, as alleged herein and caused members of the Class to purchase shares of the Shelf-Space Funds and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

109.    Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Shelf-Space Funds, including members of the Class, in an effort to enrich themselves through undisclosed tactics in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).  All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

110.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG and the Shelf-Space Funds' operations, as specified herein.

111.    Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Shelf-Space Funds

65

alleged above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

112.    Class members were ignorant of Defendants' fraudulent scheme.  Class members were injured because had Class members known of Defendants' unlawful scheme, they would not have held, purchased or otherwise acquired shares of the Shelf-Space Funds, would not have held shares of mutual funds in the Shelf Space Funds whose NAV was impacted by charges against assets held by costs whose primary purpose was not to benefit plaintiffs and the other class members but rather the defendants, and would not have paid the fees or costs associated with ownership of the Shelf-Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities.  Absent Defendants' wrongful conduct, Class members would not have been injured.

113.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

114.    As a direct and proximate result of Defendants' wrongful conduct, Class members suffered damages in connection with their purchases and acquisitions of Shelf-Space Funds during the Class Period.

## COUNT III

### AGAINST THE AIG BROKERS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-10 PROMULGATED THEREUNDER

115.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

116.    During the Class Period, the AIG Brokers effected transactions in the Shelf-Space Funds for or with the accounts of Class members, and/or induced Class members to purchase the

Shelf-Space Funds.

117.     At or before completion of Class members' purchases of the Shelf-Space Funds, the AIG Brokers failed to disclose the source and amount of remuneration that the AIG Brokers received from the Shelf-Space Funds in connection with Plaintiffs' and the other members of the Class' purchases of the Shelf-Space Funds, as required by Rule 10b-10, promulgated under Exchange Act Section 10(b).  To the extent the Shelf Space Funds did not disclose such information, the AIG Brokers had the duty to disclose the source and remuneration and revenue from the Shelf-Space Funds in connection with their purchases of share of such funds.

118.     The Shelf-Space Funds' payment of such remuneration created insurmountable and undisclosed conflicts of interest. Class members were thus ignorant of the source and amount of remuneration the AIG Brokers received from the Shelf-Space Funds and of the resulting conflicts of interest.  Had Class members known of the source and amount of such remuneration and the resulting conflicts of interest, they would not have held, purchased or otherwise acquired shares of the Shelf-Space Funds, would not have paid any commissions or fees paid as a result of their acquisitions of the Shelf-Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf-Space Funds, or if they had, they would not have held, purchased or otherwise acquired them at the artificial prices they paid for such securities.

119.     Plaintiffs and the other members of the Class have sustained damages due to the AIG Brokers' violations of Rule 10b-10.

120.     At the time they purchased the Shelf-Space Funds traceable to the defective disclosures, Class members were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.

## COUNT IV

### AGAINST AIG INC. FOR VIOLATIONS
### OF SECTION 20(a) OF THE EXCHANGE ACT

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein except for Claims brought pursuant to the Securities Act.

122.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against AIG

Inc.

123.    As the parent company, AIG Inc. directly and indirectly was responsible for the

content and causing the dissemination of the various statements which Plaintiffs contend are

false and misleading. AIG Inc. had the ability to prevent the issuance of statements alleged to

have failed to disclose the material information described herein and to provide disclosure of

information not disclosed by the Shelf Space Funds.

124.    AIG Inc. had direct and supervisory involvement in the operations of the AIG

Brokers.

125.    As set forth above, the Defendants violated Section 10(b) and Rules 10b-5 and

10b-10 promulgated thereunder by AIG's acts and omissions as alleged in this Complaint. AIG

Inc. is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of

Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in

connection with their purchases of the Shelf-Space Funds' securities during the Class Period.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)     Determining that this action is a proper class action and certifying

Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and

their counsel as Class counsel;

> (b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

> (c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

> (d)    Such other and further relief as the Court may deem just and proper.

## VIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: May 31, 2007

Respectfully submitted,

**STULL, STULL & BRODY**

  /s/  James Henry Glavin IV

Jules Brody (JB-9151)
Mark Levine (ML-0180)
James Henry Glavin IV (JG-2188)
James E. Lahm (JL-0242)
6 East 45th Street
New York, New York 10017
Tel:    (212) 687-7230

**MILBERG WEISS** & **BERSHAD LLP**
Janine L. Pollack (JP-0178)
One Pennsylvania Plaza
New York, New York 10119
Tel:    (212) 594-5300

***Lead Counsel for Plaintiffs***