**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

IN RE: AIG ADVISOR GROUP SECURITIES
LITIGATION

06-CV-01625(JG)(JMA)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE SECOND CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Defendants*

Of Counsel:

    Thomas J. Kavaler
    Laura C. Fraher

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT

I.      Plaintiffs' Claims are Time Barred Because Plaintiffs Were on Notice of
        the Facts That Form the Basis of Their Complaint No Later Than March
        2004 but Did Not Sue Until April 7, 2006............................................................2

II.     The Complaint Fails Adequately to Allege a 1934 Act Violation.....................9

        A.      Plaintiffs Have Alleged No Material Misrepresentation or Omission ...................9

1.      Plaintiffs Fail to Allege That Defendants Received a Materially Greater Amount of
        Compensation from the "Shelf Space Funds" Than They Received from Other Funds .. 10

2.      Plaintiffs Again Fail to Allege The Materiality of the Alleged Payments........................ 10

3.      The Alleged Misstatements and Omissions Must Be Considered in the Context of the
        Disclosures that Plaintiffs Concede Defendants Made ...................................................... 14

        B.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Allege with
                Particularity Facts Giving Rise to a Strong Inference of Scienter ........................ 18

        C.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Adequately
                Allege the Element of Loss Causation .................................................................. 20

        D.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Adequately
                Allege Transaction Causation or Reliance ............................................................ 21

        E.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Adequately
                Allege Damages .................................................................................................... 22

III.    Plaintiffs Rule 10b-10 Claims Are Not Actionable ............................................23

IV.     The Complaint Does Not Adequately Allege That AIG Was a "Control
        Person" Within the Meaning of the Securities Laws .........................................24

V.      Plaintiffs' Pro Forma "Scheme" Liability Claims Also Fail to State a
        Claim......................................................................................................................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

Cases

*Ballan* v. *Wilfred American Educational Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989) ............................................................................................. 8

*In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................................................. 7

*In re Donna Karan International Inc. Securities Litigation*, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ............................................. 7-8

*In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357 (3d Cir. 1993) *cert. denied*, 510 U.S. 1178 (1994) .................................... 7

*Fezzani* v. *Bear, Stearns & Co.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004) ........................... 8

*Goldberg* v. *Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069 (1978) ....................................................................... 7

*Levine* v. *Seilon, Inc.*, 439 F.2d 328 (2d Cir. 1971) ................................ 22

*Levitin* v. *PaineWebber, Inc.*, 933 F. Supp. 325 (S.D.N.Y. 1996) .................................... 23

*Menowitz* v. *Brown*, 991 F.2d 36 (2d Cir. 1993) ................................ 8

*Morris* v. *Wachovia Securities, Inc.*, 277 F.Supp.2d 622 (E.D. Va. 2003) ...................... 23

*In re Mutual Funds Investment Litigation*, 2007 WL 1519815 (D. Md. May 21, 2007) ............................................................................. 19n

*Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000) ................................ 23

*Siemers* v. *Wells Fargo & Co.*, 2007 U.S. Dist. LEXIS 21935 (N.D. Cal. Mar. 9, 2007) ................................................................ 18-19, 22-23

*Teamsters Local 282 Pension Trust Fund* v. *Angelos*, 762 F.2d 522 (7th Cir. 1985) ............................................................................. 22

*United States* v. *Matthews*, 787 F.2d 38 (2d Cir. 1986) ................................ 7

*Wright* v. *Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ........................... 19n

**Page**

Regulations

SEC Regulations

    Rule 10b-5, 17 C.F.R. § 240.10b-5 (2007).................................................... *passim*
    Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a) (2007) ......................................... 25
    Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c) (2007) ......................................... 25
    Rule 10b-10, 17 C.F.R. § 240.10b-10 (2007)............................................... 23-24

Rules

Fed. R. Civ. P.

    9(b)................................................................................................................... 22, 23

Statutes

Judicial Code

    28 U.S.C. § 1658(b) (2000), as amended .................................................... 8

Securities Exchange Act of 1934

    § 10(b), 15 U.S.C. § 78j(b) ......................................................................... *passim*
    § 20(a), 15 U.S.C. § 77t(a)........................................................................... 9

Other Authorities

    Advantage Capital Corp., *Elite Partner Program Policy* (Jan. 1, 2004),
    *available at*
    http://web.archive.org/web/20040609010855/www.advcap.net/EPProgra
    mDisclosure.pdf ............................................................................................ 5-6, 11n
    *AIM Investments Daily Prices* (June 7, 2007) *available at*
    http://www.aiminvestments.com/portal/site/aim/menuitem.b5e6f82a8826
    219d3e5 66943acd8fba0 ............................................................................... 12n
    FSC Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at*
    http://web.archive.org/web/20040601124426/www.fscorp.com/EPProgra
    mDisclosure.pdf ............................................................................................ 5n
    *Putnam Investments Monthly Performance Summary* (Feb. 28, 2007)
    *available at*
    https://content.putnam.com/shared/pdf/monthly_performance_funds.pdf; .................. 12n
    Royal Alliance Corp., *Elite Partner Program Policy* (Jan. 1, 2004),
    *available at*
    http://web.archive.org/web/20040423172905/royalalliance.com/EP0104.p
    df ................................................................................................................... 5n
    Sentra Securities Corp. and Spelman & Co., *Elite Partner Program Pol-
    icy* (Jan. 1, 2004), *available at*
    http://web.archive.org/web/20040601173808/sentraspelman.com/EPProgr
    amDisclosureSS.pdf ...................................................................................... 5n

**Page**

SunAmerica Securities Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040728000007/www.sunamericasecurities. com/EPProgramDisclosureSAS.pdf ........................................................... 5n

Defendants Royal Alliance, Inc., SunAmerica Securities, Inc., FSC Securities Corp., Sentra Securities Corp., Spelman & Co., Inc., Advantage Capital Corp., AIG Financial Advisors, Inc. (collectively, the " Broker Defendants") and American International Group, Inc. ("AIG") respectfully submit this memorandum of law in support of Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Complaint" or "Second Amended Complaint").

## PRELIMINARY STATEMENT

Given the opportunity to remedy the numerous problems which permeated the Consolidated Amended Class Action Complaint ("First Amended Complaint"), Plaintiffs have now definitively demonstrated that it is their theory, and not just their pleading, that fails to support their putative securities fraud claims.  Plaintiffs have once again presented this Court with a complaint purporting to state claims under the federal securities laws that relies solely upon pejorative language, conclusory allegations, and an underlying factual scenario that has been repeatedly reviewed by courts in this Circuit and invariably held by them not to support a viable securities fraud claim.  Even after being provided with specific guidance by the Court, Plaintiffs are unable, in their Second Amended Complaint, to turn this pleading strategy into a viable securities fraud claim.  The Second Amended Complaint, like its predecessor, fails to state a claim and thus must be dismissed with prejudice.  Plaintiffs could do no better with a Third or Fourth Amended Complaint.

In dismissing the First Amended Complaint by Order dated April 25, 2007 (the "April 25 Order" or "Order"), the Court specifically identified numerous pleading deficiencies that Plaintiffs must overcome in order to state a viable claim here.  A careful review of the Second Amended Complaint reveals that Plaintiffs' attempts to do so have fallen woefully short.  In particular, despite the Court's specific directives, Plaintiffs continue to fail adequately to plead the nature of the "payment structure" that they allege was materially misrepresented and continue to rely upon the already rejected "substantially similar in substance" method of pleading.

Plaintiffs also continue to fail to distinguish between the funds that are at issue in this case and those that this Court has already ruled are not.  Plaintiffs' failure to remedy any of the judicially identified pleading deficiencies is fatal to their claims and thus Defendants address herein those identified deficiencies and Plaintiffs' continued pleading failures.  So as not to unduly burden the Court, Defendants do not here restate the additional arguments presented in their briefing on the motion to dismiss the First Amended Complaint which the Court did not address in the April 25 Order.  However, should the Court find that Plaintiffs have adequately cured the pleading deficiencies previously identified in the April 25 Order and addressed herein, Defendants hereby incorporate by reference and reassert those arguments that were not explicitly addressed in the April 25 Order, in particular those arguments relating to falsity, scienter, and scheme liability, as well as Plaintiffs' Rule 10b-10 claims and Plaintiffs' control person claims under §20(a) of the 1934 Act.  For the Court's convenience, specific references to the arguments advanced in earlier briefing are included, *infra*, where appropriate.

## ARGUMENT

### I.    Plaintiffs' Claims are Time Barred Because Plaintiffs Were on Notice of the Facts That Form the Basis of Their Complaint No Later Than March 2004 but Did Not Sue Until April 7, 2006

Plaintiffs allege that a conflict of interest on the part of the Broker Defendants resulted from "revenue sharing" arrangements between those Defendants and certain mutual funds, and that this alleged conflict of interest raises the specter that the Broker Defendants made "biased" rather than "unbiased" investment recommendations to Plaintiffs.  *E.g.*, Complaint at ¶ 38 ("Plaintiffs relied on their belief that they were receiving objective advice from the AIG advisors, but the Defendants, in fact, carefully participated in an institutional revenue sharing scheme wherein the AIG Brokers received secret payments from the Shelf-Space Funds in exchange for recommending such funds regardless of their suitability to clients of AIG or the comparative value of the funds.  Defendants' evaluation of the Shelf-Space Funds was neither objective nor performance-based.").  Plaintiffs allege that Defendants failed to disclose these facts — or at

least the facts underlying their pejorative conclusions.  Plaintiffs allege that they first learned of Defendants' "conflict of interest" on June 8, 2005 when the NASD announced that the Broker Defendants had agreed to settle, without admission of any wrongdoing, a dispute with the NASD regarding alleged Conduct Rule violations.  *E.g.*, Complaint at ¶ 14 ("The truth about AIG was revealed on June 8, 2005 when the NASD fined and censured the AIG Brokers for the exact conduct alleged in this complaint.").  Plaintiffs admit, however, that the existence of the revenue sharing programs was disclosed to Plaintiffs *by Defendants' January 2004 website disclosures*. *See* Complaint at ¶ 87.  In light of the 2004 disclosures, Plaintiffs' claims — whatever their dubious merit — are necessarily and irretrievably time-barred.

In opposing Defendants' motion to dismiss the First Amended Complaint, Plaintiffs suggested that they were not aware of the disclosures provided by Defendants on their websites.  *See* Plaintiffs' Corrected Memorandum of Law in Opposition to Defendants' Motions to Dismiss the [First] Consolidated Amended Class Action Complaint at 36 ("since Defendants' 2004 website information was only included on Defendants' websites . . . it cannot 'irrefutably demonstrate' when Plaintiffs should have discovered Defendants' fraudulent conduct").  Apparently recognizing the inconsistency inherent in identifying disclosures contained on Defendants' websites as the alleged source of misstatements upon which Plaintiffs relied (*see* Complaint at ¶¶ 31-37, citing archived versions of Defendants' websites dated between July 2003 and March 2004) (the very time period that the website disclosures that put Plaintiffs on notice of their claims were posted)) as evidence of Defendants' alleged misrepresentations, while simultaneously denying awareness of additional website disclosures, Plaintiffs have now abandoned this position and admitted, as part of their allegations in respect of the revelation of the "truth", that they in fact read the 2004 revenue sharing disclosures set forth on Defendants' websites.  *E.g.*, Complaint at ¶ 87.  Plaintiffs' concession that they read the 2004 disclosures demonstrates that their claims are time-barred.

In a final effort to save their stale claims, Plaintiffs now assert that Defendants' 2004 disclosures were themselves misleading and thus inadequate to put Plaintiffs on notice of the facts giving rise to their claims. This allegation is wholly without merit because the 2004 disclosures clearly reveal all of the material facts upon which this claim is based and which were later "revealed" by the NASD.

As noted above, the gravamen of Plaintiffs' claims is an alleged "conflict of interest" that they contend was first disclosed by the NASD on June 8, 2005. As summarized by the Court in its April 25 Order, Plaintiffs inferred this "conflict of interest" from the NASD's allegations that "the Elite Partners program offered participant funds increased visibility on the firms' websites . . . ; increased access to the sales force . . . ; the inclusion of materials relating to the Elite Partner funds in . . . internal marketing publications and newsletters; ticket charge waivers; and participation in joint marketing programs between [participant broker-dealers] and Elite Partner fund complexes." Order at 4 (quoting First Amended Complaint at ¶ 36) (internal citations and quotation marks omitted). The NASD also alleged that "[t]he mutual fund complexes that participated in [the Elite Partner] programs paid extra fees for enhanced visibility." Simply reviewing the language of Defendants' 2004 disclosures reveals that every material fact upon which Plaintiffs base their claims in 2007, and every material fact cited by the NASD in 2005, was disclosed by Defendants in 2004:

> We currently offer mutual funds sponsored by more than 100 companies, but because there are more than 8,000 mutual funds available for sale in the United States, *we focus on a select group* of some of the largest and most well-known mutual fund families that offer a broad spectrum of investment products. *This group of fund families has greater access to our representatives to provide training and other educational presentations and product information so that they can serve investors better. We call this our Elite Partner Program.*
>
> The following fund families currently participate in the Elite Partner Program: AIG SunAmerica Asset Management, AIM Investments, Alliance Bernstein, Fidelity Investments, Franklin Templeton Investments, Putnam Investments, NationsFunds, Oppenheimer Funds, Van Kampen Investments, and WM Funds Distributor, Inc.
>
> *In addition to the customary sales charges in connection with sales of mutual funds, elite partners make payments to ACC to participate in the program.* First, ACC receives a payment of up to 0.25 percent (25 basis points) of an inves-

tor's total purchase amount of a mutual fund through an ACC registered representative (the "Gross Sales Payment"). If, for example, an investor invested $10,000 in a fund, ACC would be paid up to $25. Second, for as long as the investor holds that fund or another fund within the same fund family into which he or she has exchanged, ACC will receive an additional payment, paid quarterly, of up to 0.1 percent (ten basis points) per year of the amount held (the "Assets Under Management Payment"). For example, on a $10,000 holding, 0.1 percent is $10.

***These payments are made by the mutual fund's distributor, investment advisor or other related entity***. The participants in the Elite Partner Program and/or their affiliates make aggregate payments based on the formula set forth above.

Registered representatives of ACC do not receive additional selling compensation in connection with sales of mutual funds offered by elite partners, as opposed to other mutual fund families. However, where a nominal "ticket charge" applies, representatives usually pay an amount of $9 per transaction in connection with each purchase or sale of a mutual fund by a client. ***With respect to client purchases (but not liquidations) of Elite Partner funds, ACC absorbs the ticket charge, and the compensation payable to the representative would be $9 greater than with other funds.*** For example, if a client purchased $10,000 of a mutual fund which had a 4% front-end sales charge, the gross commission payable by the client would be $400 ($10,000 x 4%). A representative could receive up to approximately 90% of this amount, or $360. In connection with the sale of an elite partner fund, the representative would receive the entire $360. With a mutual fund not offered by an Elite Partner, the representative would pay the $9 ticket charge out of the commission and receive only $351.

Advantage Capital Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040609010855/www.advcap.net/EPProgramDisclosure.pdf.[1]

These disclosures plainly state that, in selling mutual funds, financial advisors focused on selling a select group of funds which participated in the Broker Defendants' Elite Partner Programs. The disclosures also make clear that, in order to participate in the Elite Partner Program (and thus be the focus of the financial advisors' selling efforts), a fund made payments to the Broker Defendants. Finally, the disclosures explicitly state that, while the financial advi-

---

[1]    *See also* virtually identical disclosures by the other Broker Defendants at:

FSC Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040601124426/www.fscorp.com/EPProgramDisclosure.pdf; Royal Alliance Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040423172905/royalalliance.com/EP0104.pdf; Sentra Securities Corp. and Spelman & Co., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040601173808/sentraspelman.com/EPProgramDisclosureSS.pdf; SunAmerica Securities Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040728000007/www.sunamericasecurities.com/EPProgramDisclosureSAS.pdf. The cited website disclosures have previously been submitted to the Court, as Exhibits B-F to the Affidavit of Thomas J. Kavaler, sworn to on September 29, 2006 ("Kavaler Aff.") (Docket 20).

sors did not receive additional selling compensation for selling funds that participate in the Elite Partner Program, their compensation may have increased by a waiver of the associated "ticket charge".  It is undeniable that this disclosure explicitly revealed all of the facts that Plaintiffs claim were not disclosed, including the existence of the revenue sharing arrangement and the potential for a conflict of interest.

Notwithstanding the exhaustive and detailed nature of Defendants' 2004 disclosures, Plaintiffs challenge their adequacy, alleging that the disclosures are "materially misleading" because (i) they fail to disclose "the millions of dollars in directed brokerage that was being paid to AIG"; (ii) they fail to disclose "the quid pro quo arrangement Defendants had with the Shelf-Space Funds (*i.e.* there is no mention that Defendants were steering clients into Shelf-Space Funds and giving biased recommendations in exchange for the payments from the Shelf-Space Funds)"; and (iii) they inaccurately state that financial advisors did not receive additional compensation in connection with the sales of Elite Partner funds.  Complaint at ¶ 87.  None of these allegations is well-founded.

First, Plaintiffs' claim that the disclosures are inadequate for failing to disclose directed brokerage payments is a red herring.  The 2004 disclosures plainly reveal that the Broker Defendants received payments from the funds participating in the Elite Partner Program:  "In addition to the customary sales charges in connection with sales of mutual funds, elite partners make payments to ACC to participate in the program."  Advantage Capital Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040609010855/ www.advcap.net/EPProgramDisclosure.pdf, *also available* at Kavaler Aff. Ex. B.  The 2004 disclosures further reveal the exact formula used to calculate the amount of the payments made to the Broker Defendants.  These are the material facts, and they are fully disclosed.  That the 2004 disclosures did not define the method by which the funds made these payment to the Broker Defendants (whether it be through directed brokerage or by a check in the mail) is a non-issue.  As recognized by the Court in the April 25 Order, what is potentially material to an investor is the

(fully disclosed) fact that the Broker Defendants focused their selling efforts on certain funds and that those funds paid the Broker Defendants for that focus. It is not material to an investor what method the fund utilized to make these payments and thus the disclosure is not materially misleading for failing to employ the supposedly talismanic phrase "directed brokerage".

Plaintiffs' second allegation, that the 2004 disclosures were inadequate for failing to reveal the existence of a quid pro quo arrangement, is similarly flawed. Again, the facts that would be material to an investor — that the Broker Defendants focused their selling efforts on certain funds and that those funds paid the Broker Defendants for that focus — were fully disclosed. Upon reading the 2004 disclosure, an investor is aware that his financial advisor will focus on selling him funds that participate in the Elite Partner Program and that those funds pay the Broker Defendants for that consideration. Having been made aware of all the material facts relating to the revenue sharing arrangement and the potential for a conflict of interest, Plaintiffs cannot be heard to argue that Defendants were also required to characterize the program in the pejorative or to adopt Plaintiffs' preferred inflammatory terminology (by referring to the arrangement as "steering", "quid pro quo", "biased", etc.). *See United States* v. *Matthews*, 787 F.2d 38, 49 (2d Cir. 1986) (holding that defendants are not required to accuse themselves of wrongdoing); *Goldberg* v. *Meridor*, 567 F.2d 209, 218 n.8 (2d Cir. 1977) ("We do not mean to suggest that § 10(b) or Rule 10b-5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives."), *cert. denied*, 434 U.S. 1069 (1978); *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 375 (3d Cir. 1993) ("[P]laintiffs cannot successfully contend that the prospectus is actionable because it failed to describe its debt-equity ratio as either 'unwarranted' or 'excessive.'"), *cert. denied*, 510 U.S. 1178 (1994); *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing."); *In re Donna Karan International Inc. Securi-*

*ties Litigation*, 1998 WL 637547, at *10 n.9 (E.D.N.Y. Aug. 14, 1998) (explaining that "the securities laws do not require corporate management 'to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner'") (quoting *Ballan* v. *Wilfred American Education Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989)).

Plaintiffs' third allegation is likewise unsupported and without merit.  Plaintiffs assert that Defendants' statement, that "[r]egistered representatives of [the broker] do not receive additional selling compensation in connection with sales of mutual funds offered by elite partners, as opposed to other mutual fund families" was false.  Plaintiffs allege that the statement was false because "[a]ccording to the NASD, '[t]he Elite Partners funds were offered . . . increased access to the sales force, which included participation in [the AIG Brokers'] educational and sales conferences and meetings to reward top producing brokers.'" Complaint at ¶ 52.  Even assuming that the NASD's untested litigation positions should be considered as facts by this Court (which, as addressed in Defendants' previous briefs, they should not be), there is no indication that even the NASD considered the Shelf-Space Funds' participation in (or even sponsorship of) conferences and meetings as a form of compensation to the individual financial advisors.  And, even if such events could somehow be construed as compensation, there is no indication — and no allegation — that such events could be considered material.

As part of the Sarbanes-Oxley reforms in 2002, Congress enacted Section 804, providing that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of:  (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b); *see also Fezzani* v. *Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 634 (S.D.N.Y. 2004) ("discovery under the 1934 Act limitations provisions includes constructive or inquiry notice, as well as actual notice") (quoting *Menowitz* v. *Brown*, 991 F.2d 36, 41 (2d Cir. 1993)).  Plaintiffs now acknowledge Defendants'

-8-

website disclosures "beginning in or about January 2004," Complaint at ¶ 87, which were available to plaintiffs and the world on Defendants' websites no later than March 2004[2], and thus cannot be heard to argue that they were not on notice in March 2004 of the information that forms the basis of their asserted claims.  Because Plaintiffs' allegations relate to facts of which they were on notice no later than March 2004, more than two years before the date they filed their first complaint in this action, *viz.,* April 7, 2006, Plaintiffs' claims under § 10(b) and § 20(a) of the 1934 Act are time-barred and must be dismissed.

## II.   The Complaint Fails Adequately to Allege a 1934 Act Violation
### A.   Plaintiffs Have Alleged No Material Misrepresentation or Omission

This Court held in its April 25 Order that Plaintiffs "fail[ed] to adequately plead that disclosure of the Shelf-Space payment arrangements would 'significantly' alter the total mix of information available to a reasonable investor (i.e., whether it was material)."  Order at 29. The materiality allegations in the Second Amended Complaint are just as conclusory as those in the First Amended Complaint.  *E.g.*, Complaint ¶ 90 ("In truth, a significant portion of those expenses was not being used to provide the services promised, but rather to increase the profits of AIG by financing the programs challenged in this lawsuit.").  Plaintiffs fail even to remedy the specific failures identified by the Court in its April 25 Order and again fail adequately to allege materiality.

---

[2]     *See* archived websites of each Broker Defendant, linking to the January 2004 disclosures:

*Advantage Capital Corp.* (Jan. 29, 2004),  available at http://web.archive.org/web/20040406142844/ http://www.advcap.net/); *FSC Corp.* (Jan 29, 2004), available at (http://web.archive.org/web/20040324 000605/http://www.fscorp.com); *Royal Alliance Corp.* (Mar. 12, 2004), available at http://web.archive. org/web/20040403122521/http://www.royalalliance.com; *Sentra Securities Corp. and Spelman & Co.* (Jan. 26, 2004), available at http://web.archive.org/web/20040322070418/http://sentraspelman.com; *SunAmerica Securities Corp.* (Mar. 22, 2004), available at http://web.archive.org/web/20040413043615/ http://www.sunamericasecurities.com.

1. **Plaintiffs Fail to Allege That Defendants Received a Materially Greater Amount of Compensation from the "Shelf Space Funds" Than They Received from Other Funds**

Plaintiffs' non-disclosure theory is that Defendants operated under a "conflict of interest" as a result of the receipt of payments from the "Shelf Space Funds" that, unbeknownst to Plaintiffs, provided Defendants with an incentive to "steer" investors to the "Shelf Space Funds". As the Court recognized in the April 25 Order, the First Amended Complaint failed to plead the materiality of the alleged misstatements and omissions because Plaintiffs "nowhere allege[d] how the compensation received by AIG Brokers for promoting Shelf Space Funds was significantly different than the compensation they received from promoting other funds." Order at 30. The Second Amended Complaint similarly fails to illuminate this point. As before, the Complaint is rife with references to alleged "kickbacks". *E.g.*, ¶¶ 2, 3, 7, 40, 50, 61, 62. Still absent, however, is any pleading as to the extent, *vel non*, to which the fees and commissions Defendants received from the "Shelf Space Funds" exceeded the fees and commissions they received from other funds. With no allegations to this effect even in light of the explicit guidance of the April 25 Order, Plaintiffs fail as a matter of law to plead materiality.

2. **Plaintiffs Again Fail to Allege The Materiality of the Alleged Payments**

Plaintiffs' half-hearted efforts to respond to particular weaknesses identified by the Court also fail. For instance, the Court recognized that the First Amended Complaint nowhere alleged "how much the ["ticket charge" forgiveness] 'kickbacks' added up to." Plaintiffs' attempt to address this issue reveals the muddled thinking underlying their theory of materiality. Plaintiffs' chosen approach to pleading this point — a misguided effort to allege materiality by multiplication — is as follows: 1) they take as given that individual financial advisors did not have to pay a ticket charge (which they allege was "at a minimum $12") for transactions

in the "Shelf Space Funds,[3] Complaint ¶ 58; 2) they assert that "[a] typical AIG advisor conducted approximately 4,867 transactions per year during the Class Period,"[4] Complaint ¶ 59; 3) they multiply the $12 ticket charge by the total number of transactions for a "typical AIG advisor" to arrive at an amount, $58,400, by which each advisor's earnings allegedly increased by selling "Shelf Space Funds" as opposed to other funds.  Complaint at ¶ 59.  The numerous flaws in this reasoning include the invalid compound assumption that ticket charges were waived for every transaction conducted by every advisor during the class period, but the most fundamental problem is that Plaintiffs impermissibly, and illogically, attempt to conflate the total number of transactions conducted by a "typical AIG advisor" with transactions in funds *actually at issue in this litigation*.  The reality that only 13 funds are at issue in this case is nowhere acknowledged in Plaintiffs' pleading.

---

[3]     Even this is a generous reading of ¶¶ 57-60 of the Complaint, which confusingly misstate what ticket charges are and who pays them.  The January 1, 2004 website disclosure of Defendant Advantage Capital Corp., like the website disclosures of the other broker Defendants, makes clear the nature of "ticket charges":

> "[W]here a nominal "ticket charge" applies, representatives usually pay an amount of $9 per transaction in connection with each purchase or sale of a mutual fund by a client. With respect to client purchases (but not liquidations) of Elite Partner funds, ACC absorbs the ticket charge, and the compensation payable to the representative would be $9 greater than with other funds. For example, if a client purchased $10,000 of a mutual fund which had a 4% front-end sales charge, the gross commission payable by the client would be $400 ($10,000 x 4%). A representative could receive up to approximately 90% of this amount, or $360. In connection with the sale of an elite partner fund, the representative would receive the entire $360. With a mutual fund not offered by an Elite Partner, the representative would pay the $9 ticket charge out of the commission and receive only $351."

Advantage Capital Corp., *Elite Partner Program Policy* (Jan. 1, 2004), *available at* http://web.archive.org/web/20040609010855/www.advcap.net/EPProgramDisclosure.pdf, *also available* at Kavaler Aff. Ex. B.

[4]     Plaintiffs cite no source for their allegations regarding the number of transactions "a typical AIG advisor" conducted during the relevant time period or for the number of financial advisors working at the Broker Defendants during the time period.  Defendants dispute the accuracy of these figures but, for purposes of this motion only, take them as true.

Plaintiffs' attempt to remedy another Court-identified weakness in the First Amended Complaint fares no better. The Court observed that in the First Amended Complaint Plaintiffs "allege[d] the use of directed brokerage as reimbursement of broker-dealers . . . but nowhere allege[d] how much directed brokerage they are talking about." April 25 Order at 30. In response, Plaintiffs once again plead, based on the AWC entered with the NASD, that Defendants "arrang[ed] and accept[ed] $41.5 million dollars of directed brokerage from January 2001 through December 2003." Complaint at ¶ 56. This recycled allegation, already identified as inadequate by the Court, cannot cure Plaintiffs' pleading deficiencies. Plaintiffs still fail to allege what portion, if any, of the alleged $41.5 million in directed brokerage payments was paid by funds that any Plaintiff owned. Some simple math reveals the ridiculousness of Plaintiffs' approach. Assume conservatively that each mutual fund family contains 50 funds.[5] Assume that the NASD AWC related to "revenue sharing" arrangements between Defendants and twelve[6] of the nineteen mutual fund families that Plaintiffs identify as "Shelf Space Funds" in Exhibit A to the Complaint. Under these assumptions, the $41.5 million in directed brokerage payments referenced in the AWC would relate to 600 separate mutual funds (50 funds times 12 fund families). Plaintiffs owned a total of thirteen mutual funds. *See* Complaint Exhibit D. 13 is 2.2% of 600; 2.2% of $41.5 million is roughly $900,000. Plaintiffs' attempt to plead materiality by reference to the $41.5 million in directed brokerage payments alleged by the NASD AWC can thus be seen for what it is — reference to a figure with no connection whatsoever to the claims as to which Plaintiffs have standing to sue.

---

[5]     It is common for mutual fund families to contain well over 50 separate mutual funds. *E.g.*, *Putnam Investments Monthly Performance Summary* (Feb. 28, 2007) (listing over 60 separate mutual funds in the Putnam mutual fund family) *available at* https://content.putnam.com/shared/pdf/monthly_performance_funds.pdf; *AIM Investments Daily Prices* (June 7, 2007) (listing over 60 separate mutual funds in the AIM mutual fund family) *available at* http://www.aiminvestments.com/portal/site/aim/menuitem.b5e6f82a8826219d3e566943acd8fba0.

[6]     *See* Complaint at ¶ 7.

Similarly, Plaintiffs' allegation that Defendants received "revenue sharing" payments for the sale of shares and as quarterly fees (of 25 basis points and 11 basis points, respectively), Complaint at ¶ 53, continues to fail to relate these payments to assets under management by the specific funds at issue in this case, as required by the Court's April 25 Order. Order at 29 ("[P]laintiffs recite that the AIG Brokers received payments of up to 25 basis points "on the sales of shares" and up to 11 basis points of quarterly fees per year, calculated by reference to assets under management. Complaint ¶ 38. Calculating the actual size of these payments is impossible, however, because plaintiffs nowhere mention the amount of assets under management for any fund.").

This Court found in its April 25 Order that Plaintiffs had failed in the First Amended Complaint to plead the alleged "payment system" with sufficient particularity to permit the Court to evaluate materiality. Order at 19. Plaintiffs have utterly failed to address any of the particular deficiencies identified by the Court in its April 25 Order. The very information the Court found lacking in the First Amended Complaint is also lacking in Second Amended Complaint. The Second Amended Complaint does no more than its predecessor pleading to allege "specifics about statements, speakers, and payment arrangements" related to funds Plaintiffs owned — all of which the Court held would be necessary to evaluate materiality. Order at 30. Instead, Plaintiffs have resorted to smoke and mirrors in an attempt to allege materiality by pleading facts that simply bear no connection to their claims in this litigation. Plaintiffs' continued use of figures completely unrelated to the funds as to which they have standing to sue in an effort adequately to allege materiality is disingenuous at best. Plaintiffs' failure to allege any specific facts to support their assertion that the alleged misstatements and omissions were material as to funds they actually owned is fatal. The Second Amended Complaint is insufficiently particular and must be dismissed.

### 3.   The Alleged Misstatements and Omissions Must Be Considered in the Context of the Disclosures that Plaintiffs Concede Defendants Made

In its April 25 Order, the Court reserved the question of whether the prospectuses of the "Shelf Space Funds" disclosed the payments that Plaintiffs claim constituted the basis of Defendants' alleged "conflict of interest" because Plaintiffs failed in the First Amended Complaint to identify the prospectuses at issue.  Order at 16 n. 16.  The Court observed, however, that the excerpts of the MFS prospectus cited by Plaintiffs in the First Amended Complaint, which is not at issue in this case, were potentially misleading in that "the prospectus does not mention . . . that commissions might also be paid out from fund assets in return for broker-dealers promoting the fund to would-be investors."  Order at 16.

Plaintiffs now allege that "[i]n return for the efforts of the AIG Brokers to steer their clients into the Shelf-Space Funds, the Funds paid them directed brokerage commissions that were in excess of what they would have paid under an agreement reached with the broker/dealers through arm's-length bargaining.  The [Funds'] investment advisors would use these excessive commissions, which are Fund assets belonging to investors, to meet their revenue sharing commitments."  Complaint at ¶ 93.  Plaintiffs also contend that

> "Had Plaintiffs and the other members of the Class and the marketplace known of the truth concerning the directed brokerage, revenue sharing and other improper practices complained of herein which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have held, purchased or otherwise acquired their shares of the Shelf-Space Funds, would not have paid any commissions or fees paid as a result of their acquisition of the Shelf-Space Funds, would not have held shares of mutual funds in the Shelf Space Funds whose NAV was impacted by charges against assets held by costs whose primary purpose was not to benefit plaintiffs and the other class members but rather the defendants and would not have paid the fees and costs associated with ownership of the Shelf-Space Funds . . . ."

Complaint at ¶ 104.

In response to the Court's April 25 Order, Plaintiffs now extensively recite in the Complaint the prospectus disclosures that are at issue in this case.  The Court's wisdom in re-

-14-

quiring Plaintiffs to set forth *in extenso* the language of the actual prospectuses at issue is manifest.  These newly alleged, and far more extensive, disclosures prove what Defendants have asserted all along — that the relevant disclosures available to the market during the class period revealed the directed brokerage "revenue sharing" arrangements — and thus, by Plaintiffs' logic, the "conflict of interest" — that are the basis of these claims and were absent from the excerpt from the MFS prospectus that the Court previously reviewed in Plaintiffs' prior pleading.

The January 30, 2003 SAI for the Putnam California Tax Exempt Income Fund cited by Plaintiffs explicitly discloses that "*Putnam Management may consider sales of shares of the fund (and, if permitted by law, of the other Putnam funds) as a factor in the selection of broker-dealers to execute portfolio transactions for the fund.*"  Complaint at ¶ 69 (emphasis added). Similarly, the May 1, 2001 SAI for the AIM Value Fund and the December 2, 2002 SAI for the AIM Intermediate Government Fund disclose that "AIM may determine *target levels of commission business* with various brokers on behalf of its clients (including the Funds) over a certain time period. The target levels will be based upon the following factors, among others: (1) the execution services provided by the broker; (2) the research services provided by the broker; and (3) *the broker's interest in mutual funds in general and in the Funds and other mutual funds advised by AIM or AIM Capital Management, Inc. (collectively, the "AIM Funds") in particular, including sales of the Funds and of the other AIM Funds.*"  Complaint at ¶ 74 (emphasis added). The February 1, 2004 SAI for the SunAmerica Growth Opportunities Fund disclosed that "*consideration may also be given to the willingness of particular brokers to sell shares of a [Sun America] Fund as a factor in the selection of brokers for transactions effected on behalf of a Fund.*"  Complaint at ¶ 70 (emphasis added).  The October 1, 2004 SAI for the American Funds Income Fund of America disclosed that "[s]ubject to the considerations outlined above, the investment advisor *may place orders for [American Funds'] portfolio transactions with broker-dealers who have sold shares of the funds* managed by the investment advisor, or who have provided investment research, statistical or other related services to the investment advisor."  Com-

plaint at ¶ 71 (emphasis added).  Moreover, these disclosures also clearly indicate that the funds in some instances compensate certain brokers at a level higher than others, based on services. *E.g.*, Complaint at ¶ 73 (quoting *Fidelity International Growth and Income Fund Statement of Additional Information*, Dec. 29, 2003 ("Brokers or dealers that execute transactions for a fund may receive compensation that are [sic] in excess of the amount of compensation that other brokers or dealers might have charged, in recognition of the products and services they have provided.")).

Plaintiffs cannot have it both ways.  They cannot say, with no basis other than a Conduct Rule-based settlement with the NASD, that these "revenue sharing" arrangements constituted a "conflict of interest" while at the same time saying that disclosure of these very "revenue sharing" arrangements — and even focused prospectus and SAI disclosures like those above that brokers' sales of funds would be considered in determining the commission business funds gave to brokers — did not inform the market of that very "conflict of interest".[7]

Particularly troubling are Plaintiffs' allegations relating to directed brokerage. Plaintiffs allege that the fact of directed brokerage payments constitutes a *de facto* conflict of interest.  *E.g.*, Complaint at ¶ 54 ("Directed brokerage involves allotting trades — and the lucrative commissions that are a result of the trades — in the securities that make up a mutual fund investment portfolio to a particular brokerage . . . in exchange for that brokerage pushing the sale of those mutual funds onto investors.").  Shockingly, Plaintiffs continue to allege that directed brokerage was not disclosed.  *E.g.*, Complaint at ¶ 78 ("The Shelf-Space Fund prospectuses cited above are materially false and misleading in that they <u>failed to disclose</u> that Plaintiffs were paying fees funding the Shelf-Space system of payments, including <u>directed brokerage</u>, that was in

---

[7]        Notably, despite Plaintiffs' numerous "conflict of interest" allegations, the Second Amended Complaint — like its predecessor — is devoid of any allegation that any particular Broker Defendant "steered" any particular plaintiff to make an inappropriate investment.

fact part of the quid pro quo agreements between the AIG Brokers and the Shelf-Space Funds . . . .") (emphasis added).  As discussed above, Plaintiffs were constrained to plead the very disclosures that they claim do not exist.  *See, e.g.,* Complaint at ¶ 70 (quoting *SunAmerica Growth Opportunities Fund Statement of Additional Information*, Jan. 28, 2003 ("On behalf of the Funds, the Advisor has entered into <u>directed brokerage</u> agreements. A <u>directed brokerage</u> agreement includes those arrangements under which products or services (other than execution of securities transactions), expenses reimbursements, or commissions are recaptured for a client from or through a broker dealer, in exchange for directing the client's brokerage transactions to that broker-dealer.") (emphasis added)).

If, as Plaintiffs contend, the definition of directed brokerage is "allotting trades . . . in the securities that make up a mutual fund to a particular brokerage . . . *in exchange for that brokerage pushing the sale* of those mutual funds onto investors," Complaint at ¶ 54 (emphasis added), then it must follow that disclosure of the existence of "directed brokerage" is equivalent to a disclosure that the fund "allott[ed] trades . . . in the securities that make up a mutual fund to a particular brokerage . . . in exchange for that brokerage pushing the sale of those mutual funds onto investors."  In other words, under the Plaintiffs' formulation, by disclosing that they engaged in directed brokerage (as Plaintiffs concede they did), the funds disclosed the very "conflict of interest" that Plaintiffs allege.  Thus, under Plaintiffs' own formulation, the material facts have been disclosed and there is no material misstatement or omission.

To comply with the Court's requirement that they plead the existence of misrepresentations or omissions in the prospectus disclosures actually at issue in this case, Plaintiffs were forced to provide the Court with evidence that reveals that the very facts they allege were omitted or misstated have in fact been adequately disclosed.  Plaintiffs' allegations of material misstatements and omissions must be considered in the context of the disclosures that Plaintiffs concede were made.  Doing so reveals that the Plaintiffs have failed to allege that any material misstatement or omission occurred.

**B.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Allege with Particularity Facts Giving Rise to a Strong Inference of Scienter**

In support of their Motion to Dismiss the First Amended Complaint, Defendants argued that Plaintiffs failed adequately to allege scienter because they pleaded neither motive, recklessness, nor conscious wrongdoing on the part of any Defendant.  Due to the numerous other failings in the First Amended Complaint, the Court in its April 25 Order did not reach these scienter arguments.  Because the Second Amended Complaint also fails adequately to allege scienter, Defendants respectfully refer the Court to the scienter arguments they advanced in their memorandum of law in support of their motion to dismiss at Point I(B) and their reply memorandum at Point I(C).

In addition to the scienter arguments advanced in Defendants' previous briefing, it is important to point out that the alleged misstatements and omissions, *vel non*, in the mutual funds' prospectuses and SAIs cannot be attributed to Defendants as Plaintiffs assume in the Complaint.  In dismissing similar claims against broker defendants, the court in *Siemers* v. *Wells Fargo & Co.* observed:

> "As alleged, it would be materially deceptive for a sponsor of a fund to compete for investment dollars without disclosing an established practice of misappropriating investors' money.  That disclosure obligation would be at the *sponsor* level, however.  Whether that disclosure obligation would extend to the *broker* level would depend, among other things, on what the *broker* knew or should have known.  In the chain of distribution, the sponsor is at the top.  The investor is at the bottom.  The broker, if one is involved, is in the middle.  Brokers are not privy to all inside information within a fund.  Even brokers with revenue-sharing arrangements are not privy to all such information.  Brokers are not, therefore, automatically on notice of every wrong committed inside a fund."

*Siemers* v. *Wells Fargo & Co.*, 2007 U.S. Dist. LEXIS 21935, at \*\*49-50 (N.D. Cal. Mar. 9, 2007) (dismissing with prejudice plaintiffs' section 10(b) claims based on "shelf space" allegations against broker defendants) (emphasis in original).  In *Siemers*, as here, Plaintiffs sought to predicate broker liability on alleged inadequacies in various mutual funds' prospectuses and SAIs.  The *Siemers* court assumed, for purposes of deciding the motion to dismiss, that the bro-

ker in that case was aware of its own revenue-sharing arrangement with the fund family, but found that "there is nothing in the complaint to indicate that [the broker defendant] was aware of the vast scope of [the fund family's] larger network of revenue sharing arrangements." *Id.* at *51. The *Siemers* court recognized that "the vast scope of [the fund family's] revenue-sharing program was what rendered it material," *id.* at *51, and held that "the proposed complaint simply does not set forth facts and circumstances from which we can reasonably draw a strong inference as to [the broker defendant's] knowledge of any larger [mutual fund family] scheme." *Id.* at 52.

The distinction pointed out by the *Siemers* court is vital to evaluating the adequacy of Plaintiffs' scienter allegations because even assuming, *arguendo*, that Defendants believed that the funds' prospectuses and SAIs were flawed insofar as they did not explicitly disclose the funds' revenue sharing arrangements with Defendants, Plaintiffs have alleged no facts to allow the conclusion that Defendants had visibility of the funds' revenue sharing arrangements with other brokers to permit Defendants to evaluate the extent, if any, of the flaw in the funds' prospectuses and SAIs.[8]

---

[8]    Plaintiffs' Complaint attempts to allege primary violations of Section 10(b) against the Broker Defendants premised on alleged misstatements and omissions in the "Shelf Space" mutual funds' prospectuses and SAIs. *See, e.g.*, Complaint at ¶ 63 ("The AIG Brokers disclosed information to their customers concerning mutual fund purchases primarily through supplying customers with the prospectuses, and, if requested, the statements of additional information issued by the mutual funds."); *id.* at ¶ 65 ("The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Shelf-Space Funds and the financial incentives received by the AIG Brokers for such activities."). Dissemination of even a misleading document, however, is not tantamount to making a misstatement for securities fraud purposes. *See Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("a secondary actor cannot incur primary liability under the [1934] Act for a statement not attributed to that actor at the time of its dissemination"); *In re Mutual Funds Investment Litigation*, 2007 WL 1519815, at *3 (D. Md. May 21, 2007) (granting defendant's motion to dismiss where defendant was alleged to have distributed misleading mutual fund prospectuses, and holding that allegations that defendant disseminated mutual fund prospectuses, even if the prospectuses were materially misleading, were insufficient to expose defendant to 1934 Act liability). Therefore, to the extent Plaintiffs' allegations of primary liability against the Broker Defendants rest on the brokers' dissemination of allegedly misleading mutual fund prospectuses and SAIs, those allegations fail to state a claim under Section 10(b) of the 1934 Act.

Plaintiffs have failed as a matter of law to allege facts giving rise to a strong in-

ference of scienter on the part of any Defendant.

**C.      Plaintiffs Have Not Stated a Claim Because the Complaint Does Not
        Adequately Allege the Element of Loss Causation**

The loss causation theory propounded in Plaintiffs' First Amended Complaint

came in three variations.  The first variation, that in the absence of the alleged misstatements and

omissions Plaintiffs would not have bought shares in the Shelf Space Funds, but rather would

have invested in other funds that would have earned them a greater return, was rejected by the

Court in its April 25 Order as relating to transaction causation rather than loss causation.  Order

at 22.  Likewise, the second variation, that the alleged misstatements and omissions "distorted"

the "market prices" at which plaintiffs bought Shelf-Space Fund shares such that the share prices

"did not reflect the risks and costs of the continuing course of conduct alleged," First Amended

Complaint at ¶ 81, was rejected by the Court in its April 25 Order because "the price of mutual

fund shares is not set by the market but by law," and because "Plaintiffs nowhere allege[d] that

the total amount of liabilities (fees and commissions) at issue were anything but fully disclosed

to investors."  Order at 22.

The April 25 Order left Plaintiffs with one potentially viable theory of loss causa-

tion: that Defendants somehow misled Plaintiffs into thinking the fees and commissions they

paid "were 'legitimate outlays for services' accruing to the benefit of plaintiffs, whereas in fact

the fees went to Shelf-Space promotional services, accruing to the benefit of the defendants."

Order at 22.  In other words, absent the allegedly illegitimate fees and commissions, the total

amount of fees Plaintiffs paid would have been smaller.  Not surprisingly, Plaintiffs have

adopted the Court's formulation and now allege in the Second Amended Complaint that "Plain-

tiffs were misled into thinking that the fees and commissions they paid on the Shelf-Space Funds

were legitimate outlays for services accruing to their benefit, when in actuality, the fees went to

Shelf-Space promotional services, accruing to the benefit of Defendants"  Complaint at ¶ 14, and

that "[a]bsent the fees being used to pay for Defendants' kickback programs, Plaintiffs' and the other members of the Class' total amount of fees, and, thus, the resulting diminution of their investment's asset value, would have been smaller." Complaint at ¶ 90.

Whatever merit this theory of loss causation may have in the abstract, *vel non*, the facts alleged in the Complaint plainly fail to support it. Fundamental to Plaintiffs' new loss causation allegation that they would not have paid certain fees that "accru[ed] to the benefit of Defendants" had they been aware of the purpose of those fees is the premise that Plaintiffs were in fact not aware of the purpose of those fees. Because, as discussed in Points I and II(A), *supra*, Plaintiffs now plead the very disclosures — including the exhaustive "revenue sharing" disclosures available on Defendants' websites no later than March 2004 — that informed Plaintiffs of the usage of these fees, they cannot now be heard to claim that they would not have paid the fees if they had known how some part of the fees would be used *because they knew that fact*. Defendants disclosed not only the fees and commissions but the "revenue sharing" programs that underlie Plaintiffs claims. Therefore, it cannot have been the case that any misstatement or omission on Defendants' part was the cause of Plaintiffs' payment of the fees in question. The causal chain between the alleged fraud and the alleged loss is broken, and Plaintiffs' latest attempt to plead loss causation fails.

### D.    Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Adequately Allege Transaction Causation or Reliance

This Court held in its April 25 Order that "to the extent plaintiffs' Section 10(b) claims are based upon misrepresentations, plaintiffs [in the First Amended Complaint] nowhere allege that any particular individual relied upon those misrepresentations." Order at 29. The Second Amended Complaint does no better. Plaintiffs again make only general, non-specific allegations of reliance. *E.g.*, ¶ 38 ("Plaintiffs relied on their belief that they were receiving objective advice from the AIG advisors"); ¶ 77 ("Plaintiffs relied on the fact that they believed that Defendants were not subject to a conflict of interest"). These allegations are plainly inadequate

-21-

to satisfy Plaintiffs' obligations under Rule 9(b) and the PSLRA to plead the facts and circum-stances constituting fraud with particularity.

Even more fundamental than the shortcomings of Plaintiffs' pleading is the fact that truthful information available to plaintiffs precludes as a matter of law the assertion that plaintiffs relied on the alleged misstatements and omissions. As discussed more fully above, De-fendants made extensive disclosures of the very "revenue sharing" arrangements Plaintiffs con-tend Defendants misrepresented or omitted to disclose. *See supra* at Points I and II(A). Plain-tiffs cannot be heard to argue that they relied on misrepresentations or silence while ignoring specific disclosures of "revenue sharing". *See, e.g., Teamsters Local 282 Pension Trust Fund* v. *Angelos*, 762 F.2d 522, 530 (7th Cir. 1985) (Easterbrook, J.) ("[t]he investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him").

### E.   Plaintiffs Have Not Stated a Claim Because the Complaint Does Not Adequately Allege Damages

"[A] defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got . . . ." *Levine* v. *Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971) (Friendly, J.). Plaintiffs fail to allege any facts to allow the Court to assess how, if at all, the amount they paid is greater than the value of what they got — rather, they simply allege that De-fendants engaged in a fraud in order to "profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Shelf-Space Funds." Complaint at ¶ 111. This allegation is reminiscent of plaintiffs' inadequate damages theory in the *Siemers* case. Plaintiffs there sought "restitution of the commissions and revenue sharing monies that the Broker-Dealer Defendants received . . . [so that] the Broker-Dealer Defendants [would] be held responsible for their own conduct regarding revenue sharing which was not adequately disclosed to Plaintiff and other class members." *Siemers* v. *Wells Fargo & Co.*, 2007 U.S. Dist. LEXIS 21935, at **54-55 (N.D. Cal. Mar. 9, 2007). The *Siemers* court found the plaintiff's proposed measure of damages to be "unfit for duty" because it sought a "monumental windfall" which would "bear no connec-

tion to any actual damages suffered by any investor by reason of any broker's failure to disclose its conflict of interest." *Id.* at *55. The flaws in plaintiffs' damages allegations prompted the *Siemers* court to find that plaintiffs' Section 10(b) theory was "fatally flawed" and to dismiss that Section 10(b) action against the broker defendants with prejudice. *Id.*

Plaintiffs' damages theory here may or may not be the same as the theory rejected as "fatally flawed" by the *Siemers* court. In fact, Plaintiffs' damages theory is unknowable from the face of the Complaint because it appears nowhere therein. To the extent that Plaintiffs here have a damages theory, they have failed to allege it with any particularity. The Complaint should be dismissed on that basis.

### III.   Plaintiffs Rule 10b-10 Claims Are Not Actionable

Plaintiffs' First Amended Complaint purported to allege violations of Rule 10b-10. The Court declined in its April 25 Order to address "the question whether plaintiffs have a private right of action [under Rule 10b-10] to allege such a claim in the first place." Order at 31 n. 28. The Second Amended Complaint likewise purports to allege a violation of Rule 10b-10. Complaint at ¶¶ 115-20. It is not at all clear that a private right of action exists under Rule 10b-10. *Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121, 126 n. 7 (2d Cir. 2000); *Levitin* v. *PaineWebber, Inc.*, 933 F. Supp. 325, 329-30 (S.D.N.Y. 1996) ("It is not clear whether a private right of action exists for violation of Rule 10b-10."). In any event, if there is such a private right of action, such a claim, like all § 10(b) claims, must comply with Rule 9(b) and plead facts constituting a violation with particularity. *See Morris* v. *Wachovia Securities, Inc.*, 277 F. Supp. 2d 622, 638 (E.D. Va. 2003) ("It is unnecessary to decide whether [defendant] complied with the requirements of Rule 10b-10 or whether a private right of action exists to enforce the requirements of Rule 10b-10 because [plaintiff] has failed to allege facts to satisfy either the transaction causation or the loss causation requirements of § 10(b)."); *Levitin*, 933 F. Supp. at 330 ("liability under Rule 10b-10 can only be imposed for conduct that violates section 10(b) of the 1934 Act").

-23-

Any claim under Rule 10b-10, like all of Plaintiffs' § 10(b) claims, would fail on the merits. The Court in its April 25 Order noted that "the question whether defendants met their Form N1-A disclosure obligations is likely relevant to plaintiffs' Rule 10b-10 claim." Order at 19. The Court did not reach Defendants' arguments regarding the sufficiency of their Form N1-A disclosures. Those arguments apply equally to the Complaint and thus Defendants hereby re-assert those arguments, contained in their memorandum in support of their motion to dismiss at Point I(A) and in their reply memorandum at Point I.

## IV.   The Complaint Does Not Adequately Allege That AIG Was a "Control Person" Within the Meaning of the Securities Laws

Plaintiffs' First Amended Complaint relied upon bare, unsupported — and un-supportable — conclusory allegations that AIG "had the power and authority, and exercised the same, to cause the AIG Brokers to engage in the wrongful conduct complained of," First Amended Complaint at ¶ 99, and that AIG held a "100% ownership" interest in the Broker-Dealer Defendants, *id.*, to state a claim against AIG for control person liability. Plaintiffs continue to rely upon the same conclusory and insufficient allegations in the Complaint. *E.g.*, Complaint at ¶ 123 ("As the parent company, AIG Inc. directly and indirectly was responsible for the content and causing the dissemination of the various statements which Plaintiffs contend are false and misleading. AIG Inc. had the ability to prevent the issuance of statements alleged to have failed to disclose the material information described herein and to provide disclosure of information not disclosed by the Shelf Space Funds.").

In its April 25 Order, the Court did not reach Defendants' arguments in favor of dismissal of Plaintiffs' control person liability claims. Those arguments apply equally to the Complaint and thus Defendants hereby reassert those arguments, contained in AIG's memorandum and in Defendants' reply memorandum at Point IV.

-24-

**V.    Plaintiffs' Pro Forma "Scheme" Liability Claims Also Fail to State a Claim**

A complete dearth of "scheme" allegations did not stop Plaintiffs from asserting violations of Rule 10b-5(a) and (c) in the First Amended Complaint.  Plaintiffs' failure to plead facts supporting these claims with particularity prevented the Court from evaluating the merits of these claims.  Order at 30 ("The lack of particularity poses the same impediment to a determination whether defendants' actions constituted a "scheme" for Rule 10b-5(a) and 10b-5(c) purposes.").  Because the Court did not reach the merits of Defendants' arguments on this issue in the context of the previous pleading, and because the Second Amended Complaint also fails to allege a "scheme", Defendants respectfully refer the Court to the "scheme" liability arguments contained in their memorandum of law at Point I(A)(5) and in their reply memorandum at Point I(B).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  June 22, 2007

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:   /s/ Thomas J. Kavaler
        Thomas J. Kavaler (TK-8517)
        Laura C. Fraher (LF-1466)
80 Pine Street
New York, New York  10005
(212) 701-3000

Attorneys for Defendants