UNITED STATES DISTRICT COURT                    FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                              :
                                              :
                                              :
                                              :          MEMORANDUM
In re: AIG ADVISOR GROUP SECURITIES           :          AND ORDER
LITIGATION.                                    :
                                              :          06 CV 1625 (JG)
                                              :
                                              :
-------------------------------------------------------------- X

A P P E A R A N C E S :

         STULL, STULL & BRODY
                6 East 45th Street
                New York, NY 10017
         By:    Mark Levine
                Attorneys for Plaintiffs

         CAHILL GORDON & REINDEL LLP
                80 Pine Street
                New York, NY 10005
         By:    Thomas J. Kavaler
                Attorneys for Defendants

JOHN GLEESON, United States District Judge:

         In a memorandum and order dated April 25, 2007, I dismissed the previous

complaint in this securities fraud putative class action. *See In re AIG Advisor Group Sec. Litig.*,

No. 06 CV 1625(JG), 2007 WL 1213395, at *15 (E.D.N.Y. Apr. 25, 2007) ("April 25 Order"). I

assume the reader's familiarity with that decision. The plaintiffs timely filed an amended

complaint, and the defendants now move to dismiss it with prejudice.[1] Because I conclude the

new complaint does not remedy certain inadequacies I identified in the previous complaint, I

---

[1]         This is the plaintiffs' second amendment, so the operative pleading is now entitled "Second
Consolidated Amended Class Action Complaint." The new complaint brings claims pursuant to the same provisions
of the Securities Exchange Act of 1934 that its predecessor did, namely § 10(b), 15 U.S.C. § 78j(b), and § 20(a), 15
U.S.C. § 78t. The new complaint omits the plaintiffs' prior claims pursuant to the Securities Act of 1933.

grant the motion.[2]

I concluded that the previous complaint did not plead with adequate particularity the circumstances of the defendants' alleged fraud.  In particular, I wrote, "plaintiffs fail to adequately plead that disclosure of the Shelf-Space arrangements would 'significantly' alter the total mix of information available to a reasonable investor (*i.e.*, whether it was material)."  April 25 Order at *14 (footnote omitted).  I mentioned a non-exhaustive list of specific inadequacies in this regard, but the basic problem was that the complaint never mentioned even an estimate of how much money the defendants' financial advisors stood to receive as compensation for selling Shelf-Space Fund interests to the plaintiffs.  *See id.*  The plaintiffs have attempted to fix that problem by alleging in the new complaint amounts involved in at least some payments.  However, as discussed below, the new complaint's description of the Shelf-Space pay structure remains, for the most part, too generalized to withstand the motion to dismiss pursuant to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA").  And the specific numbers that can be gleaned from the new complaint are too small to state a claim upon which relief can be granted.

DISCUSSION

The plaintiffs allege fraud.  *See, e.g.*, Compl. ¶ 101 ("Defendants . . . engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class.").  Under Rule 9 and the PSLRA, they must

---

[2]      Because I dismiss the predicate § 10(b) claims, I also dismiss the Rule 10b claims, *see Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) ("[T]he private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)"), and the control-person claims pursuant to § 20(a), *see SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show [among other things] a primary violation by the controlled person . . . .), *cert. denied*, 522 U.S. 812 (1997).

therefore state with particularity "the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including, among other things, an explanation "why the [defendants'] statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). *See also* 15 U.S.C. § 78u-4(b)(1) (requiring that securities fraud pleadings "specify . . . the reason or reasons why [each alleged fraudulent] statement is misleading"); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (applying heightened pleading requirements to § 10(b) claims). The particularity requirement reflects a desire "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted).

The plaintiffs claim they were sold interests in Shelf-Space Funds by financial advisors who touted their objectivity, even though their advice was biased by incentive payments from the Funds. *See* Compl. ¶¶ 4-11. Because the plaintiffs do not allege that a material amount of money was at stake for any of their financial advisors, however, they still do not adequately explain why the following statement, for example, was materially false or misleading: "[The broker-dealers'] entrepreneurial style of business allows them to be unbiased in terms of the products they can provide to you." *Id.* ¶ 35. The explanation provided -- that the financial advisors "received secret payments from the Shelf-Space Funds in exchange for recommending such funds regardless of their suitability to clients of AIG or the comparative value of the funds," *id.* ¶ 38 -- is sufficient only if the payments were significant enough to create some bias. If the secret payments were *de minimis*, for example, hiding them and professing to be "unbiased" would not have been materially misleading to a reasonable investor. *See, e.g.*, *In re Morgan*

3

*Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS

20758, at *32-*33 (S.D.N.Y. Apr. 18, 2006) (fees of "mere fractions of a percentage point" and

*de minimis* in-kind compensation held immaterial as a matter of law); *see also Feinman v. Dean*

*Witter Reynolds, Inc.*, 84 F.3d 539, 541 (1996) (Newman, C.J.) ("[R]easonable minds could not

find that an individual investing in the stock market would be affected in a decision to purchase

or sell a security by knowledge that the broker was pocketing a dollar or two of the fee charged

for the transaction."  (citation omitted)).  "[P]laintiffs must do more than say that the

[complained-of] statements . . . were false and misleading; they must demonstrate with

specificity why and how that is so."  *Rombach*, 355 F.3d at 174.  Here, the plaintiffs' allegations

about the defendants' financial advisors' receipt of payments must be particular enough to

explain why the payments biased the advisors and, consequently, why the defendants' statements

to the contrary were materially false or misleading.

       The plaintiffs argue that "the particularity requirements of Rule 9(b) and the

PSLRA do not apply to materiality."  Pl. Br. 13 n.9.  This argument does not withstand the

motion to dismiss.  For one thing, it only goes to whether I was correct to require the plaintiffs to

plead specific facts about the significance of the Shelf-Space payments as a matter of pleading

materiality.  The plaintiffs do not dispute that under Rule 9(b) and the PSLRA they must plead

specific facts to support their explanation why the defendants' claims of objectivity were false or

misleading.  And in any event the argument is not valid.  As is often the case, the particularity

requirements apply here *both* to allegations that explain falsity *and* to allegations that explain

materiality because in this case those allegations are one and the same.  *See, e.g.*, *In re Sierra*

*Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 375 (S.D.N.Y. 2007) (holding plaintiffs failed to

plead with adequate particularity that defendant's "positive statements about its . . . business [were] materially misleading").  The factual claim underlying the plaintiffs' proffered explanation why the defendants' statements were false, *i.e.*, that the defendants were biased by Fund payments, is the same factual claim underlying their explanation why the statements were material, *i.e.*, that a reasonable investor would be "substantial[ly]" likely to find disclosure of the defendants' bias by Fund payments to "hav[e] significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citations omitted) (stating materiality standard).  Given the plaintiffs' fraud theory, there is no distinction between factual allegations that go to materiality and factual allegations that go to explain falsity.

The new complaint does not plead the factual claim of bias with the requisite particularity.  As before, the plaintiffs claim their financial advisors received several types of Shelf-Space compensation: revenue sharing, directed brokerage, "ticket charge" incentives, and "various over-and-above incentives."  Compl. ¶¶ 51-60.  But none of the supplied information supports the inference that the money at stake in the particular transactions involving the plaintiffs was significant.  This is principally because the complaint includes almost none of the specific dollar amounts involved in these payments.[3]  Instead, it mentions figures covering thousands of transactions brokered by thousands of financial advisors with funds in which the plaintiffs did not purchase interests.  Such figures are far too generalized to specifically allege bias on the part of the financial advisors who dealt with the plaintiffs in this case.

With respect to directed brokerage, for example, which was allegedly the

---

[3]     As I explain below, the few specifically pleaded incentive payments do not state a claim upon which relief can be granted.

"primary method" of Shelf-Space compensation, *id.* ¶ 54, the plaintiffs now allege that "Defendants" altogether took in "$41.5 million dollars [*sic*] of directed brokerage from January 2001 through December 2003." *Id.* ¶ 56.[4]  The complaint supports this figure with a citation to a letter from the National Association of Securities Dealers reciting the reasons for a sanction and fine it imposed on the defendants. *See id.*  But this aggregate figure generalizes across "Defendants."  It adds up the directed brokerage compensation received by all the financial advisors employed by every single defendant, involving transactions involving non-plaintiff investors, from Shelf-Space Funds in which the plaintiffs never purchased interests.  The figure does not support the proposition that the financial advisor who advised, say, Plaintiff Alan Bogage stood to gain a not-insignificant amount of money by pushing Shelf-Space Funds on Bogage.

The allegations with respect to two of the other types of Shelf-Space payments are similarly generalized.  First, the plaintiffs maintain -- as they did previously -- that certain financial advisors were compensated with "paid trips and bonuses" and "reimbursement" for certain expenses and administrative costs. *Id.* ¶ 60.  But they nowhere allege how much compensation was at stake for any given financial advisor.  Second, the plaintiffs allege -- as they did previously -- that financial advisors received "revenue sharing payments" from the Funds of "up to a 0.25% (*i.e.*, 25 basis points) charge on the sales of shares" and "[q]uarterly fees, of up to 0.11% (*i.e.*, 11 basis points) per year, of the amount of assets under management." *Id.* ¶ 53.  The plaintiffs argue that applying this formula to their listing of assets under

---

[4]     The complaint supplements that figure with allegations that "70-90%" of the commission from directed brokerage trades "would be credited or paid to one or more of the Defendants," Compl. ¶ 55, but, as before, it never alleges even an estimate of how much money was at stake for any given commission.

management for each of the Funds at issue, *see id.* Ex. E, yields the inference that "the amount of revenue Defendants received . . . was in the hundreds of millions per year."  Pl. Br. 17.  "On a standard transaction of $10,000," they contend, "Defendants would receive $276,810,625 per year on the sale of shares (a $25 fee for each $10,000 transaction multiplied by 2,275 advisors making 4,867 transactions per year)."  *Id.*  But this calculation, again, is an estimate of the total amount of money received by *all* the financial advisors employed by the defendants from *thousands* of transactions involving *all* of the Shelf-Space Funds, not just the ones at issue in this case.  *See also id.* (calculating "[a] close estimate of the amount of quarterly fees per year" to be "in or close to the hundreds of millions of dollars").  That extrapolation is no substitute for pleading with particularity the claim that the amount of revenue sharing received by the financial advisors in this case was significant.

    With a proper focus on the potential bias of a particular financial advisor concerning a particular investment, the calculation at most reveals that individual financial advisors stood to gain $25 on a standard transaction.[5]  Such an inference satisfies the particularity requirements, but it does not withstand the motion to dismiss pursuant to Rule 12(b)(6).  As the Second Circuit has recognized, "[i]f brokerage firms are slightly inflating the cost of their transaction fees, the remedy is competition among the firms in the labeling and pricing of their services, not resort to the securities fraud provisions."  *Feinman*, 84 F.3d at 541.  Though more than "a dollar or two" is allegedly at stake for a financial advisor, *id.*, I conclude

---

[5]    Actually, it reveals nothing so particular, since the "standard" $10,000 transaction benchmark is supplied not by the complaint but by the plaintiffs' brief.  In a letter submitted after oral argument, the plaintiffs calculated the particular revenue-sharing amount "owed upon purchase for each Plaintiff" from the number of shares each plaintiff purchased and the price per share.  Letter of Mark Levine, Aug. 3, 2007, at 1-2 (citing Compl. Ex. D).  Each dollar amount supplied was greater than $25, but no amount was greater than $175.07.

that the defendants' disclosure that their financial advisors stood to gain $25 from convincing a particular investor to buy Shelf-Space Fund interests would not have been *substantially* likely to be viewed by a reasonable investor as significantly altering the total mix of information available.  Because the disclosure of such a payment would not have been material, the allegation does not state a claim upon which relief can be granted.

The allegations with respect to ticket charges are also legally insufficient.  The claim that ticket charges paid by the Funds on behalf of the defendants "were at a minimum of $12 during the Class Period" is pled with the requisite specificity, because it focuses on what "each AIG advisor" stood to receive from a given transaction.  Compl. ¶ 58.[6]  But it pleads far too small a dollar amount to sufficiently allege materiality.

The plaintiffs argue that my focus on the payments to particular financial advisors from particular transactions is inappropriate, because the Shelf-Space payments "should be assessed in their totality in order to decide whether Plaintiffs were receiving biased advice."  Pl. Br. 18.  In general, they argue, bias can be inferred from summing up the payments going to thousands of financial advisors conducting thousands of transactions with funds that the plaintiffs never bought shares in, because "any reasonable investor would want to know the extent of [the] Shelf-Space program as a whole in order to understand the impact of the program on the recommendation of the AIG advisor."  *Id.* at 16.  I agree with the plaintiffs that the question whether their financial advisors were biased concerns "the impact" of Shelf-Space

---

[6]  The complaint also characterizes the "effect" of the ticket charge payments as "staggering," because "[a] typical AIG advisor conducted approximately 4,867 transactions per year during the Class Period," which at $12 a charge "meant that each AIG advisor would earn approximately $58,400 more from selling Shelf-Space Funds than from selling non-Shelf-Space Funds," and all the advisors together "made approximately $132,860,000."  Compl. ¶ 59.  As I have explained, this sort of general allegation does not withstand the motion to dismiss pursuant to Rule 9(b) and the PSLRA.

payments on the advice they dispensed.  But I disagree that that impact had anything to do with "the extent of [the] Shelf-Space program as a whole."  The plaintiffs in this case claim the advice they received on certain transactions was biased.  Whether that is true depends only on what their financial advisors stood to gain from the transactions at issue.  The plaintiffs have not persuaded me otherwise.

Even if the bias of a financial advisor concerning a particular transaction with a particular Fund could be inferred from payments not involving that advisor, that transaction, or that Fund, the new complaint still would not adequately explain why the plaintiffs' advisors were biased.  The major premise of the plaintiffs' bias theory is that advisors who expect to receive more money from one fund than another have an interest in advancing the more generous fund's interests and not the other's.  That is why the plaintiffs refer to the Shelf-Space payments as "incentives."  Compl. ¶ 48 ("Defendants' financial advisors should have referred other funds than the Shelf-Space Funds to investors, but . . . the incentives and pressure biased the AIG Brokers and caused them to do otherwise.").  But the complaint never mentions what the defendants' financial advisors stood to receive from recommending a non-Shelf-Space Fund's shares.  Without an adequate explanation why the advisors would choose to recommend Shelf-Space Funds over other funds, the complaint lacks an adequate explanation why the advisors were biased.[7]

---

[7]     The plaintiffs argue that the new complaint "unequivocally alleges that the Shelf-Space payments were only being made by the Shelf-[S]pace Funds," and that other non-Shelf-Space funds were not making the same payments."  Pl. Br. 18.  But the cited portions of the complaint do not support the proposition that the Shelf-Space payments were greater than other potential payments to the financial advisors.  And the allegation "that Defendants did not promote other funds at all," *id.*, does not explain why the defendants were biased -- it begs the question.

CONCLUSION

I conclude that an inference of bias cannot properly be drawn from the plaintiffs' allegations.  Their latest complaint remains improperly focused on the systemic, not the particular.  It is accordingly dismissed with prejudice.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (district court has discretion to deny leave to amend after second dismissal under Rule 9(b) and the PSLRA).  I therefore have no occasion to address the defendants' other arguments for dismissal.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
        September 20, 2007

10